1  MICHAEL J. HADDAD (SBN 189114)
   JULIA SHERWIN (SBN 189268)
2  TERESA ALLEN (SBN 264865)
3  HADDAD & SHERWIN LLP
   505 Seventeenth Street
4  Oakland, CA 94612
   Telephone:    (510) 452-5500
5  Facsimile:    (510) 452-5510

6  Attorneys for Plaintiffs

7                    **UNITED STATES DISTRICT COURT**

8                    **EASTERN DISTRICT OF CALIFORNIA**

9

10 JOHN ADENA, Deceased, by and through his Co-      )
   Successors in Interest, CIRCE ADENA and           )
11 RICHARD ADENA; CIRCE ADENA, Individually,         )
   and RICHARD ADENA, Individually,                  )
12                                                    )    **Case No.**
             Plaintiffs,                              )
13       vs.                                          )    **COMPLAINT FOR DAMAGES,**
                                                      )    **DECLARATORY AND**
14 SHASTA COUNTY, a public entity; SHASTA            )    **INJUNCTIVE RELIEF, AND**
15 COUNTY SHERIFF-CORONER TOM BOSENKO,              )    **DEMAND FOR JURY TRIAL**
   in his individual capacity; CAPTAIN DAVE KENT;    )
16 SHASTA COUNTY JAIL DEPUTIES KIRK                  )
   SCHRITTER, DEVIN HURTE, DEPUTY DIAZ,              )
17 EMMANUAL ALCAZAR, ZACHARY                          )
18 JURKIEWICZ, JOSEPH GRADY, NATHANIAL               )
   NEVES, HECTOR CORTEZ; WELLPATH INC., a            )
19 Delaware corporation; WELLPATH                    )
   MANAGEMENT, INC., a Delaware Corporation;         )
20 WELLPATH LLC, a Delaware Limited Liability        )
   Company; TRACY LEWIS, L.M.F.T.; PAM               )
21 JOHANSEN, L.C.S.W.; DANIEL DELLWO, P.A.;          )
22 and DOES 1–20; individually, jointly and severally, )
                                                      )
23                                                    )
                                                      )
24                                                    )
                                                      )
25              Defendants.                           )

26

27

28

COMPLAINT AND JURY DEMAND

Plaintiffs, by and through their attorneys, HADDAD & SHERWIN LLP, for their Complaint against Defendants, state as follows:

### JURISDICTION

1.      This is a civil rights wrongful death/survival action arising from Defendants' use of excessive force and deliberate indifference to the serious medical and mental health needs of pretrial detainee, JOHN ADENA, resulting in his death on September 22, 2019, at the Shasta County jail.  This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth and Fourteenth Amendments to the United States Constitution, and the laws and Constitution of the State of California.  Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343. Plaintiffs further invoke the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367, to hear and decide claims arising under state law.

### INTRADISTRICT ASSIGNMENT

2.      A substantial part of the events and/or omissions complained of herein occurred in the City of Redding, Shasta County, California.  Pursuant to Eastern District of California Civil Local Rule 120(d), this action is properly assigned to the Sacramento Division of the United States District Court for the Eastern District of California.

### PARTIES AND PROCEDURE

3.      Plaintiff CIRCE ADENA is the mother of Decedent JOHN ADENA and a resident of the State of California.  Plaintiff CIRCE ADENA brings these claims individually and as Co-Successor in Interest for her son, Decedent JOHN ADENA, pursuant to California Code of Civil Procedure §§ 377.10 *et seq*. and federal civil rights laws.  Decedent JOHN ADENA had no spouse or children.  A successor in interest declaration is filed herewith.

4.      Plaintiff RICHARD ADENA is the father of Decedent JOHN ADENA and a resident of the State of California.  Plaintiff RICHARD ADENA brings these claims individually and as Co-Successor in Interest for his son, Decedent JOHN ADENA, pursuant to California Code of Civil Procedure §§ 377.10 *et seq*. and federal civil rights laws.  Decedent JOHN ADENA had no spouse or children.  A successor in interest declaration is filed herewith.

5.      Plaintiffs bring these claims pursuant to California Code of Civil Procedure §§ 377.20 et seq. and 377.60 et seq., which provide for survival and wrongful death actions.  Plaintiffs

also bring their claims individually and on behalf of Decedent JOHN ADENA on the basis of 42 U.S.C. §§ 1983 and 1988, the United States Constitution, federal and state civil rights law, and California law.  Plaintiffs also bring these claims as Private Attorneys General, to vindicate not only their rights, but others' civil rights of great importance.

6.      Defendant SHASTA COUNTY ("COUNTY") is a public entity, duly organized and existing under the laws of the State of California.  Under its authority, the COUNTY operates the Shasta County Sheriff's Office (SCSO).

7.      Defendant SHERIFF-CORONER TOM BOSENKO ("BOSENKO"), at all times mentioned herein, was employed by Defendant COUNTY as Sheriff-Coroner for the COUNTY, and he was acting within the course and scope of that employment.  In that capacity, Defendant BOSENKO was a policy making official for the COUNTY OF SHASTA.  Further, Defendant BOSENKO was ultimately responsible for the provision of medical care to inmates at the COUNTY jail, including assessment of possible mental health needs, and all COUNTY policies, procedures, and training related thereto.  He is being sued in his individual capacity.

8.      Defendant CAPTAIN DAVE KENT ("KENT"), at all times mentioned herein, was employed by Defendant COUNTY as Jail Commander and Captain of the Custody Division, including the jail, for the COUNTY, and he was acting within the course and scope of that employment.  In that capacity, Defendant KENT was a policy making official for the COUNTY OF SHASTA.  Further, Defendant KENT was responsible for the general management and control of the Custody Division, with primary authority and responsibility for the operations, staff assignments, program development, personnel supervision and training, maintenance and auxiliary inmate services at the jail, subordinate only to the Sheriff and/or Undersheriff.

9.      Defendant DEPUTY KIRK SCHRITTER ("SCHRITTER"), at all times mentioned herein, was employed by Defendant COUNTY as a corrections deputy at the jail, and was acting within the course and scope of that employment.

10.      Defendant DEPUTY DEVIN HURTE ("HURTE"), at all times mentioned herein, was employed by Defendant COUNTY as a corrections deputy at the jail, and was acting within the course and scope of that employment.

11.     Defendant DEPUTY DIAZ ("DIAZ"), at all times mentioned herein, was employed by Defendant COUNTY as a corrections deputy at the jail, and was acting within the course and scope of that employment.

12.     Defendant DEPUTY EMMANUAL ALCAZAR ("ALCAZAR"), at all times mentioned herein, was employed by Defendant COUNTY as a corrections deputy at the jail, and was acting within the course and scope of that employment.

13.     Defendant DEPUTY ZACHARY JURKIEWICZ ("JURKIEWICZ"), at all times mentioned herein, was employed by Defendant COUNTY as a corrections deputy at the jail, and was acting within the course and scope of that employment.

14.     Defendant DEPUTY JOSEPH GRADY ("GRADY"), at all times mentioned herein, was employed by Defendant COUNTY as a corrections deputy at the jail, and was acting within the course and scope of that employment.

15.     Defendant DEPUTY NATHANIAL NEVES ("NEVES"), at all times mentioned herein, was employed by Defendant COUNTY as a corrections deputy at the jail, and was acting within the course and scope of that employment.

16.     Defendant DEPUTY HECTOR CORTEZ ("CORTEZ"), at all times mentioned herein, was employed by Defendant COUNTY as a corrections deputy at the jail, and was acting within the course and scope of that employment.

17.     Defendants WELLPATH INC., WELLPATH MANAGEMENT, INC., AND WELLPATH LLC ("WELLPATH"), were at all times herein mentioned alter-egos of each other, sharing money, resources, policies, practices, officers, directors, attorneys, and management, each organized under the laws of the State of Delaware and licensed to do business in California. Defendant WELLPATH provided medical, mental health, and nursing care to pretrial and post-conviction detainees and inmates in Shasta County Jail and Juvenile Hall, pursuant to a contract with the COUNTY OF SHASTA.  On information and belief, WELLPATH and their employees and agents are responsible for making and enforcing policies, procedures, supervision, and training related to the medical care of inmates and detainees in Defendant COUNTY OF SHASTA's jails, including but not limited to assessment of inmate-patients for mental health and emergency medical needs, sending patients for emergency medical care and mental health care, and providing suicide

prevention precautions.  On information and belief, WELLPATH and its employees and agents are and were at all material times responsible for making and executing policies, procedures, supervision, and training related to the medical care and/or mental health care of detainees and inmates in the COUNTY OF SHASTA jails, including, but not limited to, properly assessing and classifying inmates, properly sending inmates for emergency medical and mental health care, properly assessing and addressing the mental health needs of inmates, properly assessing and treating the serious medical and mental health needs of inmates, including suicide prevention, observation of suicidal and potentially suicidal inmates, mental illness, and emotional disturbance. Defendants TRACY LEWIS, L.M.F.T., PAM JOHANSEN, L.C.S.W., DANIEL DELLWO, P.A.-- as well as certain DOE DEFENDANTS including, but not limited to WELLPATH employees and agents acting within the course and scope of their employment with WELLPATH (and within the course and scope of their employment by COUNTY by virtue of WELLPATH's contract with COUNTY) -- were all responsible for properly assessing and addressing the medical needs of inmates, properly assessing and addressing the mental health needs of inmates, properly assessing and treating the serious medical needs of inmates, providing appropriate observation and a treatment plan for serious medical needs, including suicide prevention, care and treatment for mental illness and emotional disturbance, monitoring inmates, and summoning emergency medical care when it was needed.

18.     Defendant TRACY LEWIS, L.M.F.T., was at all material times employed by Defendant WELLPATH as a Licensed Marriage and Family Therapist, and acted within the course and scope of that employment.  As set forth below, Defendant LEWIS failed to properly assess and address MR. ADENA's mental health needs, failed to request appropriate suicide precautions for MR. ADENA in, and following his discharge from, the safety cell, failed to send MR. ADENA to the hospital when he was not improving in the safety cell, failed to request or institute any increased observation of MR. ADENA while he was in the safety cell or following his discharge from the safety cell, and failed to create a treatment plan for MR. ADENA, among other failures, all with deliberate indifference to MR. ADENA's serious mental health needs.

19.     Defendant PAM JOHANSEN, L.C.S.W., was at all material times employed by Defendant WELLPATH, as a Licensed Clinical Social Worker and acted within the course and

scope of that employment.  As set forth below, Defendant JOHANSEN failed to properly assess and address MR. ADENA's medical and mental health needs, failed to request appropriate suicide precautions for MR. ADENA following his discharge from the safety cell, failed to request or institute any increased observation of MR. ADENA in the safety cell or following his discharge from the safety cell, failed to create a treatment plan for MR. ADENA, and failed to summon appropriate and emergency medical care for MR. ADENA when he informed her he was sick, vomiting, and needed medical attention, among other failures, all with deliberate indifference to MR. ADENA's serious mental health needs.

20.     Defendant DANIEL DELLWO, P.A., was at all material times employed by Defendant WELLPATH as a Physician's Assistant and acted within the course and scope of that employment.  Defendant DELLWO failed to properly assess and address MR. ADENA's medical and mental health needs, failed to request appropriate suicide precautions for MR. ADENA, failed to transfer MR. ADENA to the hospital for appropriate medical care for what Defendant suspected was psychosis that may have an "organic" cause, failed to institute constant observation of MR. ADENA, failed to send MR. ADENA to the hospital when he was not improving in the safety cell, failed to request appropriate mental health and suicide precautions for MR. ADENA following his discharge from the safety cell, failed to request or institute any increased observation of MR. ADENA following his discharge from the safety cell, and failed to create a treatment plan for MR. ADENA, among other failures, all with deliberate indifference to MR. ADENA's serious mental health needs.

21.     Plaintiffs are ignorant of the true names and capacities of Defendants DOES 1-20 (DOE Defendants") and therefore sues these Defendants by such fictitious names.  Plaintiffs are informed and believe and thereon allege that each Defendant so named is responsible in some manner for the injuries and damages sustained by Plaintiffs as set forth herein.  Plaintiffs will amend their complaint to state the names and capacities of each DOE DEFENDANT when they have been ascertained.

22.     Plaintiffs are informed and believe and thereon allege that each of the Defendants were at all material times an agent, servant, employee, partner, joint venturer, co-conspirator, and/or alter ego of the remaining Defendants, and in doing the things herein alleged, was acting within the

course and scope of that relationship.  Plaintiffs are further informed and believe and thereon allege that each of the Defendants herein gave consent, aid, and assistance to each of the remaining Defendants, and ratified and/or authorized the acts or omissions of each Defendant as alleged herein, except as may be hereinafter specifically alleged.  At all material times, each Defendant was jointly engaged in tortious activity and an integral participant in the conduct described herein, resulting in the deprivation of Plaintiffs' and Decedent's constitutional rights and other harm.

23.     At all material times, each Defendant acted under color of the laws, statutes, ordinances, and regulations of the State of California and Shasta County.

24.     Plaintiffs timely and properly filed tort claims with Shasta County pursuant to California Government Code sections 910 et seq., and this action is timely filed within all applicable statutes of limitation.

25.     This complaint may be pled in the alternative pursuant to Federal Rule of Civil Procedure 8(d).

### GENERAL ALLEGATIONS

26.     Plaintiffs reallege each and every paragraph in this complaint as if fully set forth here.

27.     JOHN ADENA was a 31-year-old man who had close relationships with his parents and siblings.



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



Although MR. ADENA had earlier trained to be a fire fighter and paramedic, he had worked at Mercy Medical Center hospital for eight years, most recently as a heart monitor technician, before losing his job in July 2019.  Around that time, MR. ADENA began acting strangely and erratically and started to exhibit signs of mental illness, including paranoia, inconsistent with his typical personality and behavior.  His sudden shift in behavior was alarming to his family and friends.

28.     MR. ADENA had no history of assaultive behavior and no criminal record, but on August 17, 2019, he was arrested and charged with violations of Cal. Penal Code §§242 and 647(f) for misdemeanor battery and disorderly conduct.  The incident that gave rise to MR. ADENA's arrest indicated that MR. ADENA was suffering from a serious mental illness.  The arresting Redding police officers reported that "[MR. ADENA] was not making any sense and appeared to be confused and did not know where he was."  Upon arrival at the Shasta County jail, COUNTY Deputy Espinoza completed a medical prescreening form prior to MR. ADENA's admission into the jail and noted that MR. ADENA admitted that he had been suicidal three hours prior, but MR. ADENA was not placed in a safety cell for his own protection or referred to a mental health clinician for an evaluation despite obvious signs that he was suffering from a mental health crisis. MR. ADENA was simply housed in a sobering cell and released the following day.

29.     On or about August 21, 2019, MR. ADENA was arrested again and charged with two misdemeanors for violating California Penal Code §148(a)(1)(resisting or obstructing a peace officer in the performance of his duties) and §594(a)(1) (vandalism) in Shasta Lake City, California. The arresting Shasta County deputies recognized MR. ADENA from a previous encounter, and knew that he suffered from mental health issues, yet when MR. ADENA did not immediately comply with their orders, likely due to his mental health issues, Shasta County Sheriff's deputies Tased MR. ADENA – the razor-sharp barbed probes striking him in the right bicep and right forearm – and delivered multiple drive stuns to his right shoulder, causing continuous pain and incapacitation.  The arresting Shasta County deputies also punched MR. ADENA multiple times in his rib cage area.  The deputies then transported MR. ADENA to the hospital for medical clearance before escorting him to Shasta County jail.

30.     Upon arrival at the Shasta County jail, COUNTY Deputy Van Gerwen conducted the medical prescreening prior to MR. ADENA's admission into the jail.  Deputy Van Gerwen knew, but concealed the fact, that force was used to effectuate MR. ADENA's arrest even though MR. ADENA was brutally beaten and Tased multiple times by the arresting deputies.

31.     Throughout his incarceration, COUNTY Defendants continuously ignored signs that MR. ADENA suffered from a mental health illness and repeatedly engaged in or permitted unnecessary uses of significant force against MR. ADENA, including unreported and concealed beatings, without provocation, ultimately resulting in his death.

32.     Within hours of being booked into the jail on August 21, 2019, at approximately 6:55 p.m., JOHN ADENA, clearly suffering from a mental health condition, was placed in a holding cell with several other inmates.  A fight erupted between the inmates, including MR. ADENA, and several deputies arrived at the cell, including COUNTY Defendants KIRK SCHRITTER ("SCHRITTER") and DEVIN HURTE ("HURTE").  Defendant SCHRITTER reported that MR. ADENA ignored his commands to lie on his stomach on the cell floor and that MR. ADENA resisted Defendant SCHRITTER's efforts to pull MR. ADENA onto the floor by pulling his arms into his chest.  Reportedly, MR. ADENA began yelling, kicking, and flailing his body around as the deputies tried to force him to the ground.  Defendants SCHRITTER and HURTE knew or should have known that MR. ADENA was clearly suffering from a mental health condition, yet, rather than treat his passive resistance and inability to follow instructions with compassion and understanding, COUNTY Deputy Gonzalez Tased MR. ADENA in dart mode, striking him his lower back, then applied a drive stun to the back of MR. ADENA's right thigh.  It is well known in law enforcement that use of a Taser constitutes an intermediate, significant use of force causing severe excruciating pain that radiates throughout the body as electrical impulses and instantly overrides the victim's central nervous system, paralyzing the muscles throughout the body and rendering the target limp and helpless.  The use of the Taser in drive stun mode is purely to inflict pain.  On information and belief, Deputy Gonzalez Tased MR. ADENA for at least a full five-second cycle each time.

33.     Defendants then requested the Shasta County District Attorney's office to file two additional misdemeanor charges against MR. ADENA for allegedly violating Penal Code § 243(B) (battery) and Penal Code § 148 (resisting/obstructing a peace officer).

34.     The next day, on August 22, 2019, a WELLPATH nurse attempted to do a neurological check on JOHN ADENA to monitor his condition following the injuries he received the previous day.  The nurse was accompanied by COUNTY Defendant SCHRITTER and Deputies Decker and Van Gerwen to MR. ADENA's cell.  When the deputies opened the cell, MR. ADENA began exhibiting signs of obvious mental illness, including making incoherent statements, then rolled onto his back and tucked his knees up to his chest and began rocking forward.  MR. ADENA clearly did not pose a threat to the deputies.  Yet, the deputies entered the cell and, without provocation, forcibly rolled MR. ADENA over on his side and collectively used painful twist lock, figure four, and bar arm compliance holds to handcuff MR. ADENA.  As a result of Defendant SCHRITTER and Deputies Decker and Van Gerwen's aggressive tactics, MR. ADENA unnecessarily suffered a bloody nose during this encounter, possibly while handcuffed.  On information and belief, there was no need to use any force under these circumstances.

35.     While maintaining their painful control holds, Defendant SCHRITTER and Deputies Decker and Van Gerwen brought MR. ADENA to the medical division of the jail to be assessed for his injuries.  While awaiting medical attention, MR. ADENA allegedly began to resist the deputies, possibly passively.  The deputies resumed their unnecessary uses of force when Deputy Stewart, who was assigned to the medical division, grabbed MR. ADENA by the back of his head and forced his head in between his legs, Deputy Decker took control of MR. ADENA's right arm using a c-grip compliance hold.  Defendant SCHRITTER and Deputy Decker pulled MR. ADENA down to the floor while continuing to use painful arm, wrist, and figure four control holds.  Deputy Webb then pinned MR. ADENA's head down to the floor.  Deputy Van Gerwen then applied leg restraints to MR. ADENA's ankles.  MR. ADENA consented to an injection consisting of Benadryl and Haldol for sedation.  Defendants then carried MR. ADENA to Booking Sobering Cell 4 where they continued to use unnecessary bar arm and figure four holds while MR. ADENA was drugged,

1   handcuffed and non-threatening.  As the deputies removed the handcuffs and backed out of the cell,

2   MR. ADENA rolled back onto his back and resumed rocking back and forth with his knees tucked

3   up to his chest.  On information and belief, MR. ADENA continued to show signs of mental illness

4   throughout this encounter and was likely confused, disoriented, and fearful as a result of his mental

5   disorder.

6         36.     Defendants then requested the Shasta County District Attorney's office to file two

7   felony charges against MR. ADENA for allegedly violating Penal Code § 69 (resisting/obstructing

8   an executive officer with threats of violence) and one misdemeanor count of Penal Code § 148

9   (resisting/obstructing a peace officer) – which would have the effect of prolonging his jail

10   incarceration under Defendants' care.

11         37.     That same day, WELLPATH Defendant TRACI LEWIS, L.M.F.T. ("LEWIS"),

12   contacted MR. ADENA's parents, Plaintiffs CIRCE and RICHARD ADENA, to gather information

13   about MR. ADENA's mental health and suicide history.  Plaintiffs told Defendant LEWIS that MR.

14   ADENA had begun exhibiting signs and symptoms of mental illness after recently losing his job

15   and home, and having to move in with his parents, and that he had no history of drug use or mental

16   health history.

17         38.     The following day, on August 23, 2019, WELLPATH Defendant PAM JOHANSEN,

18   LCSW ("JOHANSEN"), evaluated MR. ADENA in the mental health clinic.  Defendant

19   JOHANSEN reported that MR ADENA was escorted to the mental health clinic by several

20   deputies.  MR. ADENA told Defendant JOHANSEN that he worked at a hospital until a few

21   months prior and explained, "I lost my job, I got fired, lost my house."  COUNTY DOE Defendants

22   alleged to Defendant JOHANSEN that MR. ADENA "stomped on our feet" the day before.

23   Defendant JOHANSEN noted that MR. ADENA appeared sad, confused, and anxious and that she

24   tried to gather additional information concerning MR. ADENA's mental health, but, although MR.

25   ADENA was cooperative and polite, she suspected that the presence of numerous deputies deterred

26   him from being more forthcoming with information.  Defendant JOHANSEN did nothing to

27   evaluate MR. ADENA in private or try to engage him in a supportive conversation to draw out what

28

1    Defendants were doing to MR. ADENA in jail.  Defendant JOHANSEN noted that she would

2    reattempt her evaluation of MR. ADENA the next day.

3         39.    On August 24, 2019, at approximately 10:26 a.m., Defendant JOHANSEN

4    performed the initial mental health assessment on MR. ADENA.  She reported that MR. ADENA

5    repeated that he had recently been fired from his job after 8 years and became homeless.  Defendant

6    JOHANSEN further reported that MR. ADENA experienced auditory hallucinations and expressed

7    feelings of hopelessness, helplessness, and guilt/worthlessness related to losing his job and

8    becoming homeless, explaining, "I have lost everything. I have no one."  Defendant JOHANSEN

9    also noted that MR. ADENA appeared disheveled, hopeless, paranoid, anxious, and confused and

10   making incoherent statements such as, "people were following me, they were after my car."

11        40.    Later that day, at approximately 12:04 p.m., Defendant JOHANSEN evaluated MR.

12   ADENA again and noted that MR. ADENA informed her that he had finally slept well after being

13   awake for three days.  Defendant JOHANSEN wrote that MR. ADENA continued to appear

14   anxious and that he exhibited possible paranoid ideation as he continued to talk about, "people who

15   don't like me, people were after me."   Defendant JOHANSEN reported that she suspected MR.

16   ADENA was suffering from drug induced psychosis, despite having been in Defendants' jail

17   custody for three days without access to any drugs.

18        41.    On August 26, 2019, COUNTY Defendants HURTE, DIAZ, ALCAZAR, and

19   JURKIEWICZ, escorted MR. ADENA from booking to medical via a "chain-all movement" for an

20   evaluation with WELLPATH Defendant Daniel DELLWO, P.A. ("DELLWO").  On information

21   and belief, a chain-all movement requires belly chains with wrist cuffs and leg irons to significantly

22   limit an inmate's mobility.  Defendant DELLWO evaluated MR. ADENA and reported that had no

23   history of mental health issues but, "is clearly struggling with these issues."   When Defendant

24   DELLWO asked MR. ADENA if he had ever been on mental health medication, MR. ADENA

25   replied, "I don't need any fucking [mental health] meds," then tried to run out of the medical exam

26   room while he was in handcuffs, leg irons and belly chains.

27

28

42.     As MR. ADENA attempted to run out of the room, Defendants DIAZ and HURTE, on information and belief, tackled him and forced him to the ground.  Defendant DIAZ then grabbed MR. ADENA's left wrist and Defendant JURKIEWICZ grabbed his right wrist, and together they forcibly twisted MR. ADENA's handcuffed wrists behind his back using painful rear wrist lock compliance holds.  Defendants DIAZ and JURKIEWICZ threw MR. ADENA up against a wall.  Deputy Brown, who had arrived to the scene with multiple other deputies, took over control of MR. ADENA's left arm.  MR. ADENA allegedly began to "physically resist" – although he was fully restrained by the belly chain, handcuffs, shackles, and deputies' control holds – but none of the deputies reported that MR. ADENA had struck them during this altercation.  On information and belief, MR. ADENA's "resistance" consisted of trying to pull his body away from the deputies to prevent further injuries.  On information and belief, DOE Defendants were present and observed and/or participated in this use of excessive force by Defendants HURTE, DIAZ, ALCAZAR, and JURKIEWICZ and failed to intervene to stop it or to protect MR. ADENA, exhibiting callousness and deliberate indifference to MR. ADENA's well-being and medical needs.  Defendants HURTE, DIAZ, ALCAZAR, and JURKIEWICZ then carried MR. ADENA to his cell by his arms and legs.  MR. ADENA was housed in cell 3C16 at the time, which required the deputies to take the elevator to level 3.

43.     On information and belief, COUNTY Defendants have perpetuated a pervasive practice of severely beating and causing significant injuries to inmates during what has been known as "elevator rides."  In addition, COUNTY Defendants conduct "elevator rides" in inmates' cells by placing magnetic boards on the windows of cells to conceal what is happening in those cells from other inmates.  Plaintiffs are informed and believe and thereon allege that COUNTY Defendants put magnets over the cell windows while they beat and brutalized JOHN ADENA, in an attempt to conceal that abuse from other inmate-witnesses.  On information and belief, as a custom and practice, deputies do not document such beatings and uses of excessive force.

44.     On information and belief, COUNTY Defendants HURTE, DIAZ, ALCAZAR, JURKIEWICZ, and DOES caused severe injuries to MR. ADENA during this "elevator ride" to

level 3, and possibly during other "elevator rides" throughout his incarceration, and furthermore during multiple beatings in his cells.

45.     Once Defendants HURTE, DIAZ, ALCAZAR, and JURKIEWICZ exited the elevator, they carried MR. ADENA to his cell and placed him on the floor.  Defendants continued utilizing unnecessary painful figure four pain compliance holds and rear wrist lock compliance holds as they removed the handcuffs, belly chains, and leg irons.  As Defendants exited the cell, Defendant HURTE drive stunned MR. ADENA in his lower back for at least a full five second cycle with his Taser.  On information and belief, MR. ADENA was incapacitated before being Tased and would not have been a threat to anyone.  Yet, Defendant HURTE drive stunned MR. ADENA again in the lower back for at least another full five second cycle.  After these unnecessary and grossly disproportionate uses of force, and while MR. ADENA was likely incapacitated and unable to pose any threat to anyone, Defendants continued using painful controls holds on MR. ADENA until they exited the cell.  On information and belief, Defendants HURTE, ALCAZAR, JURKIEWICZ, and DIAZ failed to summon medical attention for MR. ADENA after their multiple uses of excessive force.

46.     Following this incident, Defendant DIAZ wrote up MR. ADENA for violating inmate rules and regulations.  A disciplinary hearing was held and MR. ADENA, who was incapacitated by his mental illness as COUNTY Defendants knew, was found guilty.  He received 30 days disciplinary lockdown and loss of all privileges from September 6, 2019, until October 6, 2019.  On information and belief, MR. ADENA's obvious mental health illness was ignored during this hearing, and rather than get him the help he desperately needed, Defendants further penalized him.

47.     On or about September 16, 2019, at approximately 4:45 a.m., MR. ADENA was brought to the emergency room at Shasta Regional Medical Center after he reportedly fell off the top of his bunk bed and hit the back of his head on the hard cement floor.  MR. ADENA suffered severe 2-centimeter posterior scalp lacerations requiring staples to seal.  He was cleared to return to jail that same day.

48.   Upon returning back to the jail, MR. ADENA had a telepsychiatry consultation with WELLPATH psychiatrist, Stancil Johnson, M.D.  Dr. Johnson reported that MR. ADENA injured his head by banging it onto a wall, and noted that based on staff reports, MR. ADENA had no significant psychiatric problems (despite extensive charting of Mr. Johnson's significant psychiatric problems in WELLPATH records), although he had previously seen a psychiatrist for anxiety.  Dr. Johnson wrote MR. ADENA a prescription for anxiety and scheduled a follow up appointment for a week later.

49.   WELLPATH Defendant DELLWO then assessed MR. ADENA and observed that the two lacerations on the back of MR. ADENA's head were likely the result of self-harm, rather than from MR. ADENA falling off the top bunk bed, which would cause one laceration from a single impact from the fall, not two or more lacerations.  Defendant DELLWO recommended MR. ADENA be placed in a safety cell due to being a danger to himself for purposely causing his head lacerations.  Although he believed that MR. ADENA's injuries were self-inflicted, Defendant DELLWO failed to create any treatment plan for MR. ADENA.

50.   MR. ADENA was then placed in a safety cell, and on information and belief, with his clothing removed, and given a safety smock and blanket.  Given Defendants' belief that MR. ADENA's serious head injury was self-inflicted, Defendant WELLPATH's Suicide Prevention policy required that MR. ADENA be placed on constant, one-on-one direct observation.  The requirement of constant, 24 hour, 7 day a week observation for inmate-patients who are acutely at risk of suicide is a nationally generally accepted standard.  Defendant WELLPATH's policy required that MR. ADENA receive this constant observation.  However, Defendant COUNTY has refused to provide any cells within its nine-floor jail where patients can receive the required constant observation.  In addition, Defendants COUNTY, BOSENKO, and KENT allow their employees to cover cell windows with magnets which preclude patients from being observed through them, and preclude beatings and abuse of the inmates from being observed.

51.   On September 16, 2019, MR. ADENA was first observed in the safety cell by COUNTY Deputy Lockwood at approximately 10:05 a.m.  COUNTY Defendant DIAZ did not

1  conduct the next check until 12:32 p.m., over two and a half hours later.  Defendant DIAZ waited

2  over another hour to conduct his next check at 1:44 p.m.  COUNTY DOE Defendants failed to

3  conduct any safety cell checks until 5:25 p.m., nearly four hours later.  No COUNTY deputies

4  conducted any further safety cell checks on MR. ADENA for the remainder of the day.

5        52.     On September 17, 2019, at approximately 4:20 p.m., WELLPATH Defendant

6  LEWIS conducted a mental health sick call on MR. ADENA.  Defendant LEWIS noted that MR.

7  ADENA continued to report that his head injuries were caused by him falling out of the top bunk

8  despite Defendants' charted disbelief of this story, including since MR. ADENA always slept on the

9  bottom bunk, and despite Defendant DELLWO reporting that MR. ADENA's injuries were

10  consistent with self-injury or intentional injury by others.  Defendant LEWIS further noted that MR.

11  ADENA was calm and polite, but had a blank stare and flat affect, and that he lacked insight and

12  good judgment.  Defendant LEWIS considered MR. ADENA a "high risk for self-harm," yet failed

13  to create a treatment plan for him or request the required continuous observation of him, in

14  deliberate indifference to his serious medical and mental health needs.

15        53.     On September 17, 2019, COUNTY Defendant JURKIEWICZ and several other

16  COUNTY DOE Defendants continued to allow hours to go by in between their safety cell checks

17  on MR. ADENA, rather than keep him on continuous observation as required by national standards

18  and WELLPATH's policy, or at least conduct two intermittent checks every half hour per the

19  COUNTY's safety cell policy.  Title 15 of the California Code of Regulations requires the checks to

20  include direct visual observation and to be documented.  Defendants simply reported that MR.

21  ADENA was offered water during their checks, without any documentation of MR. ADENA's

22  condition.

23        54.     On September 18, 2019, COUNTY Defendant HURTE and several other COUNTY

24  DOE Defendants also failed to conduct timely safety checks on MR. ADENA, again allowing

25  several hours in between the checks.  Defendants knew that MR. ADENA was suspected of being

26  actively engaged in self-harm.  In addition, it is well known in corrections and correctional

27  healthcare that an inmate who is being abused by other inmates or corrections officers will

28

COMPLAINT AND JURY DEMAND       16

1  commonly fail to report that abuse.  Yet, Defendants persistently failed to provide MR. ADENA

2  with the required observation to keep him safe.

3       55.    WELLPATH Defendant LEWIS conducted another mental health sick call on MR.

4  ADENA on September 18, 2019.  Defendant LEWIS wrote that MR. ADENA, "Continues to report

5  he fell off top bunk, although he is housed alone and has always been observed sleeping on the

6  bottom bunk."  When Defendant LEWIS asked MR. ADENA about his behavior, he replied, "just

7  having a hard time."  Defendant LEWIS noted that MR. ADENA remained a high risk for self-harm

8  and that he would continue on suicide watch in the safety cell.  Again, Defendant LEWIS failed to

9  create a treatment plan for MR. ADENA.

10      56.    On September 18, 2019, MR. ADENA's criminal case was called and a doubt arose

11  as to his competence.  On information and belief, the criminal proceedings against MR. ADENA

12  were suspended and the case was referred by the Shasta County Superior Court for a Penal Code §

13  1368 psychological Evaluation Report to be completed.  The matter was continued to October 23,

14  2019, for receipt of the Penal Code §1368 Evaluation Report.  Plaintiffs CIRCE and RICHARD

15  ADENA attended this hearing and noticed the back of JOHN ADENA's head actively bleeding, on

16  information and belief, from the injuries he suffered at the hands of SHASTA COUNTY deputies.

17      57.    On September 19, 2019, WELLPATH psychiatrist, Dr. Stancil Johnson, wrote a

18  supplemental report following his telepsychiatry appointment with MR. ADENA on September 16,

19  2019, noting inconsistencies in his original report about how MR. ADENA injured himself,

20  observing that MR. ADENA may have been "   [BLANK]   " or engaged in self-injurious

21  behaviors.  Plaintiffs believe and thereon allege that Dr. Johnson was noting MR. ADENA may

22  have been beaten.  Dr. Johnson further indicated that MR. ADENA exhibited signs of paranoia and

23  ordered WELLPATH Defendant DELLWO to do a neurological check on MR. ADENA.

24      58.    That same day, Defendant LEWIS conducted another mental health sick call and

25  again reported that MR. ADENA remained a "high risk for self-harm due to impulsivity, suspected

26  self-injurious behavior, and lack of insight."  Also on September 19, 2019, in a late chart entry not

27  entered until after MR. ADENA's death on September 22, 2019, Defendant LEWIS reported that

28

COMPLAINT AND JURY DEMAND                17

1   she spoke to MR. ADENA's father, Plaintiff RICHARD ADENA, who had inquired about getting

2   help with visiting his son.  Defendant LEWIS wrote that she informed Plaintiff RICHARD ADENA

3   of JOHN ADENA's mental health status and placement in a safety cell.

4          59.     Also on September 19, 2019, a WELLPATH nurse reported that COUNTY deputies

5   informed her that MR. ADENA was "purposely putting toothpaste in his mouth to make it look like

6   he was foaming at the mouth and scraping his knuckles on the ground."  Yet, WELLPATH

7   Defendants failed to request a psychiatric evaluation of MR. ADENA, failed to transfer him for

8   outside emergency psychiatric evaluation, and failed to create a treatment plan for him, with

9   deliberate indifference to his serious medical and psychiatric needs.

10         60.     Again, COUNTY Defendants HURTE, SCHRITTER, and several COUNTY DOE

11  Defendants failed to timely observe MR. ADENA in the safety cell throughout the day on

12  September 19, 2019.  At one point, four hours passed before a COUNTY DOE Defendant

13  conducted a safety cell check on MR. ADENA, in violation of SHASTA COUNTY's safety cell

14  policy.

15         61.     On September 20, 2019, WELLPATH Defendant DELLWO conducted a medical

16  sick call on MR. ADENA.  Defendant DELLWO noted that MR. ADENA had a strange history of

17  no mental health issues his entire life until he lost his job a month before he got arrested.  Defendant

18  DELLWO further noted that after discussions with mental health staff, it was agreed that MR.

19  ADENA would be assessed for organic causes of psychosis.  Yet, Defendant DELLWO ordered no

20  tests or evaluations that would assess any organic causes of psychosis.  In addition, Defendant

21  DELLWO was well aware of JOHN ADENA's long history of serious and unabated mental health

22  issues while he was in jail.  Defendant DELLWO knew that patients whose medical or mental

23  health needs exceed the facility's capabilities to provide care for them, must be transferred to the

24  hospital.  Defendant DELLWO failed to order the transfer of MR. ADENA to the hospital and

25  failed to create a treatment plan for him, all with deliberate indifference to MR. ADENA's serious

26  mental health needs.

27

28

62.     WELLPATH Defendant JOHANSEN also assessed MR. ADENA on September 20, 2019.  Defendant JOHANSEN expressed her doubts to MR. ADENA concerning the credibility of MR. ADENA's account of how he obtained the lacerations to the back of his head and her concerns for his safety.  Defendant JOHANSEN noted that MR. ADENA appeared very anxious, that he stared blankly, and had minimal responses.  She determined that MR. ADENA was too unstable to consider removal from the safety cell.

63.     COUNTY Defendant SCHRITTER and several other COUNTY DOE Defendants continued to leave MR. ADENA unchecked in his safety cell for hours at a time from September 19, 2019, through September 21, 2019, including over four hours on two occasions, even though they knew or should have known that MR. ADENA was considered at high-risk for self-injurious behaviors, it was suspected by WELLPATH staff that the injuries to the back of his head were intentionally inflicted, and that he was exhibiting signs of psychosis.

64.     On September 21, 2019 at approximately 11:30 a.m., WELLPATH Defendant JOHANSEN evaluated MR. ADENA again during a mental health sick call and suddenly discontinued his suicide watch, reporting that MR. ADENA has been cooperative with custody and jail nurses, even though Defendant JOHANSEN suspected that MR. ADENA's injuries were self-inflicted, knew or should have known that he was supposed to be evaluated for organic causes of psychosis, knew he was medication non-compliant, and the day before she deemed MR. ADENA "too unstable" to be released from the safety cell.  Defendant JOHANSEN discharged MR. ADENA from the safety cell with no request for increased observation of him and no treatment plan whatsoever.  On information and belief, inmates suffering from severe mental illnesses are not adequately monitored in the segregated housing unit and do not receive the level of psychiatric care needed to treat their mental illness.  With full knowledge that MR. ADENA suffered from untreated psychosis, and was believed to have recently engaged in self-injurious behavior while housed in his segregated cell just days prior, Defendant JOHANSEN chose to discharge MR. ADENA from the safety cell without any measures taken for continuity of care, without any psychiatric or mental health evaluation or treatment plan, all with deliberate indifference to his serious mental health

needs.  In addition, Defendant JOHANSEN discharged MR. ADENA to be housed alone in a segregated cell, essentially in solitary confinement.  It has been well known in correctional healthcare for decades that housing a severely mentally ill inmate alone in segregation or solitary confinement endangers the patient's mental health and greatly increases the risk of further morbidity and suicide.  It is generally accepted in correctional health care throughout the United States that inmates at risk of suicide who are housed alone in segregated cells must be under constant observation.

65.  On Defendant JOHANSEN's instruction, MR. ADENA was discharged from the safety cell and returned to segregated cell 3C16 without any heightened monitoring.  On information and belief, the COUNTY permits deputies to record "welfare checks" on inmates by utilizing a "PIPE" device that they can swipe against a sensor on the wall outside the cell without ever observing the inmate.  The COUNTY does not require corrections officers to provide the direct visual observation, and documentation of that observation, that California law requires.  On information and belief, deputies at Shasta County jail also openly utilize large white magnets to cover windows outside of cell doors, further preventing inmates from being directly observed during welfare checks and allowing unjustified uses of excessive force by deputies to go unnoticed.

66.  Later that day, at 3:21 p.m., Defendant JOHANSEN observed MR. ADENA in cell 3C16 and reported that MR. ADENA told her: "I am sick, I need to see medical.  I am vomiting."  It is well known in the medical profession that vomiting after a head injury, like MR. ADENA suffered when he claimed to have fallen off of the top bunk, is a sign of traumatic brain injury requiring immediate medical attention.  Defendant JOHANSEN simply noted that she would advise the nursing staff as to MR. ADENA's request, as he was "not likely to put in a sick slip." However, there is no evidence that she actually informed any medical staff of this urgent need for care.  MR. ADENA never received the immediate medical attention he needed and was not observed nor assessed at all in response to his request.

67.  The following day, on September 22, 2019, at approximately 5:00 a.m., WELPATH nurse, Alexandra Jones-Morast, L.V.N., and COUNTY Defendants J. GRADY ("GRADY"),

COMPLAINT AND JURY DEMAND                    20

NATHANIAL NEVES "(NEVES"), and HECTOR CORTEZ ("CORTEZ") were conducting medication rounds when they observed MR. ADENA lying on his left side next to the toilet in his segregated cell flinging his right arm back and forth and moaning with a purple or brown foam like substance coming out of his mouth.  Ms. Jones-Morast spoke to MR. ADENA, but he was unable to respond.  When it was apparent that MR. ADENA was in obvious distress and suffering from some unknown medical condition, Ms. Jones-Morast directed COUNTY Defendants GRADY, NEVES, and CORTEZ to take MR. ADENA to the medical unit to be assessed for a safety cell placement without regard for the possibility that moving him would exacerbate his injuries.

68.     Defendants GRADY, NEVES, and CORTEZ then entered the cell and worked in concert to use excessive force against MR. ADENA.  Defendant NEVES unnecessarily used his full body weight to put MR. ADENA's legs into a figure four compliance hold, even though MR. ADENA was not actively resisting the deputies.  Defendant NEVES reported hearing a gurgling sound while they were attempting to handcuff MR. ADENA while he was prone, which signified for him that MR. ADENA was having a medical emergency.  Without any precautionary measures, and while MR. ADENA was clearly suffering from a serious medical condition, Defendants GRADY, NEVES and CORTEZ dragged MR. ADENA out of the cell by his arms when Defendants determined that he could not walk on his own.  Defendants callously dragged MR. ADENA, face down by his handcuffed arms, throughout level 3C, onto the elevator, and down to the medical unit on the first level.

69.     En route to the medical unit, jail videos captured COUNTY Defendants GRADY, NEVES, and CORTEZ dragging MR. ADENA throughout the jail.  On information and belief, COUNTY Defendants GRADY, NEVES, and CORTEZ also carelessly bumped MR. ADENA's head on a table in the 3C pod as they transported him to the medical unit.  Droplets of blood were later found on the dayroom table in the 3C pod by COUNTY detectives investigating MR. ADENA's death.

70.     Video footage of the elevator ride to the medical unit shows Defendant NEVES needlessly place MR. ADENA's legs into a painful figure four compliance hold using his full body

1   weight while MR. ADENA was clearly under medical distress, prone, handcuffed, not resisting, and

2   unable to pose any threat.  A full view of MR. ADENA in the elevator was obstructed due to

3   Defendants GRADY's and CORTEZ's tactical positioning to block the camera.

4         71.     When Defendants GRADY, NEVES, and CORTEZ arrived in the medical unit they

5   noticed that Mr. ADENA, who had been face down on the elevator ride down from the level 3, had

6   turned purple.  COUNTY deputies immediately began performing life-saving measures.  At this

7   time, Ms. Jones-Morast noticed dark colored blood around MR. ADENA's mouth that she believed

8   looked to be two to three days old.  MR. ADENA's head wounds also bled and there was blood on

9   the floor.  A paramedic and Emergency Medical Technician arrived but were unable to revive MR.

10   ADENA.  MR. ADENA was pronounced deceased at 5:45 a.m.

11         72.     In a supplemental interview conducted by COUNTY detectives nearly three months

12   after MR. ADENA's death, Defendant NEVES recounted that MR. ADENA was behaving

13   strangely immediately after he was discharged from the safety cell the day before.  Defendant

14   NEVES described that throughout his hourly checks, MR. ADENA was moaning and rubbing his

15   hands on the concrete cell floor and that he was lying in various "unnatural positions" in his cell.

16   Defendant NEVES never summoned emergency medical care throughout his hourly checks even

17   though he thought MR. ADENA was having a medical emergency, failed to log any of these

18   observations of MR. ADENA, and failed to initially disclose this information to the COUNTY

19   detectives during his first interview a couple of hours after MR. ADENA's death.

20         73.     In addition, Defendant GRADY informed investigators that "approximately a week

21   ago, Adena fought with deputies,"  Defendants wrote no reports about this "fight" which occurred

22   around the time of MR. ADENA's suffering multiple suspicious bleeding lacerations on the back of

23   his head on September 16, 2019.

24         74.     JOHN ADENA's death in custody is one of 25 reported by the Shasta County

25   Jail since 2006, as reported in a June 24, 2020, article[1] in Redding's Record Searchlight entitled,

26

---

27   [1] https://www.redding.com/in-depth/news/local/2020/06/24/shasta-county-jail-california-inmate-deaths-mental-health-services/5281201002/

28

1   "Dying Inside: Why Are More Deaths Happening in Shasta County Jail Custody?"  JOHN

2   ADENA's death was one of three at the Shasta County Jail in the month of September 2019 alone.

3   Shasta County ranks second in total deaths among California's 10 county jail systems with 10,000

4   to 18,000 annual bookings, based on State data from 2005-2018.  Captain Gene Randall, who

5   currently runs the jail, acknowledged that some deaths in custody are ultimately preventable,

6   responding, "There's no question about it."

7         75.    WELLPATH holds itself and its officers, directors, and managing agents out as

8   experts in the field of correctional healthcare.  WELLPATH is the largest for-profit correctional

9   healthcare provider in the United States, with contracts covering in excess of 550 jails, prisons, and

10  behavioral health facilities in 36 states.

11        76.    Yet, the California Forensic Medical Group, Inc.  ("CFMG"), which was part of the

12  Correctional Medical Group Companies that merged with Correct Care Solutions in 2019 to

13  form WELLPATH and ran all of the companies' services in the State of California, has been

14  criticized for its persistent inadequate health care provided to inmates throughout the State of

15  California.  A January 17, 2015, article[2] in the *Sacramento Bee* entitled, "California for-Profit

16  Company Faces Allegations of Inadequate Inmate Care," reported that CFMG's population-adjusted

17  rate of suicide or drug overdose deaths in custody is 50% higher than non-CFMG counties.  In a 10-

18  year period ending in May 2014, 92 people died of suicide or a drug overdose while in the custody

    of a jail served by CFMG.

19        77.    A July 13, 2020, article[3] in the *Atlantic* entitled, "Private Equity's Grip on Jail

20  Health Care" reported that correctional care is good business, especially as more counties have

21  moved to privatize.  WELLPATH currently serves about 10 percent of the counties in the nation.

22  WELLPATH is expected to enjoy at least $1.5 billion in revenue every year.  WELLPATH and its

23  predecessor companies' contracts with the COUNTY require WELLPATH to pay for all outside or

24

25

26  [2] (https://www.sacbee.com/news/investigations/the-public-eye/article7249637.html)

27  [3]file:///C:/Users/resaf/Downloads/Private%20Equity's%20Grip%20on%20Jail%20Health%20Care
    %20-%20The%20Atlantic.pdf

28

hospital care for inmates up to $25,000, which creates a disincentive for WELLPATH and its employees to send patients off-site for emergency care.

78.     All COUNTY and WELLPATH employed Defendants had actual knowledge that MR. ADENA was suffering from serious emergency medical/psychiatric needs, and all Defendants denied MR. ADENA necessary medical and/or psychiatric care, including necessary emergency care.  Defendants deliberately disregarded MR. ADENA's safety and medical/psychiatric needs in their housing placement, assessment, custody, and care decisions.  On information and belief, due to such deliberate indifference, MR. ADENA's medical/psychiatric condition deteriorated.

79.     Defendants SCHRITTER, HURTE, DIAZ, ALCAZAR, JURKIEWICZ, GRADY, NEVES, CORTEZ, LEWIS, JOHANSEN, DELLWO, and the remaining DOE DEFENDANTS knew and/or must have known that MR. ADENA had serious medical and psychiatric needs requiring emergency treatment, care, and hospitalization, and that with deliberate indifference to such needs, these Defendants, and/or remaining DOES caused MR. ADENA to be deprived of such necessary, life-saving medical and psychiatric care.

80.     Defendants SHERIFF-CORONER TOM BOSENKO and Jail Commander CAPTAIN DAVE KENT, were each briefed and informed throughout MR. ADENA's jail incarceration, and had personal knowledge of, his intake and booking documentation, all of his medical and psychiatric events, all uses of force on him, all disturbances involving him, all safety cell placements, and all disciplinary measures taken against him.  Defendants BOSENKO and KENT knew and/or must have known that MR. ADENA had serious medical and psychiatric needs requiring emergency treatment, care, and hospitalization, and that with deliberate indifference to such needs, they caused MR. ADENA to be deprived of such necessary, life-saving medical and psychiatric care.  Further, Defendants BOSENKO and KENT had actual knowledge of all jail customs and practices described herein, including but not limited to the use of magnets over cell windows to cover-up uses of force and to obscure observation of and by inmates, routine unauthorized and illegal uses of excessive force by deputies that went unreported, and the systematic failure to require written documentation of visual observations and inmate-patients'

condition during PIPE cell checks, all as a matter of routine cover-up and code of silence.  Further, Defendants BOSENKO and KENT were ultimately responsible for all customs, practices, policies, procedures, training, supervision, and investigation at the jail, with direct oversight, command, and personal knowledge in all of those areas.  Defendants BOSENKO and KENT were personally aware of MR. ADENA and his problems at their jail throughout his incarceration, and of their staffs' deliberate indifference to MR. ADENA's rights and safety throughout his incarceration.

81.     According to the official Shasta County autopsy report, MR. ADENA's cause of death was: carotid artery dissection of unclear etiology, with hyponatremia as a significant condition.  The manner of death was considered undetermined.

82.     In addition to the foregoing evidence of the use of unjustified, injurious force on JOHN ADENA, COUNTY Defendants and possibly remaining DOE Defendants, also caused severe injuries to JOHN ADENA that led to his death as noted in the autopsy performed by the COUNTY's forensic pathologist, Deirde Amaro, M.D., on or about September 26, 2019, all evidence of the use of a very high degree of unnecessary force on JOHN ADENA.  The autopsy report included a list of injuries present on MR. ADENA's body during the autopsy:

HEAD/NECK

- A 2.4 x 2 cm red-brown abrasion is on the lower right face.
- A 4 x 4 cm reverse "L"-shaped pink-brown to red-pink abrasion is on the right forehead.
- A 3 x 2 cm orange-brown abrasion/contusion is on the right malar prominence. Posteriorly, is a 1.4 x 1.8 cm orange-pink abrasion/contusion.
- A 3 x 1.8 cm pink-purple contusion and red-brown abrasion is on the right temple, and extended scalp reflection reveals an underlying partial scalp thickness hemorrhage.
- A 3 x 1.5 cm faint pink-brown abrasion/contusion is on the lower left forehead.
- A 2 x 2 cm cluster of punctate pink-brown abrasion/contusions is on the right forehead.

- A 2 x 1 cm pink-brown abrasion/contusion is on the upper left forehead, near the hairline.
- A 5 x 2.5 cm orange-brown to red-brown abrasion extends from the left malar prominence to the left temple, partially surrounding the left eye.
- At the posterior occipital scalp, under the hair, are several healing lacerations:
    a) 4.5 x 0. 7 cm, horizontally oriented, partially healed full thickness, with flanking red-brown abrasion (x 4 surgical staples)
    b) 3 x 1 cm, horizontally oriented, partially healed, with flanking red-brown abrasion ( x 3 surgical staples)
    c) 2.3 x 0.8 cm, vertically oriented, partially healed with granulation tissue
    d) 3 x 1 cm, obliquely oriented, partial thickness, partially healed
    e) 1.5 cm, obliquely oriented, partial thickness, partially healed, with 3 x 2 x 0.4 cm subjacent scalp hematoma
- Numerous oral contusions and lacerations were also identified including: bilateral rectilinear lacerations and contusions extending anteriorly along the buccal mucosa (suggestive of dental injuries); faint petechiael hemorrhages adjacent to the maxillary frenulum; punctate to ovoid red-pink to purple-blue contusions at the upper left mucosae and at the lower left gingiva.
- Punctate contusions involve the bilateral tongue and within the tongue tip.
- A 5 x 1 cm purple-red contusion courses along the underside of the chin, following the right jawline.
- A patch of hemorrhage involves the posterior hypopharynx (may be attributable to intubations attempts).

TORSO

- Irregular, indistinct red-brown abrasions and purple-brown contusions up to 4 x 1.5 cm are on the center chest (may be attributable to CPR).
- Multiple, bilateral anterolateral hemorrhagic rib fractures with overlying soft tissue hemorrhage are present (may be attributable to CPR).
- Approximately 150 mL of blood is recovered from each chest cavity (may be attributable to CPR).
- Anterior mediastinal hemorrhage is present (some of which may be attributable to CPR).
- A 7 x 2 cm dried, leathery, orange-yellow abrasion is on the lateral left chest, near the inferior costal margin.

EXTREMITIES

- 6 x 4.5 cm faint pink-brown contusion with roughly central 2 x 1.8 cm pallor is on the posteromedial right forearm.
- A punctate pink-orange abrasion is on the dorsal right 5th finger, overlying the proximal interphalangeal joint.
- A 1 x 1 cm purple- blue contusion is on the anterior right upper arm.
- A 3.5 x 1 cm purple-red contusion is on the proximal anteromedial right forearm.
- A 2 x 1 cm pink-orange contusion is on the distal anterolateral right forearm.
- A punctate pink-orange abrasion is on the ventral right hand, near the base of the thumb.
- A 4.5 x 2 cm red-pink contusion is on the posteromedial right elbow with subjacent patch of soft tissue hemorrhage.
- A 2.5 x 1.8 cm blue-purple-pink contusion is on the anterior left upper arm.
- Scabbed brown abrasions (1 x 1cm, 1 x 0.4 cm) are on the posterior left elbow.
- A punctate red-orange abrasion is on the dorsal left index finger, overlying the proximal interphalangeal joint.

- A 2 x 2 cm pink-purple contusion is on the anterior right knee. Inferiorly is a punctate red-brown abrasion.
- Large purple-beige contusion nearly covers the dorsal right foot.
- Broad purple-pink contusion with, superiorly, focal partially scabbed 1. 8 x 0.5 cm abrasion, nearly covers the anterior left lower leg with diffuse subjacent soft tissue hemorrhage.
- Purple-brown to purple-gray contusion covers the medial left ankle to medial left foot.
- Subungual hemorrhage involves the left big toe.



ADENA, John
C19-0600        09/26/2019

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15   83.   Decedent's death was proximately caused by the individual COUNTY Defendants'

16   (SCHRITTER, HURTE, DIAZ, ALCAZAR, JURKIEWICZ, GRADY, NEVES, CORTEZ, and

17   DOES) uses of excessive force, violations of standards, and deliberate indifference to Decedent's

18   rights, safety and well-being as set forth above.  Decedents' death was also proximately caused by

19   WELLPATH Defendants' (LEWIS, JOHANSEN, DELLWO, and DOES 1-20) deliberate

20   indifference to MR. ADENA's rights, safety, and serious medical and psychiatric needs, as set forth

21   above.  Decedents' death was also proximately caused by Defendants COUNTY, WELLPATH,

22   BOSENKO, and KENT's deliberate indifference to MR. ADENA's rights, safety, and serious

23   medical and psychiatric needs, as set forth above.

24   84.   Defendants concealed the results of the autopsy, and all information concerning

25   JOHN ADENA's death, for over a year, repeatedly ignoring Plaintiffs' multiple and lawful requests

26   for information about their son's death.  When Defendants finally produced the autopsy report and

27   photographs to Plaintiffs in November 2020, they demonstrated that COUNTY Defendants and

28

possibly one or more WELLPATH and DOE Defendants severely brutalized, beat, stomped, choked, and smothered JOHN ADENA, directly causing his death.  MR. ADENA suffered extensive hemorrhage in his neck and a common carotid artery dissection, cause by blunt force trauma; extensive blunt force trauma to his head, which is deadly force; extensive blunt force trauma on his legs, ankles, and feet, including injuries consistent with severe stomping on his ankles and feet; and smothering to the point that his teeth were imprinted into and tore into the inside of his lips.

85.     JOHN ADENA's death also was proximately caused by Defendant COUNTY's failure to reasonably train and supervise jail deputies who were required to observe, monitor, and protect MR. ADENA.  These substantial failures reflect Defendant COUNTY's policies implicitly or directly ratifying and/or authorizing the routine use of excessive force and deliberate indifference to serious medical needs and the failure to reasonably train, instruct, monitor, supervise, investigate, and discipline deputies employed by Defendants COUNTY and SHERIFF-CORONER TOM BOSENKO ("BOSENKO") in the use of force and deliberate indifference to inmates' serious medical needs.

86.     Decedent's death also was proximately caused by Defendant WELLPATH's failure to reasonably staff, train, supervise, and equip their medical and mental healthcare staff in the proper and reasonable screening, assessment, and care of mentally ill or emotionally disturbed inmates or inmates needing emergency medical treatment; failure to implement and enforce generally accepted, lawful policies and procedures at the jail; and deliberate indifference to the serious medical/psychiatric needs of inmates such as JOHN ADENA.  These substantial failures reflect Defendant WELLPATH's policies implicitly ratifying and/or authorizing the deliberate indifference to serious medical needs by their medical and mental healthcare staff and the failure to reasonably train, instruct, monitor, supervise, investigate, and discipline medical and mental healthcare staff employed by Defendants.

87.     At all material times, and alternatively, the actions and omissions of each Defendant were intentional, wanton, and/or willful, conscience-shocking, reckless, malicious, deliberately

indifferent to Decedent's and Plaintiffs' rights, done with actual malice, grossly negligent, negligent, and objectively unreasonable.

88.     As a direct and proximate result of each Defendant's acts and/or omissions as set forth above, to the extent permitted and pled by the various legal claims set forth below, Plaintiffs sustained the following injuries and damages, past and future, among others:

a.     Wrongful death of JOHN ADENA, pursuant to Cal. Code of Civ. Proc. § 377.60 et. seq.;

b.     Loss of support and familial relationships, including loss of love, companionship, comfort, affection, society, services, solace, and moral support, pursuant to Cal. Code of Civ. Proc. § 377.60 et. seq.;

c.     Plaintiffs' emotional distress [individual familial association claims];

d.     JOHN ADENA's hospital and medical expenses, pursuant to Cal. Code of Civ. Proc. § 377.20 et. seq.;

e.     JOHN ADENA's coroner's fees, funeral and burial expenses, pursuant to Cal. Code of Civ. Proc. § 377.20 et. seq.;

f.     Violation of JOHN ADENA's constitutional rights, pursuant to Cal. Code of Civ. Proc. § 377.20 et. seq. and federal civil rights law;

g.     JOHN ADENA's loss of life, pursuant to federal civil rights law;

h.     JOHN ADENA's conscious pain, suffering, and disfigurement, pursuant to federal civil rights law;

i.     All damages and penalties recoverable under 42 U.S.C. §§ 1983 and 1988, and as otherwise allowed under California and United States statutes, codes, and common law.

**FIRST CAUSE OF ACTION**
**(42 U.S.C. § 1983)**
**AGAINST DEFENDANTS SCHRITTER, HURTE, DIAZ, ALCAZAR, JURKIEWICZ,**
**GRADY, NEVES, CORTEZ, LEWIS, JOHANSEN, DELLWO,**
**AND REMAINING DOES**

89.     Plaintiffs reallege each and every paragraph in this complaint as if fully set forth here.

90.     By the actions and omissions described above, Defendants SCHRITTER, HURTE, DIAZ, ALCAZAR, JURKIEWICZ, GRADY, NEVES, CORTEZ, LEWIS, JOHANSEN, DELLWO, AND REMAINING DOES violated 42 U.S.C. § 1983, depriving Decedent JOHN ADENA, through Plaintiffs herein, of the following clearly established and well-settled constitutional rights protected by the First, Fourth and Fourteenth Amendments to the United States Constitution:

a.     Decedent's right to be free from excessive and unreasonable force and restraint in the course of seizure and as a pretrial detainee, as secured by the Fourth and/or Fourteenth Amendments; and

b.     Decedent's right to be free from deliberate indifference to JOHN ADENA's safety and serious medical needs while in custody as a pretrial detainee as secured by the Fourth and/or Fourteenth Amendments.

c.     Decedent's and Plaintiffs' right to familial association as secured by the First and/or Fourteenth Amendments.

91.     Defendants subjected Decedent to their wrongful conduct, depriving Decedent of rights described herein, knowingly, maliciously, and with conscious and reckless disregard for whether the rights and safety of Decedent and others would be violated by their acts and/or omissions.

92.     As a direct and proximate result of Defendants' acts and/or omissions as set forth above, Decedent, through Plaintiffs herein, sustained injuries and damages as set forth above at ¶ 88.

93.     The conduct of Defendants entitles Plaintiffs to punitive damages and penalties allowable under 42 U.S.C. § 1983 and as provided by law.  Plaintiffs do not seek punitive damages against Defendant SHASTA COUNTY.

94.     Plaintiffs are also entitled to reasonable costs and attorneys' fees under 42 U.S.C. § 1988, and other applicable United States and California codes and laws.

**SECOND CAUSE OF ACTION**
***(Monell* - 42 U.S.C. § 1983)**
<u>**AGAINST DEFENDANTS SHASTA COUNTY and WELLPATH**</u>

95.     Plaintiffs reallege each and every paragraph in this complaint as if fully set forth here.

96.     The unconstitutional actions and/or omissions of Defendants SCHRITTER, HURTE, DIAZ, ALCAZAR, JURKIEWICZ, GRADY, NEVES, CORTEZ, LEWIS, JOHANSEN, DELLWO, AND REMAINING DOES, as well as other employees or officers employed by or acting on behalf of the Defendants COUNTY and/or WELLPATH, on information and belief, were pursuant to the following customs, policies, practices, and/or procedures of Defendants COUNTY and/or WELLPATH, stated in the alternative, which were directed, encouraged, allowed, and/or ratified by policymaking officers for Defendant COUNTY and its Sheriff's Office and/or Defendant WELLPATH, including SHERIFF-CORONER BOSENKO and JAIL COMMANDER KENT:

    a.     To deny pretrial detainees and other inmates access to timely, appropriate, competent, and necessary care for serious medical and psychiatric needs;

    b.     To allow and encourage inadequate and incompetent medical and mental health care for jail inmates and arrestees;

    c.     To house seriously mentally ill patients at high risk of suicide in solitary confinement in segregated cells, thereby increasing their risk of suicide;

    d.     To provide no treatment plan for severely mentally ill inmate-patients;

    e.     To fail to provide necessary and legally required documented observation of inmates, including inmates at risk of suicide or self-harm and/or inmates at risk of harm by others;

    f.     To fail to institute, require, and enforce proper and adequate training, supervision, policies, and procedures concerning handling mentally ill and/or emotionally disturbed persons or persons in medical crisis, or medical emergencies;

    g.     To fail to use appropriate and generally accepted law enforcement procedures for handling mentally ill and/or emotionally disturbed persons or persons in medical crisis;

h.    To tolerate the use of routine, and often unreported, excessive and unnecessary force against inmates;

i.    To cover up violations of constitutional rights by any or all of the following:

    i.    By failing to properly investigate and/or evaluate incidents of violations of rights, including by unconstitutional medical and psychiatric care at the jail;

    ii.    By ignoring and/or failing to properly and adequately investigate and/or investigate and discipline unconstitutional or unlawful conduct by jail staff and WELLPATH employees; and

    iii.    By allowing, tolerating, and/or encouraging jail and WELLPATH staff to: cover-up abuse with magnets on cell windows; fail to file complete and accurate reports; file false reports; make false statements; persistently refuse to provide victims' next of kin with any information about the victim's death; ignore repeated lawful requests for information; and/or obstruct or interfere with investigations of unconstitutional or unlawful conduct by withholding and/or concealing material information;

j.    To allow, tolerate, and/or encourage a "code of silence" among law enforcement officers, custodial officers, sheriff's office personnel, and WELLPATH staff at the jail whereby an officer or member of the sheriff's office, or WELLPATH staff does not provide adverse information against a fellow officer, or member of the SCSO, or WELLPATH staff;

k.    To fail to have and enforce necessary, appropriate, and lawful policies, procedures, and training programs to prevent or correct the unconstitutional conduct, customs, and procedures described in this Complaint and in subparagraphs (a) through (j) above, with deliberate indifference to the rights and safety of Decedent, Plaintiffs and the public, and in the face of an obvious need for such policies, procedures, and training programs.

97.    Defendants COUNTY and WELLPATH, through their employees and agents, and through their policy-making supervisors, BOSENKO, Captain DAVE KENT ("KENT") and remaining DOES, failed to properly hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline Defendants SCHRITTER, HURTE, DIAZ, ALCAZAR, JURKIEWICZ, GRADY, NEVES, CORTEZ, LEWIS, JOHANSEN, DELLWO, DOES 1-20, and other COUNTY, and WELLPATH personnel, with deliberate indifference to Plaintiffs', Decedent's, and others' constitutional rights, which were thereby violated as described above.

98.     The unconstitutional actions and/or omissions of Defendants SCHRITTER, HURTE, DIAZ, ALCAZAR, JURKIEWICZ, GRADY, NEVES, CORTEZ, LEWIS, JOHANSEN, DELLWO, REMAINING DOES, and other Sheriff's Office personnel, as described above, were approved, tolerated, and/or ratified by policymaking officers for the COUNTY and its Sheriff's Office, including Defendants BOSENKO and KENT and by WELLPATH and WELLPATH medical director.  Plaintiffs are informed and believe and thereon allege that the details of this incident have been revealed to the authorized policymakers within the COUNTY, the Shasta County Sheriff's Office, and WELLPATH, and that such policymakers have direct knowledge of the fact that the death of JOHN ADENA was the result of severe uses of excessive force – much of it unreported but proven by physical evidence – and deliberate indifference to his serious medical needs.  Notwithstanding this knowledge, the authorized policymakers within the COUNTY including BOSENKO and KENT, its Sheriff's Office, and WELLPATH have approved of the conduct and decisions of Defendants SCHRITTER, HURTE, DIAZ, ALCAZAR, JURKIEWICZ, GRADY, NEVES, CORTEZ, LEWIS, JOHANSEN, DELLWO, AND REMAINING DOES in this matter, and have made a deliberate choice to endorse such conduct and decisions, and the basis for them, that resulted in the death of JOHN ADENA.  By so doing, the authorized policymakers within the COUNTY and its Sheriff's Office, and WELLPATH have shown affirmative agreement with the individual Defendants' actions and have ratified the unconstitutional acts of the individual Defendants.  Furthermore, Plaintiffs are informed and believe, and thereupon allege, that DEFENDANTS BOSENKO, KENT and other policy-making officers for the COUNTY and WELLPATH were and are aware of a pattern of misconduct and injury caused by COUNTY law enforcement officers and WELLPATH employees similar to the conduct of Defendants described herein, but failed to discipline culpable law enforcement officers and employees and failed to institute new procedures and policy within the COUNTY and WELLPATH.

99.     The aforementioned customs, policies, practices, and procedures; the failures to properly and adequately hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline; and the unconstitutional orders, approvals, ratification, and toleration of wrongful conduct of Defendants COUNTY and WELLPATH were a moving force and/or a proximate cause of the deprivations of Decedent's clearly established and well-settled constitutional rights in violation of 42 U.S.C. § 1983, as more fully set forth above at ¶ 90.

100.     Defendants subjected Decedent to their wrongful conduct, depriving Decedent of rights described herein, knowingly, maliciously, and with conscious and deliberate indifference for whether the rights and safety of Decedent, Plaintiffs and others would be violated by their acts and/or omissions.

101.     As a direct and proximate result of the unconstitutional actions, omissions, customs, policies, practices, and procedures of Defendants COUNTY and WELLPATH, as described above, Decedent and Plaintiffs suffered serious injuries and death, Plaintiffs are entitled to damages, penalties, costs, and attorneys' fees against Defendants COUNTY and WELLPATH as set forth above in ¶¶ 91-94, including punitive damages against Defendant WELLPATH.

### THIRD CAUSE OF ACTION
#### (Supervisory Liability - 42 U.S.C. § 1983)
**AGAINST DEFENDANT BOSENKO, KENT, AND REMAINING DOES**

102.     Plaintiffs reallege each and every paragraph in this complaint as if fully set forth here.

103.     At all material times, Defendant BOSENKO, KENT, and REMAINING DOES, had the duty and responsibility to constitutionally hire, train, instruct, monitor, supervise, evaluate, investigate, staff, and discipline the other Defendants employed by their respective agencies in this matter, as well as all employees and agents of the Shasta County Sheriff's Office and WELLPATH.

COMPLAINT AND JURY DEMAND               36

104.    Defendants BOSENKO, KENT, and REMAINING DOES failed to properly hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline the respective employees of their agencies, including Defendants SCHRITTER, HURTE, DIAZ, ALCAZAR, JURKIEWICZ, GRADY, NEVES, CORTEZ, LEWIS, JOHANSEN, DELLWO, AND REMAINING DOES, and other COUNTY, Sheriff's Office, and WELLPATH personnel, with deliberate indifference to Plaintiffs', Decedent's, and others' constitutional rights, which were thereby violated as described above.

105.    As supervisors, Defendants BOSENKO, KENT, and REMAINING DOES, each permitted and failed to prevent the unconstitutional acts of other Defendants and individuals under their supervision and control, and failed to properly supervise such individuals, with deliberate indifference to the rights and serious medical needs of MR. ADENA.  Each of these supervising Defendants either directed his or her subordinates in conduct that violated Decedent's rights, OR set in motion a series of acts and omissions by his or her subordinates that the supervisor knew or reasonably should have known would deprive Decedent of rights, OR knew his or her subordinates were engaging in acts likely to deprive Decedent of rights and failed to act to prevent his or her subordinate from engaging in such conduct, OR disregarded the consequence of a known or obvious training deficiency that he or she must have known would cause subordinates to violate Decedent's rights, and in fact did cause the violation of Decedent's rights.  (See, Ninth Circuit Model Civil Jury Instruction 9.4).  Furthermore, each of these supervising Defendants is liable in their failures to intervene in their subordinates' apparent violations of Decedents' rights.

106.    The unconstitutional customs, policies, practices, and/or procedures of Defendants COUNTY and WELLPATH, stated herein, were directed, encouraged, allowed, and/or ratified by policymaking officers for Defendant COUNTY and its Sheriff's Office, and Defendant WELLPATH, including Defendants BOSENKO, KENT, and REMAINING DOES, respectively,

with deliberate indifference to Plaintiffs', Decedent's, and others' constitutional rights, which were thereby violated as described above.

107.    The unconstitutional actions and/or omissions of Defendants SCHRITTER, HURTE, DIAZ, ALCAZAR, JURKIEWICZ, GRADY, NEVES, CORTEZ, LEWIS, JOHANSEN, DELLWO, AND REMAINING DOES, and other Sheriff's Office, and WELLPATH personnel, as described above, were approved, tolerated, and/or ratified by policymaking officers for the COUNTY and its Sheriff's Office including Defendants BOSENKO, KENT, and by WELLPATH. Plaintiffs are informed and believe and thereon allege that the details of this incident have been revealed to Defendants BOSENKO and KENT, and that such Defendant-policymakers have direct knowledge of the fact that the death of JOHN ADENA was not justified or necessary, but represented deliberate indifference to his rights, safety, and serious medical needs, as set forth in ¶¶ 90 and 98 above.   Notwithstanding this knowledge, on information and belief, Defendants BOSENKO and KENT have approved and ratified the conduct and decisions of SCHRITTER, HURTE, DIAZ, ALCAZAR, JURKIEWICZ, GRADY, NEVES, CORTEZ, LEWIS, JOHANSEN, DELLWO, AND REMAINING DOES in this matter, and have made a deliberate choice to endorse such conduct and decisions, and the basis for them, that resulted in the death of JOHN ADENA.  By so doing, Defendants BOSENKO and KENT have shown affirmative agreement with the individual Defendants' actions and have ratified the unconstitutional acts of the individual Defendants. Furthermore, Plaintiffs are informed and believe, and thereupon alleges, that Defendants BOSENKO and KENT and other policy-making officers for the COUNTY and WELLPATH were and are aware of a pattern of misconduct and injury, and a code of silence, caused by COUNTY law enforcement officers and WELLPATH employees similar to the conduct of Defendants described herein, but failed to discipline culpable law enforcement officers and employees and failed to institute new procedures and policy within the COUNTY and WELLPATH.

108.    The aforementioned customs, policies, practices, and procedures; the failures to properly and adequately hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline; and the unconstitutional orders, approvals, ratification, and toleration of wrongful conduct of Defendants BOSENKO, KENT, and REMAINING DOES were a moving force and/or a proximate cause of the deprivations of Decedent's clearly established and well-settled constitutional rights in violation of 42 U.S.C. § 1983, as more fully set forth above at ¶ 90.

109.    Defendants subjected Decedent to their wrongful conduct, depriving Decedent of rights described herein, knowingly, maliciously, and with conscious and reckless disregard for whether the rights and safety of Decedent, Plaintiffs and others would be violated by their acts and/or omissions.

110.    As a direct and proximate result of the unconstitutional actions, omissions, customs, policies, practices, and procedures of Defendants BOSENKO, KENT, and REMAINING DOES as described above, Plaintiffs sustained serious and permanent injuries and are entitled to damages, penalties, costs, and attorneys' fees as set forth above in ¶¶ 91-94.

**FOURTH CAUSE OF ACTION**
**(Violation of Civil Code § 52.1) – Survival Claim**
**AGAINST DEFENDANTS SCHRITTER, HURTE, DIAZ, ALCAZAR, JURKIEWICZ, GRADY, NEVES, CORTEZ, LEWIS, JOHANSEN, DELLWO, AND BOSENKO, KENT, COUNTY, WELLPATH and REMAINING DOES**

111.    Plaintiffs reallege each and every paragraph in this complaint as if fully set forth here.

112.    Plaintiffs bring the claims in this cause of action either individually or as survival claims permissible under California law, including Cal. Code of Civ. Proc. Section 377.20 et. seq.

113.    By their acts, omissions, customs, and policies, DEFENDANTS SCHRITTER, HURTE, DIAZ, ALCAZAR, JURKIEWICZ, GRADY, NEVES, CORTEZ, LEWIS, JOHANSEN, DELLWO, BOSENKO, KENT, COUNTY, WELLPATH and REMAINING DOES, each

COMPLAINT AND JURY DEMAND                    39

Defendant acting in concert/conspiracy, as described above, while JOHN ADENA was in custody, and by threat, intimidation, and/or coercion, and with reckless disregard for his rights, interfered with, attempted to interfere with, and violated JOHN ADENA's rights under California Civil Code § 52.1 and under the United States Constitution and California Constitution as follows:

    a.    Decedent's right to be free from excessive and unreasonable force and restraint in the course of seizure and as a pretrial detainee, as secured by the Fourth and/or Fourteenth Amendments to the United States Constitution;

    b.    Decedent's right to be free from objectively unreasonable treatment and deliberate indifference to his safety and serious medical needs while in custody as a pretrial detainee as secured by the Fourth and/or Fourteenth Amendments to the United States Constitution and by California Constitution, Article 1, §§ 7 and 13;

    c.    Decedent's and Plaintiffs' right to familial association as secured by the First and/or Fourteenth Amendments to the United States Constitution.

    d.    The right to enjoy and defend life and liberty; acquire, possess, and protect property; and pursue and obtain safety, happiness, and privacy, as secured by the California Constitution, Article 1, § 1;

    e.    The right to protection from bodily restraint, harm, or personal insult, as secured by California Civil Code § 43; and

    f.    The right to emergency medical care as required by California Government Code §845.6.

114.    Defendants' violations of Plaintiffs' and Decedent's due process rights with deliberate indifference, in and of themselves constitute violations of the Bane Act.[4] Alternatively, separate from, and above and beyond, Defendants' attempted interference, interference with, and violation of JOHN ADENA rights as described above, Defendants violated Decedent's rights by the following conduct constituting threat, intimidation, or coercion:

[4] See *Atayde v. Napa State Hosp.*, No. 1:16-cv-00398-DAD-SAB, 2016 U.S. Dist. LEXIS 126639, at *23 (E.D. Cal. Sept. 16, 2016) (citing *M.H. v. Cty. of Alameda*, 90 F. Supp. 3d 889, 899 (N.D. Cal. 2013); see also, *Cornell v. City and County of San Francisco*, Nos. A141016, A142147, 2017 Cal. App. LEXIS 1011 at *58, f.n. 32 (Cal. Ct. App. Nov. 16, 2017) (approving *M.H., supra.*); *Reese v. County of Sacramento*, 888 F.3d 1030, 1043-44 (9th Cir. 2018) (following *Cornell*); *Rodriguez v. County of L.A.*, 891 F.3d 776, 799, 802 (9th Cir. 2018) (following *Cornell*).

1

2

3

       a.  With deliberate indifference to JOHN ADENA's serious medical needs, suffering, and risk of grave harm including death, depriving JOHN ADENA of necessary, life-saving care for his medical and/or psychiatric needs;

4

5

       b.  Subjecting JOHN ADENA to repeated uses of excessive force, causing immense and needless suffering, intimidation, coercion, and threats to his life and well-being;

6

7

8

       c.  Causing JOHN ADENA to be placed in punitive solitary confinement for his lawful resistance to Defendants' uses of excessive force and for his mental disturbance, thereby further depriving him of necessary observation and conditions necessary for his safety and well-being;

9

10

11

       d.  Instituting and maintaining the unconstitutional customs, policies, and practices described herein, when it was obvious that in doing so, individuals such as JOHN ADENA would be subjected to violence, threat, intimidation, coercion, and ongoing violations of rights as Decedent was here.

12

13

14

    115.    The threat, intimidation, and coercion described herein were not necessary or inherent to Defendants' violation of Decedent's rights, or to any legitimate and lawful jail or law enforcement activity.

15

16

    116.    Further, all of Defendants' violations of duties and rights, and coercive conduct, described herein were volitional acts; none was accidental or merely negligent.

17

18

19

20

    117.    Further, each Defendant violated Plaintiffs' and Decedent's rights by their reckless disregard and with the specific intent and purpose to deprive them of their enjoyment of those rights and of the interests protected by those rights.

21

22

    118.    Defendants COUNTY and WELLPATH are vicariously liable for the violation of rights by their employees and agents.

23

24

25

26

27

    119.    As a direct and proximate result of Defendants' violation of California Civil Code § 52.1 and of Decedent's rights under the United States and California Constitutions, Plaintiffs (as successors in interest for Decedent) sustained injuries and damages, and against each and every Defendant is entitled to relief as set forth above at ¶¶ 91-94, including punitive damages against all

28

COMPLAINT AND JURY DEMAND          41

individual Defendants and WELLPATH, and all damages allowed by California Civil Code §§ 52 and 52.1 and California law, not limited to costs attorneys' fees, and civil penalties.

### FIFTH CAUSE OF ACTION
#### (Violation of California Government Code § 845.6)
#### AGAINST DEFENDANTS SCHRITTER, HURTE, DIAZ, ALCAZAR, JURKIEWICZ, GRADY, NEVES, CORTEZ, AND REMAINING DOES

120.    Plaintiffs reallege each and every paragraph in this complaint as if fully set forth here.

121.    Defendants SCHRITTER, HURTE, DIAZ, ALCAZAR, JURKIEWICZ, GRADY, NEVES, CORTEZ, and REMAINING DOES knew or had reason to know that JOHN ADENA was in need of immediate medical care and treatment, including being transferred for emergency medical care, and each failed to take reasonable action to summon immediate medical care and treatment.  Each such individual defendant, employed by and acting within the course and scope of his/her employment with Defendant COUNTY, knowing and/or having reason to know of JOHN ADENA's need for immediate medical care and treatment, failed to take reasonable action to summon such care and treatment in violation of California Government Code § 845.6.

122.    Defendant COUNTY is vicariously liable for the violations of state law and conduct of their officers, deputies, employees, and agents, including individual named defendants, under California Government Code sections 815.2 and 845.6.

123.    As a direct and proximate result of the aforementioned acts of these Defendants, Plaintiffs and Decedent were injured as set forth above, and their losses entitle Plaintiffs to all damages allowable under California law.  Plaintiffs (individually and as Successors in Interest for Decedent) sustained serious and permanent injuries and is entitled to damages, penalties, costs, and attorney fees under California law as set forth in ¶¶ 91-94, above, including punitive damages against these individual Defendants.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully request the following relief against each and every Defendant herein, jointly and severally:

        d.     Compensatory and exemplary damages in an amount according to proof and which is fair, just, and reasonable;

        e.     Punitive damages under 42 U.S.C. § 1983 and California law in an amount according to proof and which is fair, just, and reasonable (Plaintiffs do not seek punitive damages against the COUNTY);

        f.     All other damages, penalties, costs, interest, and attorneys' fees as allowed by 42 U.S.C. §§ 1983 and 1988; California Code of Civil Procedure §§ 377.20 et seq., 377.60 et seq., and 1021.5; California Civil Code §§ 52 et seq., 52.1; and as otherwise may be allowed by California and/or federal law;

        g.     Declaratory and injunctive relief – including but not limited to reforms of Defendants' policies, practices, training and supervision – according to proof and which is fair, just, and reasonable;

        h.     Such further relief, according to proof, that this Court deems appropriate and lawful.

## **JURY DEMAND**

Plaintiffs hereby demand a jury trial in this action.

Dated:  April 29, 2021             HADDAD & SHERWIN LLP

                           */s/ Julia Sherwin*
                           _____
                           JULIA SHERWIN
                           Attorneys for Plaintiffs