MICHAEL J. HADDAD (SBN 189114)
JULIA SHERWIN (SBN 189268)
BRIAN HAWKINSON (SBN 341856)
HADDAD & SHERWIN LLP
505 Seventeenth Street
Oakland, CA 94612
Telephone:     (510) 452-5500
Facsimile:     (510) 452-5510

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ADENA, Deceased, by and through his Co-Successors in Interest, CIRCE ADENA and RICHARD ADENA; CIRCE ADENA, Individually, and RICHARD ADENA, Individually,<br><br>        Plaintiffs,<br><br>  vs.<br><br>SHASTA COUNTY, a public entity; SHASTA COUNTY JAIL DEPUTIES JOSEPH GRADY, NATHANIAL NEVES, HECTOR CORTEZ; CALIFORNIA FORENSIC MEDICAL GROUP, INC., a California Corporation; WELLPATH MANAGEMENT, INC., a Delaware Corporation; WELLPATH LLC, a Delaware Limited Liability Company; TRACI LEWIS, L.M.F.T.; PAM JOHANSEN, L.C.S.W.; DANIEL DELLWO, P.A.; AMANDA REAM, R.N., and DOES 2–20; individually, jointly and severally,<br><br>                  Defendants. | No. 2:21-cv-00770-MCE-DMC<br><br>**SECOND AMENDED COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF, AND DEMAND FOR JURY TRIAL** |

Plaintiffs, by and through their attorneys, HADDAD & SHERWIN LLP, for their Second Amended Complaint against Defendants, state as follows:

## JURISDICTION

1.    This is a civil rights wrongful death/survival action arising from Defendants' use of excessive force and deliberate indifference to the serious medical and mental health needs of pretrial detainee, JOHN ADENA, resulting in his death on September 22, 2019, at the Shasta County jail.  This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth and Fourteenth Amendments to the United States Constitution, and the laws and Constitution of the State of California.  Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343. Plaintiffs further invoke the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367, to hear and decide claims arising under state law.

## INTRADISTRICT ASSIGNMENT

2.    A substantial part of the events and/or omissions complained of herein occurred in the City of Redding, Shasta County, California.  Pursuant to Eastern District of California Civil Local Rule 120(d), this action is properly assigned to the Sacramento Division of the United States District Court for the Eastern District of California.

## AMENDMENT

3.    Plaintiffs file this Second Amended Complaint based on this Court's order granting the Wellpath Defendants motion to dismiss (doc. 79).

## PARTIES AND PROCEDURE

4.    Plaintiff CIRCE ADENA is the mother of Decedent JOHN ADENA and a resident of the State of California.  Plaintiff CIRCE ADENA brings these claims individually and as Co-Successor in Interest for her son, Decedent JOHN ADENA, pursuant to California Code of Civil Procedure §§ 377.10 *et seq*. and federal civil rights laws.  Decedent JOHN ADENA had no spouse or children.  A successor in interest declaration has previously been filed.

5.    Plaintiff RICHARD ADENA is the father of Decedent JOHN ADENA and a resident of the State of California.  Plaintiff RICHARD ADENA brings these claims individually and as Co-Successor in Interest for his son, Decedent JOHN ADENA, pursuant to California Code

of Civil Procedure §§ 377.10 *et seq*. and federal civil rights laws.  Decedent JOHN ADENA had no spouse or children.  A successor in interest declaration has previously been filed.

6.     Plaintiffs bring these claims pursuant to California Code of Civil Procedure §§ 377.20 et seq. and 377.60 et seq., which provide for survival and wrongful death actions.  Plaintiffs also bring their claims individually and on behalf of Decedent JOHN ADENA on the basis of 42 U.S.C. §§ 1983 and 1988, the United States Constitution, federal and state civil rights law, and California law.  Plaintiffs also bring these claims as Private Attorneys General, to vindicate not only their rights, but others' civil rights of great importance.

7.     Defendant SHASTA COUNTY ("COUNTY") is a public entity, duly organized and existing under the laws of the State of California.  Under its authority, the COUNTY operates the Shasta County Sheriff's Office (SCSO).

8.     Defendant DEPUTY JOSEPH GRADY ("GRADY"), at all times mentioned herein, was employed by Defendant COUNTY as a corrections deputy at the jail, and was acting within the course and scope of that employment.

9.     Defendant DEPUTY NATHANIAL NEVES ("NEVES"), at all times mentioned herein, was employed by Defendant COUNTY as a corrections deputy at the jail, and was acting within the course and scope of that employment.

10.     Defendant DEPUTY HECTOR CORTEZ ("CORTEZ"), at all times mentioned herein, was employed by Defendant COUNTY as a corrections deputy at the jail, and was acting within the course and scope of that employment.

11.     Defendants CALIFORNIA FORENSIC MEDICAL GROUP, INC., WELLPATH MANAGEMENT, INC., AND WELLPATH LLC (collectively here "WELLPATH"), were at all times herein mentioned alter-egos of each other, sharing money, resources, policies, practices, officers, directors, attorneys, and management, each organized under the laws of the State of Delaware and licensed to do business in California. Alternatively, and in particular, at all material times, WELLPATH LLC provided comprehensive "management services" for CALIFORNIA FORENSIC MEDICAL GROUP, INC. ("CFMG"), controlling virtually all aspects of CFMG's business, including providing policies and procedures for use in the jails, human resources, hiring and supervising employees, payroll, accounting, accounts receivable, accounts payable, tax

reporting, finance, liability insurance, contract negotiation and setting staffing plans, legal services (including paying for employees' defense counsel in this case), and supplies. In return, CFMG transferred millions of dollars yearly in revenues to WELLPATH LLC and possibly other WELLPATH entities. WELLPATH MANAGEMENT, INC. also provided management services for CFMG, including policies and procedures for use at the jail. Defendant WELLPATH provided medical, mental health, and nursing care to pretrial and post-conviction detainees and inmates in Shasta County Jail and Juvenile Hall, pursuant to a contract with the COUNTY OF SHASTA. On information and belief, WELLPATH and their employees and agents are responsible for making and enforcing policies, procedures, supervision, and training related to the medical care of inmates and detainees in Defendant COUNTY OF SHASTA's jails, including but not limited to assessment of inmate-patients for mental health and emergency medical needs, sending patients for emergency medical care and mental health care, and providing suicide prevention precautions. On information and belief, WELLPATH and its employees and agents are and were at all material times responsible for making and executing policies, procedures, supervision, and training related to the medical care and/or mental health care of detainees and inmates in the COUNTY OF SHASTA jails, including, but not limited to, properly assessing and classifying inmates, properly sending inmates for emergency medical and mental health care, properly assessing and addressing the mental health needs of inmates, properly training jail staff about important medical and mental health issues; properly assessing and treating the serious medical and mental health needs of inmates, including suicide prevention, observation of suicidal and potentially suicidal inmates, mental illness, and emotional disturbance. Defendants TRACI LEWIS, L.M.F.T., PAM JOHANSEN, L.C.S.W., DANIEL DELLWO, P.A., and AMANDA REAM, R.N., were each employees of WELLPATH, acting within the course and scope of that employment at all relevant times (and within the course and scope of their employment by COUNTY by virtue of WELLPATH's contract with COUNTY) –together with certain DOE DEFENDANTS including, but not limited to WELLPATH employees and agents acting within the course and scope of their employment with WELLPATH (and within the course and scope of their employment by COUNTY by virtue of WELLPATH's contract with COUNTY) -- were all responsible for properly assessing and addressing the medical and mental health needs of inmates; providing appropriate observation and a treatment plan for serious medical

and mental health needs, including suicide prevention, care and treatment for mental illness and emotional disturbance, monitoring inmates, and summoning emergency medical care when it was needed.

12.     Defendant TRACI LEWIS, L.M.F.T., was at all material times employed by Defendant WELLPATH as a Licensed Marriage and Family Therapist, and acted within the course and scope of that employment. As set forth below, Defendant LEWIS failed to properly assess and address MR. ADENA's mental health needs, failed to create a required treatment plan for Mr. ADENA, failed to request appropriate suicide precautions for MR. ADENA in, and following his discharge from, the safety cell, failed to send MR. ADENA to the hospital when he was not improving in the safety cell, failed to have MR. ADENA transferred to the hospital when she and Defendant DELLWO knew he was in psychosis, failed to request or institute any increased observation of MR. ADENA while he was in the safety cell or following his discharge from the safety cell, and failed to create a treatment plan for MR. ADENA, among other failures, all with deliberate indifference to MR. ADENA's serious mental health needs.

13.     Defendant PAM JOHANSEN, L.C.S.W., was at all material times employed by Defendant WELLPATH, as a Licensed Clinical Social Worker and acted within the course and scope of that employment. As set forth below, Defendant JOHANSEN failed to properly assess and address MR. ADENA's medical and mental health needs, failed to request appropriate suicide precautions for MR. ADENA following his discharge from the safety cell, failed to request or institute any increased observation of MR. ADENA in the safety cell or following his discharge from the safety cell, failed to create a treatment plan for MR. ADENA, and failed to summon appropriate and emergency medical care for MR. ADENA when he informed her he was sick, vomiting, and needed medical attention, among other failures, all with deliberate indifference to MR. ADENA's serious mental health needs.

14.     Defendant AMANDA REAM, R.N., was at all material times employed by Defendant WELLPATH, as a Registered Nurse and acted within the course and scope of that employment. As set forth below, Defendant REAM failed to properly assess and address MR. ADENA's medical and mental health needs, failed to assess MR. ADENA either on nursing rounds or when specifically requested to do so by Defendant JOHANSEN, failed to provide necessary care

1   to MR. ADENA, failed to inform any physician or mid-level provider of MR. ADENA's urgent

2   medical needs, failed to order that MR. ADENA be transferred to the hospital for emergency

3   medical care, and failed to summon appropriate and emergency medical care for MR. ADENA

4   when she was specifically informed he required immediate care, as he was sick, vomiting, and had

5   requested medical attention, among other failures, all with deliberate indifference to MR. ADENA's

6   serious mental health needs.  Defendant REAM is hereby substituted in place of Defendant DOE 1.

7         15.    Defendant DANIEL DELLWO, P.A., was at all material times employed by

8   Defendant WELLPATH as a Physician's Assistant and acted within the course and scope of that

9   employment, yet outside the scope of his licensure as described below.  WELLPATH allowed and

10  assigned Defendant DELLWO to work independently and unsupervised, outside his legal scope of

11  practice, in violation of the Physician Assistant Practice Act, California Business and Professions

12  Code § 3500 *et seq.*, as well as provisions of Title 16 of the California Code of Regulations that

13  govern Physician Assistants.  The Physician Assistant Practice Act, Cal. Bus. And Prof. Code §

14  3502, required Defendant DELLWO to have a written Practice Agreement with a licensed

15  Physician and Surgeon, and to work under the supervision of that Physician and Surgeon.  The

16  required Practice Agreement also was required to delineate Defendant DELLWO'S Prescription

17  Transmittal Authority, under Bus. And Prof. Code § 3502.1.  The required Practice Agreement was

18  required to set forth the types of medical services Defendant DELLWO was authorized to perform;

19  the policies and procedures to ensure adequate supervision of Defendant DELLWO by the

20  Physician and Surgeon; the methods for continuing evaluation of Defendant DELLWO's

21  competency and qualifications; and the furnishing and ordering of drugs by Defendant DELLWO.

22  The required Practice Agreement was required to be signed by both both Defendant DELLWO and

23  his supervising Physician and Surgeon.  Cal. Bus. and Prof. Code § 3502.3.  WELLPATH allowed

24  and assigned Defendant DELLWO to work without the legally required Practice Agreement, and to

25  work independently and unsupervised, in violation of the Physician Assistant Practice Act, and

26  Defendant DELLWO knowingly worked as a Physician Assistant without the required Practice
    Agreement.

27        16.    Title 16 of the California Code of Regulations § 1399.540 requires that Defendant

28  DELLWO's medical services provided be delegated to him in writing, in a required Delegation of

Services Agreement, by a supervising physician who remained responsible for the patients cared for by Defendant DELLWO. This written Delegation of Services Agreement was required to be signed by both Defendant DELLWO and his supervising physician. Defendants WELLPATH and DELLWO never obtained the required Delegation of Services Agreement.

17.    Title 16 Cal. Code Regs. § 1399.541 requires that Defendant DELLWO's practice be directed by a supervising physician. WELLPATH assigned and allowed Defendant DELLWO, and Defendant DELLWO agreed, to work without the required direction from a supervising physician.

18.    Title 16 Cal. Code Regs. § 1399.545 requires that Defendant DELLWO and his supervising physician establish, in writing, transport and back-up procedures for the immediate care of patients who are in need of emergency care beyond the Physician Assistant's scope of practice for such times when the supervising physician is not on the premises. Defendants WELLPATH and DELLWO failed to institute such written transport and back-up procedures with the supervising physician.

19.    Title 16 Cal. Code Regs. § 1399.545 also provides that the supervising physician has continuing responsibility to follow the progress of the patient and to make sure the Physician Assistant does not function autonomously. The supervising physician shall be responsible for all medical services provided by a Physician Assistant under his supervision. Defendants WELLPATH and DELLWO chose to have Defendant DELLWO function autonomously, and not to have any supervising physician follow the progress of patients in the SHASTA COUNTY jail, including JOHN ADENA, in blatant violation of California law.

20.    Defendant DELLWO testified that his supervising physician was Eliud Garcia, M.D. Dr. Garcia lived in Monterey California, where he also worked at other WELLPATH-serviced jails, including the Monterey County Jail. Dr. Garcia only came to the SHASTA COUNTY jail once a week, on Thursdays. On those days, Dr. Garcia was treating his own patients at the jail, and not supervising Defendant DELLWO. Defendant DELLWO worked full time, Monday through Friday. He worked autonomously as the only health care provider at the jail, responsible for the healthcare needs of over 400 inmates, without any physician supervision 80% of the time: on Mondays, Tuesdays, Wednesdays and Fridays. On Thursdays, while Dr. Garcia was on-site at the jail, he was

treating his own patients and not maintaining responsibility for the patients treated by Defendant DELLWO.

21.    Indeed, at no time during the entire month JOHN ADENA was in the SHASTA COUNTY jail, did Defendant DELLWO ever even inform Dr. Garcia of JOHN ADENA's condition, psychosis, or even MR. ADENA'S existence.  WELLPATH assigned Defendant DELLWO, and Defendant DELLWO chose, to handle JOHN ADENA's care independently, autonomously, and unsupervised.

22.    Title 16 Cal. Code Regs. § 1399.546 requires that each time a Physician Assistant provides care for a patient, the Physician Assistant record in the patient's medical record for that episode of care the supervising physician who is responsible for the patient.  That regulation also provides that when a Physician Assistant transmits an oral order, he states the name of the supervising physician responsible for the patient.  WELLPATH and Defendant DELLWO chose to violate, routinely, this legal requirement.  At no time did Defendant DELLWO ever record or state the supervising physician who was responsible for JOHN ADENA's care.

23.    Title 16 Cal. Code Regs. § 1399.547 requires that the Physician Assistant provide written notification to each patient that the Physician Assistant is licensed by the Physician Assistant Board, which shall include:

**NOTIFICATION TO CONSUMERS**
Physician Assistants are licensed and regulated
by the Physician Assistant Board
(916) 561-8780
www.pab.ca.gov

WELLPATH and Defendant DELLWO chose to violate this legal requirement, never providing the required written notification to patients treated by Defendant DELLWO.

24.    Defendant DELLWO, working independently, autonomously, and unsupervised, failed to properly assess and address MR. ADENA's medical and mental health needs, failed to create a required treatment plan for MR. ADENA, failed to provide ANY treatment for MR. ADENA, failed to request appropriate suicide precautions for MR. ADENA, failed to transfer MR. ADENA to the hospital for appropriate medical care for what Defendant suspected was psychosis that may have an "organic" cause, knew JOHN ADENA was repeatedly in psychosis – a medical

emergency requiring transfer to the hospital – and chose not to transfer him to the hospital, failed to institute constant observation of MR. ADENA, failed to send MR. ADENA to the hospital when he was not improving in the safety cell, failed to request appropriate mental health and suicide precautions for MR. ADENA following his discharge from the safety cell, failed to request or institute any increased observation of MR. ADENA following his discharge from the safety cell, among other failures, all with deliberate indifference to MR. ADENA's serious mental health needs.

25.    Plaintiffs are ignorant of the true names and capacities of Defendants DOES 2-20 (DOE Defendants") and therefore sues these Defendants by such fictitious names.  Plaintiffs are informed and believe and thereon allege that each Defendant so named is responsible in some manner for the injuries and damages sustained by Plaintiffs as set forth herein.  Plaintiffs will amend their complaint to state the names and capacities of each DOE DEFENDANT when they have been ascertained.

26.    Plaintiffs are informed and believe and thereon allege that each of the Defendants were at all material times an agent, servant, employee, partner, joint venturer, co-conspirator, and/or alter ego of the remaining Defendants, and in doing the things herein alleged, was acting within the course and scope of that relationship.  Plaintiffs are further informed and believe and thereon allege that each of the Defendants herein gave consent, aid, and assistance to each of the remaining Defendants, and ratified and/or authorized the acts or omissions of each Defendant as alleged herein, except as may be hereinafter specifically alleged.  At all material times, each Defendant was jointly engaged in tortious activity and an integral participant in the conduct described herein, resulting in the deprivation of Plaintiffs' and Decedent's constitutional rights and other harm.

27.    At all material times, each Defendant acted under color of the laws, statutes, ordinances, and regulations of the State of California and Shasta County.

28.    Plaintiffs timely and properly filed tort claims with Shasta County pursuant to California Government Code sections 910 et seq., and this action is timely filed within all applicable statutes of limitation.

29.    This complaint may be pled in the alternative pursuant to Federal Rule of Civil Procedure 8(d).

1

**GENERAL ALLEGATIONS**

2      30.     Plaintiffs reallege each and every paragraph in this complaint as if fully set forth

3  here.

4      31.     JOHN ADENA was a 31-year-old man who had close relationships with his parents

5  and siblings.

6

7

8

9

10

11   

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



17
18
19
20
21
22
23
24
25
26
27
28



Although MR. ADENA had earlier trained to be a fire fighter and paramedic, he had worked at Mercy Medical Center hospital for eight years, most recently as a heart monitor technician, before losing his job in July 2019.  Mr. Adena had suffered a head injury during a skateboarding accident in June 2019, where the Emergency physician noted he had symptoms consistent with a concussion, he had a 4 cm hematoma with swelling on his head, and had to have a small rock removed from his skull.  After the head injury, MR. ADENA began acting strangely and erratically and started to exhibit signs of mental illness, including paranoia, inconsistent with his typical personality and behavior.  His sudden shift in behavior was alarming to his family and friends.

32.    MR. ADENA had no history of assaultive behavior and no criminal record, but on August 17, 2019, he was arrested and charged with violations of Cal. Penal Code §§242 and 647(f) for misdemeanor battery and disorderly conduct.  The incident that gave rise to MR. ADENA's arrest indicated that MR. ADENA was suffering from a serious mental illness.  The arresting Redding police officers reported that "[MR. ADENA] was not making any sense and appeared to be confused and did not know where he was."  Upon arrival at the Shasta County jail, COUNTY Deputy Espinoza completed a medical prescreening form prior to MR. ADENA's admission into the jail and noted that MR. ADENA admitted that he had been suicidal three hours prior, but MR. ADENA was not placed in a safety cell for his own protection or referred to a mental health clinician for an evaluation despite obvious signs that he was suffering from a mental health crisis. MR. ADENA was simply housed in a sobering cell and released the following day.

33.    On or about August 21, 2019, MR. ADENA was arrested again and charged with two misdemeanors for violating California Penal Code §148(a)(1) (resisting or obstructing a peace officer in the performance of his duties) and §594(a)(1) (vandalism) in Shasta Lake City, California. The arresting Shasta County deputies recognized MR. ADENA from the previous encounter, and knew that he suffered from mental health issues.  The deputies then transported MR. ADENA to the hospital for medical clearance before escorting him to Shasta County jail.

34.    Throughout his month-long incarceration, WELLPATH Defendants persistently chose not to create a written, individualized treatment plan as required by Title 15 California Code

of Regulations § 1210, despite their actual knowledge of MR. ADENA's obvious mental health issues; released him from a safety cell when he was still unstable and at risk either for self-harm or harm by others, and failed to address or document any response to his physical illness and vomiting which were symptoms of life-threatening injuries that ultimately resulted in his death..  COUNTY Defendants continuously ignored MR. ADENA's obvious mental illness, treated manifestations of his mental illness as defiance to their authority, refused to get him medical care when he obviously needed it, and repeatedly engaged in or permitted unnecessary uses of significant force against MR. ADENA, including unreported and concealed beatings, without provocation, causing severe blunt force trauma that ultimately led to his death.

35.     According to the official Shasta County autopsy report, MR. ADENA's cause of death was: carotid artery dissection of unclear etiology, with hyponatremia as a significant condition.

36.     The autopsy report included a list of injuries present on MR. ADENA's body during the autopsy, all evidence of the use of a very high degree of unnecessary force on JOHN ADENA:

HEAD/NECK

- A 2.4 x 2 cm red-brown abrasion is on the lower right face.
- A 4 x 4 cm reverse "L"-shaped pink-brown to red-pink abrasion is on the right forehead.
- A 3 x 2 cm orange-brown abrasion/contusion is on the right malar prominence. Posteriorly, is a 1.4 x 1.8 cm orange-pink abrasion/contusion.
- A 3 x 1.8 cm pink-purple contusion and red-brown abrasion is on the right temple, and extended scalp reflection reveals an underlying partial scalp thickness hemorrhage.
- A 3 x 1.5 cm faint pink-brown abrasion/contusion is on the lower left forehead.
- A 2 x 2 cm cluster of punctate pink-brown abrasion/contusions is on the right forehead.

- A 2 x 1 cm pink-brown abrasion/contusion is on the upper left forehead, near the hairline.
- A 5 x 2.5 cm orange-brown to red-brown abrasion extends from the left malar prominence to the left temple, partially surrounding the left eye.
- At the posterior occipital scalp, under the hair, are several healing lacerations:
    a) 4.5 x 0. 7 cm, horizontally oriented, partially healed full thickness, with flanking red-brown abrasion (x 4 surgical staples)
    b) 3 x 1 cm, horizontally oriented, partially healed, with flanking red-brown abrasion ( x 3 surgical staples)
    c) 2.3 x 0.8 cm, vertically oriented, partially healed with granulation tissue
    d) 3 x 1 cm, obliquely oriented, partial thickness, partially healed
    e) 1.5 cm, obliquely oriented, partial thickness, partially healed, with 3 x 2 x 0.4 cm subjacent scalp hematoma
- Numerous oral contusions and lacerations were also identified including: bilateral rectilinear lacerations and contusions extending anteriorly along the buccal mucosa (suggestive of dental injuries); faint petechial hemorrhages adjacent to the maxillary frenulum; punctate to ovoid red-pink to purple-blue contusions at the upper left mucosae and at the lower left gingiva.
- Punctate contusions involve the bilateral tongue and within the tongue tip.
- A 5 x 1 cm purple-red contusion courses along the underside of the chin, following the right jawline.
- A patch of hemorrhage involves the posterior hypopharynx (may be attributable to intubations attempts).

TORSO

- Irregular, indistinct red-brown abrasions and purple-brown contusions up to 4 x 1.5 cm are on the center chest (may be attributable to CPR).

- Multiple, bilateral anterolateral hemorrhagic rib fractures with overlying soft tissue hemorrhage are present (may be attributable to CPR).
- Approximately 150 mL of blood is recovered from each chest cavity (may be attributable to CPR).
- Anterior mediastinal hemorrhage is present (some of which may be attributable to CPR).
- A 7 x 2 cm dried, leathery, orange-yellow abrasion is on the lateral left chest, near the inferior costal margin.

<u>EXTREMITIES</u>

- 6 x 4.5 cm faint pink-brown contusion with roughly central 2 x 1.8 cm pallor is on the posteromedial right forearm.
- A punctate pink-orange abrasion is on the dorsal right 5th finger, overlying the proximal interphalangeal joint.
- A 1 x 1 cm purple- blue contusion is on the anterior right upper arm.
- A 3.5 x 1 cm purple-red contusion is on the proximal anteromedial right forearm.
- A 2 x 1 cm pink-orange contusion is on the distal anterolateral right forearm.
- A punctate pink-orange abrasion is on the ventral right hand, near the base of the thumb.
- A 4.5 x 2 cm red-pink contusion is on the posteromedial right elbow with subjacent patch of soft tissue hemorrhage.
- A 2.5 x 1.8 cm blue-purple-pink contusion is on the anterior left upper arm.
- Scabbed brown abrasions (1 x 1cm, 1 x 0.4 cm) are on the posterior left elbow.
- A punctate red-orange abrasion is on the dorsal left index finger, overlying the proximal interphalangeal joint.
- A 2 x 2 cm pink-purple contusion is on the anterior right knee. Inferiorly is a punctate red-brown abrasion.
- Large purple-beige contusion nearly covers the dorsal right foot.

- Broad purple-pink contusion with, superiorly, focal partially scabbed 1. 8 x 0.5 cm abrasion, nearly covers the anterior left lower leg with diffuse subjacent soft tissue hemorrhage.
- Purple-brown to purple-gray contusion covers the medial left ankle to medial left foot.
- Subungual hemorrhage involves the left big toe.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

38.    To the extent a fact-finder can conclude that MR. ADENA died as a result of blunt force trauma injuries caused and permitted by COUNTY Defendants during times in which no other people had access to MR. ADENA to inflict such injuries, and also as a result of the WELLPATH Defendants' deliberate indifference to those injuries and related conditions including additional traumatic brain injuries, vomiting, and polydipsia (excessive water consumption).  Alternatively, given the COUNTY Defendants lack of documentation for any uses of force against John Adena in the last week leading up to his death, and given the WELLPATH Defendants' stated belief that he had engaged in self-harm and was highly impulsive and at risk for further self-harm, to the extent a fact-finder could determine that MR. ADENA's fatal injuries and conditions were the result of self-harm, WELLPATH and COUNTY Defendants' conduct also caused MR. ADENA's death.

39.    Specifically, and as described in more detail below, whether a fact-finder determines that MR. ADENA's fatal injuries and conditions were caused by deputies' uses of excessive force or by self-harm, his death was caused by each individual Defendant's deliberate indifference to his serious medical and mental health needs and/or use(s) of excessive force:

      a.    Defendant Deputy **HECTOR CORTEZ**, despite his false claim that he was not there, was present on September 16, 2019, when MR. ADENA sustained multiple, severe lacerations to the back of his head, that were so obviously caused by intentional force nobody at the jail believed those injuries were caused by falling out of bed.  Defendant CORTEZ also falsely denied, then lied about the circumstances of, his prior documented arrest for punching a man on the street.  Only deputies had access to MR. ADENA at that time to cause such injuries.  Deputies failed to document any need to use force against MR. ADENA.

      b.    Defendant Deputies **HECTOR CORTEZ, JOSEPH GRADY, and NATHANIAL NEVES**, were also on duty in pod 3C on September 22, 2019, when they "discovered" MR. ADENA in his cell laying on the floor in medical distress.  MR. ADENA at that time was dying from his carotid artery dissection –

the product of severe blunt force trauma – inflicted within the previous 10 hours or so, brain damage, and hyponatremia.  When he became unresponsive just after 5:00 a.m. on September 22, 2019, Mr. Adena's face, neck, torso, arms, feet, and ankles were covered in fresh bruises and other injuries that were not there 10 hours earlier.  All WELLPATH employees have testified that MR. ADENA had no visible injuries before he was released from the safety cell on September 21, 2019.  Again, only deputies had access to MR. ADENA to cause such injuries after his release from the safety cell on September 21 until his death on September 22.  Deputies failed to document any need to use force against MR. ADENA.

     c.   Whether MR. ADENA's injuries can be found to have been caused by deputies' excessive force or by self-harm, Defendant **NEVES** was responsible over those last 10 hours to perform hourly safety checks on MR. ADENA.  Over that period, Defendant NEVES failed to document or report to medical workers any of the alarming signs of medical and mental health distress he observed, admitting that he believed MR. ADENA was having a mental health crisis throughout the night, from immediately after MR. ADENA was released from the safety cell into a disciplinary administrative segregation cell.  Defendant NEVES attempted to cover-up his night-long observations of MR. ADENA's obvious medical and mental health needs by failing to document them or tell an investigator about them in his post-death interview.  The COUNTY's Fed. Rule Civ. Proc. 30(b)(6) "Person Most Knowledgeable" regarding safety checks testified that Deputy NEVES violated the COUNTY's training and procedures by failing to immediately summon medical help for MR. ADENA throughout that night of alarming observations.  Had MR. ADENA been sent to a hospital earlier than 5:00 a.m. on September 22, he likely would have survived.  A jury also can find that Defendant NEVES decided not to inform medical personnel of MR.

1    ADENA's obvious medical distress throughout that night to cover up excessive

2    force that he used, or failed to intervene in, that night.

3    d.   Whether MR. ADENA's injuries can be found to have been caused by deputies'

4    excessive force or by self-harm, Defendant **AMANDA REAM, R.N.** ignored

5    Defendant Johansen's request to assess and treat MR. ADENA's reports of

6    illness and vomiting on September 21, 2019.  A fact-finder can find that MR.

7    ADENA's symptoms reported to Defendant REAM were the result of the carotid

8    artery dissection, brain injury, and/or hyponatremia that caused his death.  Had

9    MR. ADENA been sent to a hospital earlier than 5:00 a.m. on September 22, he

10   likely would have survived.  Defendant REAM has admitted to the California

11   Board of Registered Nursing in a previous case arising from the death of a Shasta

12   County Jail inmate that she engaged in Gross Negligence, Incompetence, and

13   Unprofessional Conduct, including false medical records reporting.

14   e.   Whether MR. ADENA's injuries can be found to have been caused by deputies'

15   excessive force or by self-harm, Defendant **PAM JOHANSEN, L.C.S.W.** only

16   spoke to MR. ADENA with her office door open, with multiple deputies right

17   outside the door, despite MR. ADENA's request not to speak with deputies

18   within earshot of their conversation.  WELLPATH, SHASTA COUNTY, and

19   MS. JOHANSEN chose to violate MR. ADENA's medical privacy rights,

20   including under the Health Insurance Portability and Accountability Axct

21   (HIPAA), by precluding MR. ADENA from being able to speak confidentially,

22   including about deputies' abuse of him.  Defendant JOHANSEN ignored

23   WELLPATH policy requiring her to refer JOHN ADENA for urgent or emergent

24   mental health treatment on August 24, 2019, for his paranoid delusions, auditory

25   hallucinations, confusion, anxiousness, and feeling helpless, hopeless, and

26   worthless.  Defendant JOHANSEN chose to violate the policy requiring her to

27   make an urgent or emergent referral for mental healthcare for JOHN ADENA,

28

1    which resulted in him receiving no care until he was sent to the Emergency

2    Department on September 16, 2019, with multiple cuts on the back of his head.

3    Ms. JOHANSEN also failed to request increased observation of JOHN ADENA

4    after she chose to release him from the safety cell on September 21, 2019.  On

5    September 22, 2019, MR. ADENA specifically informed Defendant JOHANSEN

6    that he needed help, he was vomiting, and he needed medical care, and MS.

7    JOHANSEN saw MR. ADENA vomiting and hanging over his sink.  MS.

8    JOHANSEN claims she asked WELLPATH LVN's and an RN to assess MR.

9    ADENA, but there is no evidence in MR. ADENA's medical chart that MS.

10    JOHANSEN ever made a referral or did anything to get him the medical care he

11    needed and requested.  She testified in deposition that she requested a

12    WELLPATH nurse, matching the description of AMANDA REAM, to assess

13    MR. ADENA and would not leave the jail until the nurse informed her MR.

14    ADENA was okay.  A jury may disbelieve her given her failure to document

15    doing anything to get MR. ADENA the care he needed.  Defendant JOHANSEN

16    also had the ability to request herself that MR. ADENA be transferred to the

17    hospital, and chose not to do so, with deliberate indifference to MR. ADENA's

18    serious medical needs.  Defendant JOHANSEN also failed to institute any

19    increased observation after she permitted JOHN ADENA to be released to from

20    the safety cell and transferred to a disciplinary administrative segregation cell,

21    which she knew would cause MR. ADENA's mental health condition to

22    deteriorate. Defendant JOHANSEN also failed to institute the legally required

23    individualized treatment plan for JOHN ADENA, in violation of 15 Cal. Code

24    Regs. § 1210.  In violation of written WELLPATH policy and with actual

25    knowledge of the consequences of her actions, Defendant JOHANSEN also

26    failed to send MR. ADENA to a hospital on repeated occasions she believed he

27

28

1    had recently engaged in serious self-harm and constant observation was not

2    available in the Shasta County Jail.

3    f.    Whether MR. ADENA's injuries can be found to have been caused by deputies'

4    excessive force or by self-harm, Defendant **DANIEL DELLWO, P.A.** worked

5    independently and autonomously outside his legal scope of practice, as set forth

6    above, and committed multiple violations of the Physician Assistant Practice Act

7    and California Code of Regulations governing his practice.  He also failed to

8    enter into the legally required written Practice Agreement, Delegation of Services

9    Agreement, Prescription Transmittal Authority, and Transport and Back-Up

10    Procedures with any supervising physician, never informed any supervising

11    physician of JOHN ADENA's ongoing psychosis, chose not to transfer JOHN

12    ADENA to the hospital for his ongoing psychosis – which was a medical

13    emergency requiring hospital care, chose never even to discuss JOHN ADENA

14    with a supervising physician, and chose to keep JOHN ADENA in the jail, with

15    psychosis and no medical care other than cursory laboratory tests.  Defendant

16    DELLWO also failed to create the individualized treatment plan required by 15

17    Cal. Code Regs. § 1210.  In violation of written WELLPATH policy and with

18    actual knowledge of the consequences of his actions, Defendant DELLWO also

19    failed to send MR. ADENA to a hospital on repeated occasions he believed he

20    had recently engaged in serious self-harm and constant observation was not

21    available in the Shasta County Jail.

22    g.    Whether MR. ADENA's injuries can be found to have been caused by deputies'

23    excessive force or by self-harm, Defendant **TRACI LEWIS, L.M.F.T.** failed to

24    make sure JOHN ADENA received the treatment plan required by 15 Cal. Code

25    Regs. § 1210, even after being informed by MR. ADENA's parents of his serious

26    mental health problems that arose only recently.  Knowing that MR. ADENA

27    was in psychosis – a medical emergency requiring hospital care -- Defendant

28

LEWIS agreed with Defendant DELLWO not to transfer MR. ADENA to the hospital, and instead to keep him in the jail with Defendant DELLWO ordering cursory lab tests at the jail.  Defendant LEWIS found JOHN ADENA was very impulsive with an odd presentation, and was not communicative, only giving one or two word answers while staring at the floor.  WELLPATH, SHASTA COUNTY, and Defendant LEWIS allowed deputies to be just outside the open door to Defendant LEWIS's office while she evaluated MR. ADENA, precluding him from having a private conversation with her.  Defendant LEWIS knew MR. ADENA was suffering from some mental health problems that involved impulsivity and psychosis, knew his behavior could be caused by a traumatic brain injury or other serious medical issue, and never arranged for MR. ADENA to receive an appropriate hospital evaluation for his psychosis.  WELLPATH and Defendant LEWIS would only transfer a patient to the hospital if he met the standard for emergency psychiatric hospitalization of being a danger to himself or others or gravely disabled due to a mental disorder, under Cal. Welf. & Institutions Code § 5150.  In violation of written WELLPATH policy and with actual knowledge of the consequences of her actions, Defendant LEWIS also failed to send MR. ADENA to a hospital on repeated occasions she believed he had recently engage in serious self-harm and constant observation was not available in the Shasta County Jail.

40.     Within hours of being booked into the jail on August 21, 2019, at approximately 6:55 p.m., JOHN ADENA, clearly suffering from a mental health condition, was placed in a holding cell with several other inmates.  A fight erupted between the inmates, including MR. ADENA, and several deputies arrived at the cell.  Reportedly, MR. ADENA ignored a deputy's commands to lie on his stomach on the cell floor.  Reportedly, MR. ADENA began yelling, kicking, and flailing his body around as the deputies tried to force him to the ground.  Deputies ended up

1  tasing MR. ADENA in dart mode, striking him his lower back, then tasing him again in drive stun

2  mode to the back of MR. ADENA's right thigh.

3       41.    The next day, on August 22, 2019, a WELLPATH nurse attempted to do a

4  neurological check on JOHN ADENA to monitor his condition following the injuries he received

5  the previous day.  The nurse was accompanied by deputies to MR. ADENA's cell.  When the

6  deputies opened the cell, MR. ADENA began exhibiting signs of obvious mental illness, including

7  making incoherent statements, then rolled onto his back and tucked his knees up to his chest and

8  began rocking forward.  Those deputies used unnecessary force on MR. ADENA, causing him to

9  have a bloody nose and other injuries.

10      42.    Deputies brought MR. ADENA to the medical division of the jail to be assessed for

11  his injuries.  While awaiting medical attention, MR. ADENA allegedly began to resist the deputies,

12  possibly passively.  The deputies resumed their unnecessary uses of force including forcing him to

13  the floor, using multiple simultaneous painful control holds, then applying shackles to MR.

14  ADENA's ankles.  MR. ADENA consented to an injection consisting of Benadryl and Haldol for

15  sedation.  Deputies then carried MR. ADENA to Booking Sobering Cell 4 where they continued to

16  use unnecessary bar arm and figure four holds while MR. ADENA was drugged, handcuffed and

17  non-threatening.  As the deputies removed the handcuffs and backed out of the cell, MR. ADENA

18  rolled back onto his back and resumed rocking back and forth with his knees tucked up to his chest.

19  On information and belief, MR. ADENA continued to show signs of mental illness throughout this

20  encounter and was likely confused, disoriented, and fearful as a result of his mental disorder.

21      43.    That same day, WELLPATH Defendant TRACI LEWIS, L.M.F.T. ("LEWIS"),

22  contacted MR. ADENA's parents, Plaintiffs CIRCE and RICHARD ADENA, to gather information

23  about MR. ADENA's mental health and suicide history.  Plaintiffs told Defendant LEWIS that MR.

24  ADENA had begun exhibiting signs and symptoms of mental illness after recently losing his job

25  and home, and having to move in with his parents, and that he had no history of drug use or mental

26  health history.  Defendant LEWIS thus had actual knowledge of MR. ADENA's serious mental

27  health needs.

28

44.    It was therefore her duty, as it would also be the duty of other medical and mental health treaters, to promptly create, or have created, a treatment plan for MR. ADENA's mental health needs as required by 15 Cal. Code Regs. § 1210.

45.    The following day, on August 23, 2019, WELLPATH Defendant PAM JOHANSEN, LCSW ("JOHANSEN"), evaluated MR. ADENA in the mental health clinic.  Defendant JOHANSEN reported that MR ADENA was escorted to the mental health clinic by several deputies.  WELLPATH, SHASTA COUNTY, and MS. JOHANSEN had a practice of only assessing mental health patients with the office door open and multiple deputies outside the office door, refusing to provide HIPAA-protected communications that protect the patient's privacy.  This practice also allows the deputies' presence to intimidate the patient into not discussing abuse by deputies.  MR. ADENA told Defendant JOHANSEN that he worked at a hospital until a few months prior and explained, "I lost my job, I got fired, lost my house."  Defendant JOHANSEN noted that MR. ADENA appeared sad, confused, and anxious and that she tried to gather additional information concerning MR. ADENA's mental health, but, although MR. ADENA was cooperative and polite, she suspected that the presence of numerous deputies deterred him from being more forthcoming with information.  Defendant JOHANSEN did nothing to evaluate MR. ADENA in private or try to engage him in a supportive conversation to draw out what Defendants were doing to MR. ADENA in jail.  Defendant JOHANSEN noted that she would reattempt her evaluation of MR. ADENA the next day.

46.    On August 24, 2019, at approximately 10:26 a.m., Defendant JOHANSEN performed the initial mental health assessment on MR. ADENA.  She reported that MR. ADENA repeated that he had recently been fired from his job after eight years and became homeless. Defendant JOHANSEN further reported that MR. ADENA experienced auditory hallucinations and expressed feelings of hopelessness, helplessness, and guilt/worthlessness related to losing his job and becoming homeless, explaining, "I have lost everything. I have no one."  Defendant JOHANSEN also noted that MR. ADENA appeared disheveled, hopeless, paranoid, anxious, and

1   confused and making incoherent statements such as, "people were following me, they were after my

2   car."

3          47.     Later that day, at approximately 12:04 p.m., Defendant JOHANSEN evaluated MR.

4   ADENA again and noted that MR. ADENA informed her that he had finally slept well after being

5   awake for three days.  Defendant JOHANSEN wrote that MR. ADENA continued to appear

6   anxious and that he exhibited possible paranoid ideation as he continued to talk about, "people who

7   don't like me, people were after me."   Defendant JOHANSEN reported that she suspected MR.

8   ADENA was suffering from drug induced psychosis, despite having been in Defendants' jail

9   custody for three days without access to any drugs.  Psychosis of unknown etiology is a medical

10  emergency requiring hospital care.  With deliberate indifference to JOHN ADENA's serious

11  medical needs, Defendant JOHANSEN chose not to arrange for MR. ADENA to be transported to

12  the hospital for an assessment of his psychosis and its cause.  In addition, WELLPATH policy and

13  the intake form required that Defendant JOHANSEN refer MR. ADENA for urgent or emergent

14  mental health treatment, as he was confused, had anxiety, was paranoid and having auditory

15  hallucinations, and expressed feelings of hopelessness, helplessness, and worthlessness.  Defendant

16  JOHANSEN chose to violate this policy and not refer JOHN ADENA for urgent or emergent

17  mental healthcare, and chose not to create the required individualized treatment plan pursuant to 15

18  Cal. Code Regs. § 1210, all with deliberate indifference to JOHN ADENA's serious medical needs.

19         48.     On August 26, 2019, four deputies escorted MR. ADENA from booking to medical

20  via a "chain-all movement" for an evaluation with WELLPATH Defendant Daniel DELLWO, P.A.

21  ("DELLWO").  On information and belief, a chain-all movement requires belly chains with wrist

22  cuffs and leg irons to significantly limit an inmate's mobility.  Defendant DELLWO evaluated MR.

23  ADENA and reported that had no history of mental health issues but, "is clearly struggling with

24  these issues."   When Defendant DELLWO asked MR. ADENA if he had ever been on mental

25  health medication, MR. ADENA replied, "I don't need any fucking [mental health] meds," then

26  tried to run out of the medical exam room while he was in handcuffs, leg irons and belly chains.

27  Defendant DELLWO was working autonomously and unsupervised, without the legally required

28

physician supervision, and did not inform any supervising physician about MR. ADENA, this incident, MR. ADENA's psychosis, nor the deputies' use of force on JOHN ADENA he witnessed. Defendant DELLWO chose not to request any hospital transport for MR. ADENA's psychosis, nor even to inform his supervising physician. Defendant DELLWO also chose not to create a treatment plan for MR. ADENA, nor refer MR. ADENA for a mental health evaluation.

49.     As MR. ADENA attempted to run out of the room, deputies tackled him and forced him to the ground.  MR. ADENA allegedly began to "physically resist" – although he was fully restrained by the belly chain, handcuffs, shackles, and multiple deputies' control holds – but none of the deputies reported that MR. ADENA had struck them during this altercation.  On information and belief, MR. ADENA's "resistance" consisted of trying to pull his body away from the deputies to prevent further injuries.  Deputies then carried MR. ADENA to his cell by his arms and legs. MR. ADENA was housed in cell 3C16 at the time, which required the deputies to take the elevator to level 3.

50.     On information and belief, COUNTY Defendants have perpetuated a pervasive practice of severely beating and causing significant injuries to inmates during what has been known as "elevator rides."  In addition, COUNTY Defendants conduct "elevator rides" in inmates' cells by placing magnetic boards on the windows of cells to conceal what is happening in those cells from other inmates.  Defendant COUNTY allows and encourages deputies to place magnetic boards over the cell windows while they beat and brutalize inmates like JOHN ADENA, in an attempt to conceal that abuse from other inmate-witnesses.  On information and belief, as a custom and practice, deputies do not document such beatings and uses of excessive force.  On information and belief, due to his untreated mental health needs, MR. ADENA continued to act out and/or passively resist deputies' orders, and violence-prone deputies used unnecessary, excessive, and undocumented force against him.

51.     On or about September 16, 2019, MR. ADENA was house alone in cell 3C16. Deputy Irie McCleave gave sworn testimony in this matter that he and Defendant Deputy CORTEZ were assigned to serve the 3C pod that morning.  On information and belief, in the early morning

that day, Defendant CORTEZ, alone or with other unidentified deputies, entered MR. ADENA's cell and used unnecessary and excessive force on MR. ADENA, causing MR. ADENA to sustain a head injury with multiple lacerations on the back of his head.  Although Defendant CORTEZ did not document using any force against MR. ADENA at that time, or the need to use any force, he also later denied even being present in the 3C pod that morning.  Deputy Irie McCleave wrote a report documenting that at 5:00 a.m. that morning, he and a Wellpath RN discovered MR. ADENA with blood on his shirt, neck, and face.  They also observed blood on the floor of MR. ADENA's cell.  Deputy McCleave again confirmed Defendant CORTEZ's presence when he reported that Defendant CORTEZ, along with Deputy McCleave and another deputy, then escorted MR. ADENA to medical.  With Deputy CORTEZ present in the medical office, MR. ADENA stated, "I fell off my bunk."  MR. ADENA could not have sustained those multiple lacerations to the back of his head from one fall from his top bunk bed; further, MR. ADENA was known to sleep on the bottom bed.  On information and belief, MR. ADENA was afraid to tell medical staff that the cause of his injuries was actually due to being beaten by Deputy CORTEZ and possibly other deputies, while deputies were present.  SHASTA COUNTY and WELLPATH allow deputies to be present for patient medical and mental health assessments, in blatant violation of HIPAA and the patients' privacy rights.  Allowing deputies to be present during these confidential medical communications also prevents inmates who are being abused by deputies from speaking about the abuse.

52.      In his deposition in this matter on April 27, 2023, Defendant CORTEZ falsely denied knowing that Mr. Adena had lacerations on the back of his head on September 16, 2019, and denied being present either before or after MR. ADENA sustained those injuries, contrary to Deputy McCleave's testimony that Defendant CORTEZ was not only present but also escorted a bleeding JOHN ADENA to medical.

53.      On information and belief, the September 16, 2019 incident involving MR. ADENA was not the first incident where Defendant CORTEZ has falsely denied using unjustified force against another person.  In his deposition on April 27, 2023, he denied that he "ever used unjustified physical force on another person." (Cortez Dep., 61).  When asked again, if as an adult he had ever

punched another person without legal authority, Defendant CORTEZ eventually admitted being arrested for just that in Davis, California, in 2013.  According to the Davis police report from that incident on May 5, 2013, the arresting officer wrote that Defendant CORTEZ confirmed he was walking along the street when he punched an "Asian dude" who allegedly touched the girlfriend of one of CORTEZ's friends, then he ran away.  The report states that Defendant CORTEZ fled the scene and was later apprehended by police.  Defendant CORTEZ gave an account of that 2013 punching incident in his sworn deposition that was very different from what he told the arresting officer at the time.  Defendant CORTEZ testified he was required to take anger management classes as a result of that arrest.

54.    On September 16, 2019, at approximately 5:45 a.m., MR. ADENA was brought to the emergency room at Shasta Regional Medical Center after he reportedly fell off the top of his bunk bed and hit the back of his head on the hard cement floor.  MR. ADENA suffered multiple severe 2-centimeter posterior scalp lacerations requiring staples to seal.  He was cleared to return to jail that same day.  The WELLPATH Defendants were aware that Shasta Regional Medical Center staff did not address MR. ADENA's mental health needs.  Deputies and WELLPATH Defendants never believed that MR. ADENA sustained those multiple lacerations from falling from his bunk; rather they would later write that those injuries were self-inflicted.  WELLPATH Defendants did not consider that MR. ADENA's head injuries, including multiple lacerations, also could have been caused by deputies.

55.    Upon returning back to the jail, MR. ADENA had a telepsychiatry consultation with WELLPATH psychiatrist, Stancil Johnson, M.D.  Dr. Johnson reported that MR. ADENA injured his head by banging it onto a wall, and noted that based on staff reports, MR. ADENA had no significant psychiatric problems (despite extensive charting of Mr. Johnson's significant psychiatric problems in WELLPATH records), although he had previously seen a psychiatrist for anxiety.  Dr. Johnson wrote MR. ADENA a prescription for anxiety and scheduled a follow up appointment for a week later.

56.     WELLPATH Defendant DELLWO assessed MR. ADENA when he returned from the hospital and observed that the lacerations on the back of MR. ADENA's head were likely the result of self-harm, rather than from MR. ADENA falling off the top bunk bed, which would cause one laceration from a single impact from the fall, not two or more lacerations.  Defendant DELLWO recommended MR. ADENA be placed in a safety cell due to being a danger to himself for purposely causing his head lacerations.  Although he believed that MR. ADENA's injuries were self-inflicted, Defendant DELLWO still failed to create the individualized treatment plan for MR. ADENA, required by 15 Cal. Code Regs. § 1210.  Defendant DELLWO continued working autonomously and unsupervised, in violation of the California Physician Assistant Practice Act, and still never informed any supervising physician about JOHN ADENA's head injuries requiring transport to the hospital, nor his suspicion that the injuries were self-inflicted.

57.     MR. ADENA was then placed in a safety cell, with his clothing removed, and given a safety smock.  The safety smock is a thick quilted, sleeveless garment that does not cover the lower legs or feet.  Given Defendants' belief that MR. ADENA's serious head injury was self-inflicted, Defendant WELLPATH's Suicide Prevention policy required that MR. ADENA be placed on constant, one-on-one direct observation.  The requirement of constant, 24-hour, 7-day a week observation for inmate-patients who are acutely at risk of suicide is a nationally generally accepted standard.  Defendant WELLPATH's policy required that MR. ADENA receive this constant observation.  However, Defendant COUNTY has refused to provide any cells within its nine-floor jail where patients can receive the required constant observation.  Because it was not possible to constantly observe MR. ADENA in the Shasta County Jail, WELLPATH's own policy required that WELLPATH Defendants DELLWO, LEWIS, and JOHANSEN must send him out to a hospital where he could receive the care and treatment he needed but that the jail medical and correctional staff could not provide.  With deliberate indifference to MR. ADENA's obvious and severe mental health needs, and to WELLPATH's mandatory policy that was meant to reasonably address such severe mental health needs, WELLPATH Defendants DELLWO, LEWIS, and JOHANSEN each failed to send MR. ADENA to a hospital to address his mental health needs.  The WELLPATH

1   policy requiring that WELLPATH staff send MR. ADENA to an outside hospital for mental health

2   treatment under these circumstances was as strong as physicians' orders, which WELLPATH

3   Defendants DELLWO, LEWIS, and JOHANSEN knowingly violated.

4           58.     WELLPATH and SHASTA COUNTY violate the policy requiring that patients be

5   transported to the hospital when WELLPATH and the COUNTY refuse to provide the required

6   constant observation to inmates who are believed to engage in self-harm.  Instead, WELLPATH and

7   the COUNTY only transfer inmates to the hospital for mental health issues if the patient is so

8   severely ill he is a danger to himself or to others, or gravely disabled, due to a mental disorder under

9   California Welfare & Institutions Code § 5150.

10          59.     On September 17, 2019, at approximately 4:20 p.m., WELLPATH Defendant

11  LEWIS conducted a mental health sick call on MR. ADENA.  Defendant LEWIS noted that MR.

12  ADENA continued to report that his head injuries were caused by him falling out of the top bunk

13  despite Defendants' charted disbelief of this story, including since MR. ADENA always slept on the

14  bottom bunk, and despite Defendant DELLWO reporting that MR. ADENA's injuries were

15  consistent with self-injury (or intentional injury by others).  Defendant LEWIS further noted that

16  MR. ADENA was calm and polite, but had a blank stare and flat affect, and that he lacked insight

17  and good judgment.  Defendant LEWIS considered MR. ADENA a "high risk for self-harm," yet

18  failed to create a treatment plan for him or request the required continuous

19  observation/hospitalization of him, in deliberate indifference to WELLPATH policy and his serious

20  medical and mental health needs.

21          60.     On September 18, 2019, WELLPATH Defendant LEWIS conducted another mental

22  health sick call on MR. ADENA.  Defendant LEWIS wrote that MR. ADENA, "Continues to report

23  he fell off top bunk, although he is housed alone and has always been observed sleeping on the

24  bottom bunk."  Defendant LEWIS noted that MR. ADENA remained a high risk for self-harm and

25  that he would continue on suicide watch in the safety cell.  Defendant LEWIS considered MR.

26  ADENA a "high risk for self-harm," yet failed to create a treatment plan for him or request the

27

28

required continuous observation/hospitalization of him, in deliberate indifference to WELLPATH policy and his serious medical and mental health needs.

61.    On September 18, 2019, MR. ADENA's criminal case was called and a doubt arose as to his competence.  On information and belief, the criminal proceedings against MR. ADENA were suspended and the case was referred by the Shasta County Superior Court for a Penal Code § 1368 psychological Evaluation Report to be completed.  The matter was continued to October 23, 2019, for receipt of the Penal Code §1368 Evaluation Report.  Plaintiffs CIRCE and RICHARD ADENA attended this hearing and noticed the back of JOHN ADENA's head actively bleeding, on information and belief, from the injuries he suffered at the hands of SHASTA COUNTY deputies.

62.    On September 19, 2019, WELLPATH psychiatrist, Dr. Stancil Johnson, wrote a supplemental report following his telepsychiatry appointment with MR. ADENA on September 16, 2019, noting inconsistencies in his original report about how MR. ADENA injured himself, observing that MR. ADENA may have been "   [BLANK]   " or engaged in self-injurious behaviors.  Plaintiffs believe and thereon allege that Dr. Johnson was noting MR. ADENA may have been beaten.  Dr. Johnson further indicated that MR. ADENA exhibited signs of paranoia and ordered WELLPATH Defendant DELLWO to do a neurological check on MR. ADENA.

63.    That same day, Defendant LEWIS conducted another mental health sick call and again reported that MR. ADENA remained a "high risk for self-harm due to impulsivity, suspected self-injurious behavior, and lack of insight."  Also on September 19, 2019, in a late chart entry not entered until after MR. ADENA's death on September 22, 2019, Defendant LEWIS reported that she spoke to MR. ADENA's father, Plaintiff RICHARD ADENA, who had inquired about getting help with visiting his son.  Defendant LEWIS wrote that she informed Plaintiff RICHARD ADENA of JOHN ADENA's mental health status and placement in a safety cell.

64.    By the time of Defendant LEWIS's September 19, 2019 evaluation, JOHN ADENA's condition had not improved after four days in the safety cell.  WELLPATH's policy on Safety Cell Placement and Retention requires patient showing no improvement in the safety cell "must be transferred to the hospital for further medical and diagnostic evaluation."  With deliberate

1  indifference to JOHN ADENA's serious medical needs, Defendant LEWIS chose to violate this

2  policy requiring JOHN ADENA to be transferred to the hospital.

3      65.    Also on September 19, 2019, a WELLPATH nurse reported that COUNTY deputies

4  informed her that MR. ADENA was "purposely putting toothpaste in his mouth to make it look like

5  he was foaming at the mouth and scraping his knuckles on the ground."  Yet, WELLPATH

6  Defendants failed to request a psychiatric evaluation of MR. ADENA, failed to transfer him for

7  outside emergency psychiatric evaluation, and failed to create a treatment plan for him, with

8  deliberate indifference to his serious medical and psychiatric needs.

9      66.    On September 20, 2019, WELLPATH Defendant DELLWO conducted a medical

10  sick call on MR. ADENA.  Defendant DELLWO noted that MR. ADENA had a strange history of

11  no mental health issues his entire life until he lost his job a month before he got arrested.  Defendant

12  DELLWO further noted that after discussions with mental health staff (Defendant LEWIS), it was

13  agreed that MR. ADENA would be assessed for organic causes of psychosis.  Defendants

14  DELLWO and LEWIS agreed that JOHN ADENA would be kept in the jail, despite both of them

15  knowing that psychosis of unknown etiology is a medical emergency requiring hospital care and

16  evaluation.  Defendants DELLWO and LEWIS chose not to send MR. ADENA to the hospital for

17  his psychosis, with deliberate indifference to MR. ADENA'S serious medical needs.  Defendant

18  DELLWO ordered cursory lab tests on a non-rush basis.  In addition, Defendant DELLWO was

19  well aware of JOHN ADENA's long history of serious and unabated mental health issues while he

20  was in jail.  Defendant DELLWO knew that patients whose medical or mental health needs exceed

21  the facility's capabilities to provide care for them, must be transferred to the hospital.  Defendant

22  DELLWO again failed to order the transfer of MR. ADENA to the hospital and failed to create a

23  treatment plan for him, all with deliberate indifference to MR. ADENA's serious mental health

24  needs.  With further deliberate indifference to JOHN ADENA's serious medical needs, Defendant

25  DELLWO practiced autonomously and without the legally required supervision, in violation of the

26  Physician Assistant Practice Act.  Defendant DELLWO never discussed JOHN ADENA with his

27  supervising physician, Dr. Garcia, and assumed total responsibility for JOHN ADENA's care.

28

67.   WELLPATH Defendant JOHANSEN also assessed MR. ADENA on September 20, 2019, with the door to her office open and deputies just outside the open door.  Defendant JOHANSEN expressed her doubts to MR. ADENA concerning the credibility of MR. ADENA's account of how he obtained the lacerations to the back of his head and her concerns for his safety. Defendant JOHANSEN noted that MR. ADENA appeared very anxious, that he stared blankly, and had minimal responses.  She determined that MR. ADENA was "*too unstable to be removed from the safety cell*."  By this time, JOHN ADENA's condition had not improved after five days in the safety cell.  WELLPATH's policy on Safety Cell Placement and Retention requires patient showing no improvement in the safety cell "must be transferred to the hospital for further medical and diagnostic evaluation."  With deliberate indifference to JOHN ADENA's serious medical needs, Defendant JOHANSEN chose to violate this policy requiring JOHN ADENA to be transferred to the hospital.

68.   From September 17 through September 21, 2019, while MR. ADENA was in the safety cell, deputies served MR. ADENA excessive amounts of water, which was noted on each day's safety cell log taped to the safety cell door.  For example, on September 17 deputies served him 20 cups/bowls of water; on September 18 deputies served him 35 cups/bowls of water; on September 19 deputies served him 30 cups/bowls of water; on September 20 deputies served him 31 cups/bowls of water; on September 21 deputies served him 26 cups/bowls of water just by 9:20 am. National and state jail standards required counties to train their correctional deputies about the medical risks of inmates overconsuming water, including that overconsumption of water can lead to water intoxication, Hyponatremia and death.  Rule 12 (b)(6) depositions of COUNTY and WELLPATH persons most knowledgeable already taken in this matter reveal that neither the COUNTY nor WELLPATH provided any training to jail correctional or healthcare staff about the risks of overconsumption of water, water intoxication, and Hyponatremia that can lead to death. The excessive drinking water that untrained deputies fed to MR. ADENA in the last days of his life caused or contributed to the Hyponatremia that was a "significant condition" leading to his death.

69.     WELLPATH never trained any of its employees nor any COUNTY employees about the dangers of overconsumption of water, water intoxication, or hyponatremia.  WELLPATH never even trained any of its employees about polydipsia, excessive thirst or the abnormal urge to drink excessive amounts of water.  WELLPATH never trained its employees about even some of the conditions that can cause polydipsia, which can lead to the hyponatremia that contributed to JOHN ADENA's death, including for example:  traumatic brain injury, diabetes, depression, anxiety, or mental illnesses such as schizophrenia.  With deliberate indifference to JOHN ADENA's serious medical needs, WELLPATH chose not to train its employees about polydipsia, water intoxication, or hyponatremia even knowing that the vast majority of patients they treat in jails suffer from mental illnesses that may cause polydipsia.

70.     With deliberate indifference to JOHN ADENA's serious medical needs, WELLPATH refused to train its own employees or COUNTY employees about water intoxication, hyponatremia, or polydipsia even though one of WELLPATH's patients in the Glenn County, California, Jail, died of hyponatremia from drinking too much water, over ten years ago.

71.     WELLPATH has continued to refuse to train its employees or COUNTY employees about the dangers of water intoxication, polydipsia, and hyponatremia even after JOHN ADENA's death, even knowing his death was due in part to hyponatremia.  As a result of WELLPATH's persistent refusal to train its employees and COUNTY employees, another WELLPATH patient, in Alameda County's Santa Rita Jail -- Jesus Eric Magana -- died of water intoxication and hyponatremia in April 2023.

72.     On September 21, 2019 at approximately 11:30 a.m., WELLPATH Defendant JOHANSEN evaluated MR. ADENA again during a mental health sick call and suddenly discontinued his suicide watch, reporting that MR. ADENA has been cooperative with custody and jail nurses, even though Defendant JOHANSEN suspected that MR. ADENA's injuries were self-inflicted, knew or should have known that he was supposed to be evaluated for organic causes of psychosis, knew he was medication non-compliant, and the day before she deemed MR. ADENA "too unstable" to be released from the safety cell.  Defendant JOHANSEN discharged MR.

ADENA from the safety cell with no request for increased observation of him, and no treatment plan whatsoever, to an administrative segregation cell with a sink where he would be able to drink unlimited and unobserved amounts of water. On information and belief, inmates suffering from severe mental illnesses are not adequately monitored in the segregated housing unit and do not receive the level of psychiatric care needed to treat their mental illness. With full knowledge that MR. ADENA suffered from untreated psychosis of unknown etiology, and was believed to have recently engaged in self-injurious behavior while housed in his segregated cell just days prior, Defendant JOHANSEN chose to discharge MR. ADENA from the safety cell without any measures taken for continuity of care, without any psychiatric or mental health evaluation or treatment plan, all with deliberate indifference to his serious mental health needs. In addition, Defendant JOHANSEN discharged MR. ADENA to be housed alone in a segregated cell, essentially in solitary confinement. It has been well known in correctional healthcare for decades that housing a severely mentally ill inmate alone in segregation or solitary confinement endangers the patient's mental health and greatly increases the risk of further morbidity and suicide. It is generally accepted in correctional health care throughout the United States that inmates at risk of suicide who are housed alone in segregated cells must be under constant observation.

73.   Defendant JOHANSEN knew that being housed in segregated housing would cause JOHN ADENA's mental health to deteriorate, citing in her deposition to the book on the very same subject, entitled *Hell Is a Very Small Place: Voices from Solitary Confinement*, (2016) Edited by Jean Casella, James Ridgeway, and Sarah Shroud.

74.   On Defendant JOHANSEN's instruction, MR. ADENA was discharged from the safety cell and returned to segregated cell 3C16 without any heightened monitoring. That cell also had a sink, providing MR. ADENA unsupervised and unlimited access to water.

75.   Later that day, at 3:21 p.m., Defendant JOHANSEN observed MR. ADENA in cell 3C16 and reported that MR. ADENA told her: "I am sick, I need to see medical. I am vomiting." Defendant JOHANSEN testified that she saw MR. ADENA vomiting and hanging over the sink in his cell. It is well known in the medical profession that vomiting after a head injury, like MR.

1   ADENA suffered on September 16, 2019, is a sign of traumatic brain injury requiring immediate

2   medical attention.  Defendant JOHANSEN simply noted that she would advise the nursing staff as

3   to MR. ADENA's request, as he was "not likely to put in a sick slip."   However, there is no

4   documentation that MS. JOHANSEN actually informed any medical staff of this urgent need for

5   care.  MR. ADENA never received the immediate medical attention he needed.

6          76.     On July 2, 2024, Defendant JOHANSEN testified in a sworn deposition in this

7   matter, that after MR. ADENA informed her he was sick and vomiting, and requested medical

8   treatment at 3:21 p.m on September 21, 2019, she was very worried about MR. ADENA's health.

9   She testified she went to the nurse's office at the jail and asked WELLPATH nursing staff to

10  evaluate MR. ADENA because he was sick, vomiting, and hanging over his sink.  Defendant

11  JOHANSEN testified that the WELLPATH nursing staff did not agree to her request to evaluate

12  MR. ADENA, nor did they tell her they would evaluate him.  Instead, the WELLPATH nursing

13  staff were doing paperwork, and told her they were doing their shift change, after which at least two

14  of the WELLPATH nursing staff left the building.

15         77.     Defendant JOHANSEN testified she then found a WELLPATH nurse and asked her

16  to evaluate MR. ADENA because he was sick, vomiting, had requested medical help, and she was

17  very worried about him.  MS. JOHANSEN does not remember the name of this nurse.  However,

18  this WELLPATH nurse was Caucasian, perhaps around 40 years old, with shoulder length blonde

19  or graying hair, and wore glasses.  This WELLPATH nurse told MS. JOHANSEN she would

20  evaluate MR. ADENA.  Defendant JOHANSEN testified that she would not leave the jail, even

21  though it was after her shift was over, until this WELLPATH nurse came back from evaluating MR.

22  ADENA.  Defendant JOHANSEN did not document any of this information in MR. ADENA's

23  medical chart.

24         78.     Defendant JOHANSEN testified that the WELLPATH nurse came back to

25  Defendant JOHANSEN after claiming to have assessed MR. ADENA, and assured Defendant

26  JOHANSEN about MR. ADENA's condition so that Defendant JOHANSEN was then willing to go

27

28

home.  Defendant JOHANSEN testified this happened some time after 5:00 p.m. on September 21, 2019.

79.    Plaintiffs are informed and believe and thereon allege that the WELLPATH nurse who claimed to have assessed MR. ADENA was Defendant AMANDA REAM, R.N.  Defendant REAM matches Defendant JOHANSEN's description of the nurse who claimed to have assessed MR. ADENA.  Defendant REAM was working the 3:00 p.m. to 11:00 p.m. shift on September 21, 2019.  Defendant REAM made no notes of any assessments of JOHN ADENA that day.  She cursorily documented in MR. ADENA's medical chart that she "completed" "wound care" on MR. ADENA's head wounds at 5:24 p.m. on September 21, 2019, but made no notes whatsoever about what she observed or what she did when she claims to have performed "wound care" on MR. ADENA.

80.    Defendant REAM has previously engaged in medical fraud.  On August 14, 2018 – over one year before the death of John Adena – Randall Johnson had attempted suicide by taking $100 of methamphetamine intravenously and rectally, and was lying in a fetal position in the driveway of his home wearing only shoes and underwear, and covered in feces.  Redding, California, police officers arrested Mr. Johnson and took him to SHASTA COUNTY Jail. Defendant REAM was the WELLPATH nurse required to do the intake medical assessment on Mr. Johnson, and required to ask him all questions necessary to complete a six-page medical receiving screening form.  Defendant REAM, whose intake assessment on Mr. Johnson was recorded on video, refused to ask all of the required questions, and only asked Mr. Johnson a few questions. Then she fraudulently wrote "no" to many of the questions on the form, and cleared Mr. Johnson for admission to the jail's safety cell, with no medical follow-up.  Mr. Johnson died approximately thirty hours later from the toxic effects of methamphetamine, after having been severely beaten in the safety cell by deputies.

81.    On January 24, 2023, the California Board of Registered Nursing filed a licensing complaint (Accusation No. 4002022002298) against Defendant REAM, stating Gross Negligence, Incompetence, and Unprofessional Conduct as the causes for discipline against Defendant REAM.

82.     On March 10, 2023, Defendant REAM admitted the truth of each and every charge and allegation in the Board of Registered Nursing accusation against her.  Specifically, she admitted the following:

a.   She was employed by WELLPATH as a registered nurse at Shasta County jail, responsible for the receiving medical triage screening for arrestees;

b.   When Randall Johnson arrived at the jail on August 14, 2018, he was wearing only underwear, socks, and shoes with feces on his underwear, up his back, and on his arms;

c.   Defendant REAM was informed by the arresting officer that Mr. Johnson had attempted to commit suicide by injecting methamphetamine and ingesting it anally;

d.   Defendant REAM was informed by the arresting officer that Mr. Johnson had constantly taken methamphetamine for the prior three days, to kill himself;

e.   Contradicting the information she had received, Defendant REAM answered "no" to the intake question of whether Mr. Johnson had ingested or placed any drug into a body cavity;

f.   Defendant REAM did not thoroughly complete the Medical Intake Triage/Receiving Screening form or ask all of the required questions, inaccurately documented that she asked questions that she did not ask, and did not contact a physician or midlevel provider about Mr. Johnson's clinical presentation as required by WELLPATH policy;

g.   Defendant REAM failed to ask Mr. Johnson the type, route, frequency, and last use of methamphetamine, and documented "no" to the questions about Mr. Johnson's history of drug or alcohol use or withdrawal or suicide attempts, even though she did not ask Mr. Johnson those questions;

h.   Defendant REAM documented "no" to the question of whether Mr. Johnson had any prior driving under the influences [he told her, and was recorded to have told her, that he had a DUI];

i.   Defendant REAM medically cleared Mr. Johnson to be admitted to the jail, on suicide watch and in a safety cell, but did not give him a suicide level and he was not placed on constant (24/7) observation;

j.   On or about August 16, 2018, Mr. Johnson died at Shasta County jail of toxic effects of methamphetamine;

k.   Defendant REAM failed to follow WELLPATH's policy regarding receiving screening when she failed to refer Mr. Johnson to the emergency room for evaluation and clearance;

l.   Defendant REAM failed to follow WELLPATH's suicide prevention program policy in that Randall Johnson was acutely suicidal and should have been placed on 24 hours a day, 7 days a week observation or transferred to the hospital if the facility could not provide the proper supervision;

m.  Defendant REAM failed to follow WELLPATH's policy regarding medical follow-up, failing to note either "routine chronic care," "next provider sick call," "mental health emergent/crisis," or "next mental health clinic;"

n.   Defendant REAM was grossly negligent;

1

o.  Defendant REAM was incompetent when she failed to exercise the degree of learning, skill, care and experience of a registered nurse;

2

p.  Defendant REAM committed acts that constitute unprofessional conduct.

3

4     83.    Defendant REAM stipulated to the truth of each and every charge made against her

5   by the Board of Registered Nursing, including those listed above.  She agreed that her Registered

6   Nurse License No. 95063717 would be revoked, with the revocation stayed while she was placed on

7   probation for three years.  On July 14, 2023, the Stipulated Settlement and Disciplinary Order

8   became the Order of the Board of Registered Nursing, Department of Consumer Affairs.  The Order

9   is attached hereto as **Exhibit 1.**

10     84.    The WELLPATH Defendants knew of Amanda Ream's gross mishandling of

11   Randall Johnson's medical intake triage and receiving screening in August 2018, after Mr. Johnson

12   died.  The WELLPATH Defendants kept Defendant REAM on the payroll with no discipline or

13   retraining, continuing to allow her to provide grossly negligent, incompetent, and unprofessional

14   care, or lack of care, to patients in in Shasta County Jail.  Just over a year after she was grossly

15   negligent, incompetent, and unprofessional with respect to Randall Johnson, Defendant REAM

16   either failed or refused to assess JOHN ADENA even after being requested by Defendant

17   JOHANSEN to do so, and failed or refused to document anything concerning MR. ADENA except

18   for the "completion" of unspecific "wound care" related to MR. ADENA's head wounds, on

19   September 21, 2019.

20     85.    A little after 11:00 a.m. on September 21, 2019, MR. ADENA was transferred from

21   the safety cell back to cell 3C16, where he was housed alone.  Deputy Sierian Smith performed four

22   safety check on MR. ADENA between 11:13 a.m. and 6:41 p.m.  Deputy Smith testified in this

23   matter that during that time, she observed no injuries to Mr. Adena besides his prior head

24   lacerations.  The night shift started at 7:00 p.m.  Shift logs indicate that the night shift for September

25   21, 2019, included Defendants CORTEZ, GRADY, and NEVES.

26     86.    MR. ADENA had no new visible injuries before 6:41 p.m. on September 21.  All

27   WELLPATH individual Defendants in this case who have testified, also confirmed that JOHN

28

1  ADENA had no visible injuries (other than the September 16 cuts on the back of his head) while he

2  was in the safety cell, before being transferred to cell 3C16.  By the time of his death at around 5:00

3  a.m., September 22, 2019, JOHN ADENA's body was covered in new injuries, including multiple

4  contusions to his head, face, neck, arms, legs, feet, and ankles, and a new three-inch laceration on

5  his right cheek, and cuts inside his mouth from his teeth, due to smothering.  (See **SAC Exhibit 2**,

6  photos).  Emergency Medical Technician Matt Bohlin who performed life-saving measure on MR.

7  ADENA as he was dying testified in this matter that the injuries depicted in photos would have been

8  caused by "blunt force trauma."  Multiple physician-experts in this case will also testify that MR.

9  ADENA's injuries as depicted in **SAC Ex. 2** were caused by blunt force trauma.  During those last

10  ten hours, MR. ADENA also sustained the carotid artery dissection that caused his death.  Multiple

11  physician-experts in this case will also testify that carotid artery dissection could only have been

12  caused by severe blunt force trauma, similar to MR. ADENA having been in a severe vehicle

13  collision.

14      87.    Defendants CORTEZ, GRADY, and NEVES all gave statements to Shasta County

15  Sheriff's Department investigators later after Mr. ADENA's death on September 22, that they

16  "found" MR. ADENA in his cell in distress, along with LVN Jones-Morast, at around 5:00 a.m. on

17  September 22.  On information and belief, Defendants CORTEZ, GRADY, and NEVES used,

18  allowed, and failed to intervene in the use of excessive and unnecessary force on MR. ADENA

19  some time between 7:00 p.m. on September 21 and 5:00 a.m. on September 22, 2019, to cause those

20  new blunt force trauma injuries, including the deadly carotid artery dissection.  No force was

21  justified or reported during that time period.  No other inmates had access to MR. ADENA in cell

22  3C16 where he was housed during that period of time.  Only jail deputies had access to MR.

23  ADENA during the time that severe blunt force trauma was inflicted on him.

24      88.    From 7:30 p.m. September 21 until 5:00 a.m. September 22, Defendant NEVES was

25  assigned to do hourly safety checks on MR. ADENA.  Defendant NEVES admits being trained that

26  those checks were necessary for MR. ADENA's safety, and possibly for his life.  During that 9.5-

27  hour period, Defendant NEVES went to MR. ADENA's cell 13 times to check on MR. ADENA.

28

Those 13 cell checks were logged electronically on a PIPE system log, that records when a deputy taps a "PIPE" device against a sensor next to the cell door.  Deputy NEVES did not write any handwritten logs or alert anyone throughout the night as to the alarming observations he made, although he was required to write down at least anything "unusual" and certainly anything that could suggest an inmate was having a medical or mental health problem.  Deputy NEVES also was required to immediately inform medical/mental health staff if he had any reason to suspect that an inmate was unwell.  COUNTY policy required Defendant NEVES to document the inmate's condition each time he checked on the inmate.  Defendant NEVES violated this policy, never documenting JOHN ADENA's condition.

89.      Just before 5:00 a.m. on September 22, 2019, Defendant NEVES went down to the medical office and told Wellpath LVN Jones-Morast that MR. ADENA had had "odd behavior" and that he was "acting weird and eating toothpaste."  LVN Jones-Morast decided to immediately go and check on MR. ADENA.  In fact, Deputy NEVES observed much more troubling signs of MR. ADENA's severe injuries.  In his first interview with the Shasta County Sheriff's Investigator Joshua Hambly later that day, Defendant NEVES did not mention anything unusual happening over the previous night that included his 13 safety checks on MR. ADENA.  When Deputy Hambly re-interviewed Defendant NEVES on December 4, 2019, Defendant NEVES told him the following: that he had observed "MR. ADENA's behavior was strange immediately after he was cleared to return to his cell from the safety cell;" throughout his multiple hourly cell checks, MR. ADENA "was moaning and rubbing his hands on the concrete in the cell;" he also observed MR. ADENA "would be laying in various 'un-natural positions' in his cell;" and that "Deputy NEVES believed that ADENA was having a mental health crisis."  Deputy NEVES confirmed that that "odd behavior" went on all night long.  Yet Defendant NEVES never reported those signs of medical/mental health distress to a medical person until almost 5:00 a.m. the next morning.  The County's Rule 30(b)(6) "Person Most Knowledgeable" regarding safety checks, Lt. Joe Danis, testified in his deposition on May 1, 2024, that Deputy NEVES violated the Sheriff's Department's training and procedures that required Deputy NEVES to immediately report such signs of an

inmate's distress to a nurse or mental health worker.  Expert medical testimony in this case will

support that had Deputy NEVES followed his training for the safety of MR. ADENA and reported

what he observed earlier than 5:00 a.m. on September 22, 2019, MR. ADENA could have been

taken to a hospital emergency department where his carotid artery dissection and Hyponatremia

would have been treated and he very likely would have survived.

90.    At approximately 5:00 a.m. on September 22, 2019, LVN Jones-Morast and

COUNTY Defendants NEVES, CORTEZ, and GRADY went to MR. ADENA's cell and observed

MR. ADENA lying on his left side next to the toilet in his segregated cell flinging his right arm

back and forth and moaning with a purple or brown foam-like substance coming out of his mouth.

Ms. Jones-Morast spoke to MR. ADENA, but he was unable to respond.  When it was apparent that

MR. ADENA was in obvious distress and suffering from some unknown medical condition, Ms.

Jones-Morast directed COUNTY Defendants GRADY, NEVES, and CORTEZ to take MR.

ADENA to the medical unit to be assessed for a safety cell placement without regard for the

possibility that moving him would exacerbate his injuries.

91.    Defendants GRADY, NEVES, and CORTEZ then entered the cell and worked in

concert to use excessive force against MR. ADENA.  Defendant NEVES unnecessarily used his full

body weight to put MR. ADENA's legs into a figure four compliance hold, even though MR.

ADENA was not actively resisting the deputies.  Defendant NEVES reported hearing a gurgling

sound while they were attempting to handcuff MR. ADENA while he was prone, which signified

for him that MR. ADENA was having a medical emergency.  Without any precautionary measures,

and while MR. ADENA was clearly suffering from a serious medical condition, Defendants

GRADY, NEVES and CORTEZ dragged MR. ADENA out of the cell by his arms when

Defendants determined that he could not walk on his own.  Defendants callously dragged MR.

ADENA, face down by his handcuffed arms, throughout level 3C, onto the elevator, and down to

the medical unit on the first level.

92.    En route to the medical unit, jail videos captured COUNTY Defendants GRADY,

NEVES, and CORTEZ dragging MR. ADENA throughout the jail.  On information and belief,

Case 2:21-cv-00770-DC-DMC     Document 81     Filed 08/08/24     Page 44 of 111

1   COUNTY Defendants GRADY, NEVES, and CORTEZ also carelessly bumped MR. ADENA's

2   head on a table in the 3C pod and hit a mop bucket with his body as they transported him to the

3   medical unit.  Droplets of blood were later found on the dayroom table in the 3C pod by COUNTY

4   detectives investigating MR. ADENA's death.

5       93.     Video footage of the elevator ride to the medical unit shows Defendant NEVES

6   needlessly place MR. ADENA's legs into a painful figure four compliance hold using his full body

7   weight while MR. ADENA was clearly under medical distress, prone, handcuffed, not resisting, and

8   unable to pose any threat.  A full view of MR. ADENA in the elevator was obstructed due to

9   Defendants GRADY's and CORTEZ's tactical positioning to block the camera.

10      94.     When Defendants GRADY, NEVES, and CORTEZ arrived in the medical unit they

11  noticed that Mr. ADENA, who had been face down on the elevator ride down from the level 3, had

12  turned purple.  They moved MR. ADENA out of the elevator.  Mr. ADENA was unresponsive.

13  Defendant CORTEZ with other COUNTY deputies began performing CPR.  At this time, Ms.

14  Jones-Morast noticed dark colored blood around MR. ADENA's mouth that she believed looked to

15  be two to three days old.  MR. ADENA's head wounds also bled and there was blood on the floor.

16  A Paramedic and Emergency Medical Technician (EMT) arrived but were unable to revive MR.

17  ADENA.  The paramedic and EMT both testified that MR. ADENA had a three-inch cut on the

18  right side of his face, and blood in his nose.  MR. ADENA also had extensive blood and saliva in

19  his airway, which prevented the paramedic and EMT from inserting an endotracheal tube.  The

20  paramedic and EMT then decided to use a supraglottic airway device called an "igel."  Defendants

21  GRADY, NEVES and CORTEZ participated in chest compressions and bag valve masking for MR.

22  ADENA, including while the paramedic and EMT were caring for him.  EMT Matt Bohlin got the

23  igel properly place in MR. ADENA's mouth and throat.  He turned away from MR. ADENA to get

24  a strap from his medical bag, and when he turned back to MR. ADENA, the igel had been pulled

25  from MR. ADENA's mouth and throat, folder in half, then put back into MR. ADENA's mouth

26  after having been folded in half and inoperable.  One of the COUNTY deputies had removed the

27

28

igel, folded it in half, and jammed it back into MR. ADENA's mouth, where it would no longer work. MR. ADENA was pronounced deceased at 5:45 a.m.

95.     As described above, according to the official Shasta County autopsy report, MR. ADENA's cause of death was: carotid artery dissection of unclear etiology, with hyponatremia as a significant condition. The autopsy also found numerous injuries consistent with blunt force trauma around MR. ADENA's body. Defendants concealed the results of the autopsy, and all information concerning JOHN ADENA's death, for over a year, repeatedly ignoring Plaintiffs' multiple and lawful requests for information about their son's death. When Defendants finally produced the autopsy report and photographs to Plaintiffs in November 2020, they demonstrated that COUNTY Defendants severely brutalized, beat, stomped, choked, and smothered JOHN ADENA, directly causing his death. MR. ADENA suffered extensive hemorrhage in his neck and a common carotid artery dissection, cause by blunt force trauma; extensive hemorrhaging in his chest, caused by blunt force trauma; extensive blunt force trauma to his head, which is deadly force; extensive blunt force trauma on his legs, ankles, and feet, including injuries consistent with severe stomping on his ankles and feet; wrist injuries consistent with being beaten while handcuffed; and smothering to the point that his teeth were imprinted into and tore into the inside of his lips.

96.     Medical expert testimony in this matter will further support: that the cause of the carotid artery dissection and other injuries around MR. ADENA's head, neck and body was severe blunt force trauma; that the carotid artery dissection and hyponatremia were treatable, and MR. ADENA likely would have survived, had MR. ADENA been transported to a hospital emergency department before he became unresponsive around 5:00 a.m. on September 22, 2019.

97.     Medical expert testimony in this matter will further support: had WELLPATH Defendants LEWIS, JOHANSEN, and DELLWO (a) created the required treatment plan for MR. ADENA's severe mental health needs; (b) provided ANY medical and mental health treatment responsive to his severe needs over the course of his month-long incarceration; (c) sent him to a hospital for treatment for his psychosis and serious mental health needs as mandated by controlling standards and WELLPATH policy, then he likely would not have been in a position to die as he did.

98.     Medical expert testimony in this matter will further support: had WELLPATH Defendant JOHANSEN either ordered or requested that MR. ADENA be transferred to a hospital or not ordered MR. ADENA's release from the safety cell on September 21, 2019, he would have remained under 15-minute observation by deputies and more frequent observation by medical and mental health staff and likely would not have died as he did under alternative causation scenarios, (1) that deputies inflicted his deadly blunt force trauma in cell 3C16, or (2) that those injuries were self-inflicted, as WELLPATH staff assumed was the cause of his head lacerations sustained on or about September 16, 2019.

99.     Medical expert testimony in this matter will further support: had Defendant REAM provided ANY appropriate treatment, requested higher level treatment, or had MR. ADENA sent to a hospital when she saw him after being informed by Defendant JOHANSEN that MR. ADENA had complained of vomiting and illness on September 21, 2019 – which was a sign of both hyponatremia and closed head injury – MR. ADENA would have survived.

100.     JOHN ADENA's death in custody is one of 25 reported by the SHASTA COUNTY Jail between 2006 and June 2020, as reported in a June 24, 2020, article[1] in Redding's Record Searchlight entitled, "Dying Inside: Why Are More Deaths Happening in Shasta County Jail Custody?"  JOHN ADENA's death was one of three at the SHASTA COUNTY Jail in the month of September 2019 alone.  SHASTA COUNTY ranks second in total deaths among California's 10 county jail systems with 10,000 to 18,000 annual bookings, based on State data from 2005-2018.  Captain Gene Randall, who currently runs the jail, acknowledged that some deaths in custody are ultimately preventable, responding, "There's no question about it."

101.     WELLPATH holds itself and its officers, directors, and managing agents out as experts in the field of correctional healthcare.  WELLPATH is the largest for-profit correctional healthcare provider in the United States, with contracts covering in excess of 550 jails, prisons, and behavioral health facilities in 37 states.

---

[1] https://www.redding.com/in-depth/news/local/2020/06/24/shasta-county-jail-california-inmate-deaths-mental-health-services/5281201002/

102.    At the time of the incident, Shasta County's jail medical and mental healthcare services were provided by Defendants WELLPATH LLC and CALIFORNIA FORENSIC MEDICAL GROUP, INC. ("CFMG), a Variable Interest Entity ("VIE") of CCS-CMGC Intermediate Holdings, Inc., one of the 65 entities within the "Wellpath family."  The designation of CFMG as a VIE**,** means that it is not an independent stand-alone entity.  CFMG has no independent board of directors, is controlled by WELLPATH LLC, and due to the millions of dollars transferred yearly to WELLPATH LLC, is insolvent.  CFMG's financial viability is dependent on CCS-CMGC Intermediate Holdings, Inc. and, along with Defendants WELLPATH MANAGEMENT INC. and WELLPATH LLC, is included in consolidated financial statements for CCS-CMGC Intermediate Holding, Inc.  At the time of JOHN ADENA's death, WELLPATH was, and continues to be, responsible for the healthcare at the Shasta County jail.  WELLPATH was solvent and had substantial net equity, $674 million, as of December 31, 2021.

103.    CFMG, which was part of the Correctional Medical Group Companies that merged with Correct Care Solutions in 2019 to form WELLPATH and had the contract for all of the companies' services in the State of California, has been criticized for its persistent inadequate health care provided to inmates throughout the State of California.  A January 17, 2015, article[2] in the *Sacramento Bee* entitled, "California for-Profit Company Faces Allegations of Inadequate Inmate Care," reported that CFMG's population-adjusted rate of suicide or drug overdose deaths in custody is 50% higher than non-CFMG counties.  In a 10-year period ending in May 2014, 92 people died of suicide or a drug overdose while in the custody of a jail served by CFMG.

104.    A July 13, 2020, article[3] in the *Atlantic* entitled, "Private Equity's Grip on Jail Health Care" reported that correctional care is good business, especially as more counties have moved to privatize.  WELLPATH currently serves about 10 percent of the counties in the nation.  WELLPATH is expected to enjoy at least $1.5 billion in revenue every year.  WELLPATH and its predecessor companies' contracts with the COUNTY require WELLPATH to pay for all outside or

---

[2] (https://www.sacbee.com/news/investigations/the-public-eye/article7249637.html)

[3] file:///C:/Users/resaf/Downloads/Private%20Equity's%20Grip%20on%20Jail%20Health%20Care%20-%20The%20Atlantic.pdf

hospital care for inmates up to $25,000, which creates a disincentive for WELLPATH and its employees to send patients off-site for emergency care.

105. A July 25, 2023, *San Francisco Chronicle* article[4] entitled, "Its Patients are 'Literally a Captive Market.' Is this California Health Care Giant Failing Them?" reported that in a 2020 probe into the Massachusetts Department of Corrections, the Department of Justice found WELLPATH's mental health care was so abysmal that it may have violated the U.S. Constitution's protections against "cruel and unusual punishment," with "vague" policies that increased the risk of self-harm and suicide among mentally ill prisoners. A follow-up report this year revealed that WELLPATH had low staffing levels and high rates of unlicensed mental health providers. The article further reported that from 2016-2018, for every 10,000 inmates in WELLPATH's care, 16 died – substantially higher than for jails where WELLPATH did not provide medical/mental health care.

106. All COUNTY- and WELLPATH- employed Defendants had actual knowledge that MR. ADENA was suffering from serious emergency medical/psychiatric needs, and all Defendants denied MR. ADENA necessary medical and/or psychiatric care, including necessary emergency care. Defendants deliberately disregarded MR. ADENA's safety and medical/psychiatric needs in their housing placement, assessment, custody, and care decisions. On information and belief, due to such deliberate indifference, MR. ADENA's medical/psychiatric condition deteriorated.

107. Defendants CORTEZ, GRADY, NEVES, LEWIS, JOHANSEN, DELLWO, REAM, and the remaining DOE DEFENDANTS knew and/or must have known that MR. ADENA had serious medical and psychiatric needs requiring emergency treatment, care, and hospitalization, and that with deliberate indifference to such needs, these Defendants, and/or remaining DOES caused MR. ADENA to be deprived of such necessary, life-saving medical and psychiatric care.

108. Decedent's death was proximately caused by the individual COUNTY Defendants' (CORTEZ, GRADY, NEVES, and DOES) uses of excessive force, failure to monitor and protect, violations of standards, provision of excessive drinking water, harmful customs and practices, and

---

[4] https://www.sfchronicle.com/california/article/wellpath-health-care-jails-17917489.php

deliberate indifference to Decedent's rights, safety and well-being as set forth above.  Decedents' death was also proximately caused by WELLPATH Defendants' (LEWIS, JOHANSEN, DELLWO, REAM, and DOES 2-20) deliberate indifference to MR. ADENA's rights, safety, and serious medical and psychiatric needs, as set forth above.  Decedents' death was also proximately caused by Defendants COUNTY and WELLPATH's deliberate indifference to MR. ADENA's rights, safety, and serious medical and psychiatric needs, as set forth above.

109.    JOHN ADENA's death also was proximately caused by Defendant COUNTY's failure to reasonably train and supervise jail deputies who were required to observe, monitor, and protect MR. ADENA, and by all COUNTY jail customs and practices described herein, including but not limited to (1) permitting the use of magnets over cell windows to cover-up uses of force and to obscure observation of and by inmates, routine unauthorized and illegal uses of excessive force by deputies that go unreported, failure to have recording video cameras throughout the jail, and the systematic failure to require written documentation of visual observations and inmate-patients' condition during PIPE cell checks, all as a matter of routine cover-up and code of silence; (2) failing to train deputies about the risk of providing excessive drinking water to inmates without alerting medical staff; (3) persistent failure to provide the constant observation of inmates at risk of suicide or self-harm that WELLPATH policies and national standards require; and (4) practice and custom of not sending inmates in psychosis to the hospital unless Defendants believe the inmate meets the criteria for Welfare & Institutions Code § 5150 emergency involuntary hospitalization for being a danger to themselves or others or gravely disabled.

110.    These substantial failures reflect Defendant COUNTY's policies implicitly or directly ratifying and/or authorizing the routine use of excessive force and deliberate indifference to serious medical needs and the failure to reasonably train, instruct, monitor, supervise, investigate, and discipline deputies employed by Defendant COUNTY.

111.    Decedent's death also was proximately caused by Defendant WELLPATH's failure to reasonably staff, train, supervise, and equip their medical and mental healthcare staff in the proper and reasonable screening, assessment, and care of mentally ill or emotionally disturbed

inmates or inmates needing emergency medical treatment; failure to implement and enforce generally accepted, lawful policies and procedures at the jail, including the legal requirement for medical and mental health staff to create written individualized treatment plans for all patients; failure to train medical, mental health, and correctional staff about the risk of providing excessive drinking water to inmates without alerting medical staff; failure to train their employees or COUNTY employees about the dangers of water intoxication and hyponatremia, even ten years after one of their patients died of hyponatremia in the Glenn County jail; assigning and allowing physician assistants, including Defendant DELLWO, to work in violation of the Physician Assistant Practice Act, outside their legal scope of practice, autonomously and unsupervised, and without the legally required Practice Agreement, Delegation of Services Agreement, Prescription Transmittal Authority, and Transport and Back-Up procedures for times when the supervising physician is not on-site at the jail; assigning Defendant DELLWO to be the sole healthcare provider to over 400 inmates 80% of his work time, all day on Mondays, Tuesdays, Wednesdays, and Fridays, with an average daily population in the SHASTA COUNTY jail in August and September 2019 of 434 inmates; and deliberate indifference to the serious medical/psychiatric needs of inmates such as JOHN ADENA.  These substantial failures reflect Defendant WELLPATH's policies implicitly ratifying and/or authorizing the deliberate indifference to serious medical needs by their medical and mental healthcare staff and the failure to reasonably train, instruct, monitor, supervise, investigate, and discipline medical and mental healthcare staff employed by Defendants.

112.    Defendant COUNTY has a non-delegable duty to provide a constitutional level of medical and mental health care in its jail, regardless of having contracted with WELLPATH to provide such care.

113.    At all material times, and alternatively, the actions and omissions of each Defendant were intentional, wanton, and/or willful, conscience-shocking, reckless, malicious, deliberately indifferent to Decedent's and Plaintiffs' rights, done with actual malice, grossly negligent, negligent, and objectively unreasonable.

114.    As a direct and proximate result of each Defendant's acts and/or omissions as set forth above, to the extent permitted and pled by the various legal claims set forth below, Plaintiffs sustained the following injuries and damages, past and future, among others:

a.    Wrongful death of JOHN ADENA, pursuant to Cal. Code of Civ. Proc. § 377.60 et. seq.;

b.    Loss of support and familial relationships, including loss of love, companionship, comfort, affection, society, services, solace, and moral support, pursuant to Cal. Code of Civ. Proc. § 377.60 et. seq.;

c.    Plaintiffs' emotional distress [individual familial association claims];

d.    Violation of JOHN ADENA's constitutional rights, pursuant to Cal. Code of Civ. Proc. § 377.20 et. seq. and federal civil rights law;

e.    JOHN ADENA's loss of life, pursuant to federal civil rights law;

f.    JOHN ADENA's conscious pain, suffering, and disfigurement, pursuant to federal civil rights law;

g.    All damages and penalties recoverable under 42 U.S.C. §§ 1983 and 1988, and as otherwise allowed under California and United States statutes, codes, and common law.

**FIRST CAUSE OF ACTION**
**(42 U.S.C. § 1983)**
**AGAINST DEFENDANTS CORTEZ, GRADY, NEVES, LEWIS, JOHANSEN, DELLWO, <u>REAM, AND REMAINING DOES</u>**

115.    Plaintiffs reallege each and every paragraph in this complaint as if fully set forth here.

116.    By the actions and omissions described above, Defendants CORTEZ, GRADY, NEVES, AND REMAINING DOES violated 42 U.S.C. § 1983, depriving Decedent JOHN ADENA and Plaintiffs of the following clearly established and well-settled constitutional rights protected by the First, Fourth and Fourteenth Amendments to the United States Constitution:

a.    Decedent's right to be free from excessive and unreasonable force and restraint in the course of seizure and as a pretrial detainee, as secured by the Fourth and/or Fourteenth Amendments; and

      b.     Decedent's right to be free from deliberate indifference to JOHN ADENA's safety and serious medical and mental health needs while in custody as a pretrial detainee as secured by the Fourteenth Amendment.

      c.     Decedent's and Plaintiffs' right to familial association as secured by the First and/or Fourteenth Amendments.

117.    By the actions and omissions described above, Defendants LEWIS, JOHANSEN, DELLWO, REAM, AND REMAINING DOES violated 42 U.S.C. § 1983, depriving Decedent JOHN ADENA and Plaintiffs of the following clearly established and well-settled constitutional rights protected by the First, Fourth and Fourteenth Amendments to the United States Constitution:

      a.     Decedent's right to be free from deliberate indifference to JOHN ADENA's safety and serious medical and mental health needs while in custody as a pretrial detainee as secured by the Fourteenth Amendment.

      b.     Decedent's and Plaintiffs' right to familial association as secured by the First and/or Fourteenth Amendments.

118.    Defendants subjected Decedent to their wrongful conduct, depriving Decedent of rights described herein, knowingly, maliciously, and with conscious and reckless disregard for whether the rights and safety of Decedent and others would be violated by their acts and/or omissions.

119.    As a direct and proximate result of Defendants' acts and/or omissions as set forth above, Decedent, through Plaintiffs herein, sustained injuries and damages as set forth above at ¶ 114.

120.    The conduct of Defendants entitles Plaintiffs to punitive damages and penalties allowable under 42 U.S.C. § 1983 and as provided by law.  Plaintiffs do not seek punitive damages against Defendant SHASTA COUNTY.

121.    Plaintiffs are also entitled to reasonable costs and attorneys' fees under 42 U.S.C. § 1988, and other applicable United States and California codes and laws.

**SECOND CAUSE OF ACTION**
(*Monell* - 42 U.S.C. § 1983)
<u>AGAINST DEFENDANTS SHASTA COUNTY and WELLPATH</u>

122.    Plaintiffs reallege each and every paragraph in this complaint as if fully set forth here.

123.    The unconstitutional actions and/or omissions of Defendants CORTEZ, GRADY, NEVES, LEWIS, JOHANSEN, DELLWO, REAM, AND REMAINING DOES, as well as other employees or officers employed by or acting on behalf of the Defendants COUNTY and/or WELLPATH, on information and belief, were pursuant to the following customs, policies, practices, and/or procedures of Defendants COUNTY and/or WELLPATH, stated in the alternative, which were directed, encouraged, allowed, and/or ratified by policymaking officers for Defendant COUNTY and its Sheriff's Office and/or Defendant WELLPATH:

a.    To deny pretrial detainees and other inmates access to timely, appropriate, competent, and necessary care for serious medical and psychiatric needs;

b.    To allow and encourage inadequate and incompetent medical and mental health care for jail inmates and arrestees, including allowing Defendant DELLWO and other Physician Assistants to work autonomously and independently, without the legally required supervision and Practice Agreement, Delegation of Services Agreement, Prescription Transmittal Authority, and Transport and Back-up procedures for times when the supervising physician is not on site;

c.    To house seriously mentally ill patients at high risk of suicide in solitary confinement in segregated cells, thereby increasing their risk of suicide, including refusing to transport inmates in psychosis to the hospital;

d.    To provide no treatment plan for severely mentally ill inmate-patients, in violation of 15 Cal. Code Regs. § 1210;

e.    To fail to train correctional, medical, and mental health staff and provide appropriate policies to prevent inmates from drinking water to the point of water intoxication and hyponatremia, creating risk of death and serious injury;

f.    To continue to employ Defendant AMANDA REAM, R.N., without appropriate enhanced supervision, despite her documented history of gross incompetence, unprofessionalism, and false medical reporting;

g.    To fail to provide necessary and legally required documented observation of inmates, including inmates at risk of suicide or self-harm and/or inmates at risk of harm by others;

h.    To fail to institute, require, and enforce proper and adequate training, supervision, policies, and procedures concerning handling mentally ill and/or emotionally disturbed persons or persons in medical crisis, or medical emergencies;

i.    To fail to use appropriate and generally accepted law enforcement procedures for handling mentally ill and/or emotionally disturbed persons or persons in medical crisis;

j.    To tolerate the use of routine, and often unreported, excessive and unnecessary force against inmates;

k.    To cover up violations of constitutional rights by any or all of the following:

    i.    By failing to properly investigate and/or evaluate incidents of violations of rights, including by unconstitutional medical and psychiatric care at the jail;

    ii.    By ignoring and/or failing to properly and adequately investigate and/or investigate and discipline unconstitutional or unlawful conduct by jail staff and WELLPATH employees; and

    iii.    By allowing, tolerating, and/or encouraging jail and WELLPATH staff to: cover-up abuse with magnets on cell windows; fail to file complete and accurate reports; file false reports; make false statements; persistently refuse to provide victims' next of kin with any information about the victim's death; ignore repeated lawful requests for information; and/or obstruct or interfere with investigations of unconstitutional or unlawful conduct by withholding and/or concealing material information;

l.    To allow, tolerate, and/or encourage a "code of silence" among law enforcement officers, custodial officers, sheriff's office personnel, and WELLPATH staff at the jail whereby an officer or member of the sheriff's office, or WELLPATH staff does not provide adverse information against a fellow officer, or member of the SCSO, or WELLPATH staff;

m.    To fail to have and enforce necessary, appropriate, and lawful policies, procedures, and training programs to prevent or correct the unconstitutional conduct, customs, and procedures described in this Complaint and in subparagraphs (a) through (l) above, with deliberate indifference to the rights and safety of Decedent, Plaintiffs and the public, and in the face of an obvious need for such policies, procedures, and training programs.

124.    Defendants COUNTY and WELLPATH, through their employees and agents, and through their policy-making supervisors, failed to properly hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline Defendants CORTEZ, GRADY, NEVES, LEWIS, JOHANSEN, DELLWO, REAM, DOES 2-20, and other COUNTY, and WELLPATH personnel, with deliberate indifference to Plaintiffs', Decedent's, and others' constitutional rights, which were thereby violated as described above.

125.    The unconstitutional actions and/or omissions of Defendants CORTEZ, GRADY, NEVES, LEWIS, JOHANSEN, DELLWO, REAM, REMAINING DOES, and other Sheriff's Office personnel, as described above, were approved, tolerated, and/or ratified by policymaking officers for the COUNTY and its Sheriff's Office, and by WELLPATH and WELLPATH medical director and program director.  Plaintiffs are informed and believe and thereon allege that the details of this incident have been revealed to the authorized policymakers within the COUNTY, the Shasta County Sheriff's Office, and WELLPATH, and that such policymakers have direct knowledge of the fact that the death of JOHN ADENA was the result of severe uses of excessive force – much of it unreported but proven by physical evidence – and deliberate indifference to his serious medical needs.  Notwithstanding this knowledge, the authorized policymakers within the COUNTY including BOSENKO and KENT, its Sheriff's Office, and WELLPATH have approved of the conduct and decisions of Defendants CORTEZ, GRADY, NEVES, LEWIS, JOHANSEN, DELLWO, REAM, AND REMAINING DOES in this matter, and have made a deliberate choice to endorse such conduct and decisions, and the basis for them, that resulted in the death of JOHN ADENA.  By so doing, the authorized policymakers within the COUNTY and its Sheriff's Office, and WELLPATH have shown affirmative agreement with the individual Defendants' actions and have ratified the unconstitutional acts of the individual Defendants.  Furthermore, Plaintiffs are informed and believe, and thereupon allege, that policy-making officers for the COUNTY and

WELLPATH were and are aware of a pattern of misconduct and injury caused by COUNTY law enforcement officers and WELLPATH employees similar to the conduct of Defendants described herein, but failed to discipline culpable law enforcement officers and employees and failed to institute new procedures and policy within the COUNTY and WELLPATH.

126.    The aforementioned customs, policies, practices, and procedures; the failures to properly and adequately hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline; and the unconstitutional orders, approvals, ratification, and toleration of wrongful conduct of Defendants COUNTY and WELLPATH were a moving force and/or a proximate cause of the deprivations of Decedent's clearly established and well-settled constitutional rights in violation of 42 U.S.C. § 1983, as set forth above.

127.    Defendants subjected Decedent to their wrongful conduct, depriving Decedent of rights described herein, knowingly, maliciously, and with conscious and deliberate indifference for whether the rights and safety of Decedent, Plaintiffs and others would be violated by their acts and/or omissions.

128.    As a direct and proximate result of the unconstitutional actions, omissions, customs, policies, practices, and procedures of Defendants COUNTY and WELLPATH, as described above, Decedent and Plaintiffs suffered serious injuries and death, Plaintiffs are entitled to damages, penalties, costs, and attorneys' fees against Defendants COUNTY and WELLPATH as set forth above in ¶¶ 119-121, including punitive damages against Defendant WELLPATH.

**THIRD CAUSE OF ACTION**
**(Violation of Civil Code § 52.1) –Individual and Survival Claims**
**<u>AGAINST ALL DEFENDANTS</u>**

129.    Plaintiffs reallege each and every paragraph in this complaint as if fully set forth here.

130.    Plaintiffs bring the claims in this cause of action either individually or as survival claims permissible under California law, including Cal. Code of Civ. Proc. Section 377.20 et. seq.

131.    By their acts, omissions, customs, and policies, DEFENDANTS CORTEZ, GRADY, NEVES, LEWIS, JOHANSEN, DELLWO, REAM, BOSENKO, KENT, COUNTY, WELLPATH and REMAINING DOES, each Defendant acting in concert/conspiracy, as described above, while JOHN ADENA was in custody, and by threat, intimidation, and/or coercion, and with reckless disregard for his rights, interfered with, attempted to interfere with, and violated JOHN ADENA's rights under California Civil Code § 52.1 and under the United States Constitution and California Constitution, including some or all of the following as shown above:

    a.    Decedent's right to be free from excessive and unreasonable force and restraint in the course of seizure and as a pretrial detainee, as secured by the Fourteenth Amendment to the United States Constitution;

    b.    Decedent's right to be free from objectively unreasonable treatment and deliberate indifference to his safety and serious medical and mental health needs while in custody as a pretrial detainee as secured by the Fourth and/or Fourteenth Amendments to the United States Constitution and by California Constitution, Article 1, §§ 7 and 13;

    c.    Decedent's and Plaintiffs' right to familial association as secured by the First and/or Fourteenth Amendments to the United States Constitution.

    f.    The right to emergency medical care as required by California Government Code §845.6.

132.    Defendants' violations of Plaintiffs' and Decedent's due process rights with deliberate indifference, in and of themselves constitute violations of the Bane Act.[5]  Alternatively, separate from, and above and beyond, Defendants' attempted interference, interference with, and

---

[5] See *Atayde v. Napa State Hosp.*, No. 1:16-cv-00398-DAD-SAB, 2016 U.S. Dist. LEXIS 126639, at *23 (E.D. Cal. Sept. 16, 2016) (citing *M.H. v. County of Alameda*, 90 F. Supp. 3d 889, 899 (N.D. Cal. 2013); See also, *Cornell v. City and County of San Francisco*, 17 Cal.App.5th 766, 803 n.32 (2017) (approving *M.H., supra.*); *Page v. County of Madera*, No. 1:17-cv-00849-DAD-EPG, 2017 U.S. Dist. LEXIS 199127 at *10-11 (E.D. Cal. Dec. 2, 2017) (same); *Neuroth v. Mendocino Cty.*, No. 15-cv-3226-NJV, 2016 U.S. Dist. LEXIS 11109, at *22 (N.D. Cal. Jan. 28, 2016) (Bane Act claim pled where sheriff implemented policies, practices, and customs that led to inmate's death due to correctional deputies' deliberate indifference to serious medical/psychiatric needs).

violation of JOHN ADENA rights as described above, Defendants violated Decedent's rights by the following conduct constituting threat, intimidation, or coercion:

a. With deliberate indifference to JOHN ADENA's serious medical needs, suffering, and risk of grave harm including death, depriving JOHN ADENA of necessary, life-saving care for his medical and/or psychiatric needs;

b. Subjecting JOHN ADENA to repeated uses of excessive force, causing immense and needless suffering, intimidation, coercion, and threats to his life and well-being, then intentionally covering up such uses of unlawful force;

c. Causing JOHN ADENA to be placed in punitive solitary confinement for his lawful resistance to Defendants' uses of excessive force and for his mental disturbance, thereby further depriving him of necessary observation and conditions necessary for his safety and well-being;

d. Instituting and maintaining the unconstitutional customs, policies, and practices described herein, when it was obvious that in doing so, individuals such as JOHN ADENA would be subjected to violence, threat, intimidation, coercion, and ongoing violations of rights as Decedent was here.

133. The threat, intimidation, and coercion described herein were not necessary or inherent to Defendants' violation of Decedent's rights, or to any legitimate and lawful jail or law enforcement activity.

134. Further, all of Defendants' violations of duties and rights, and coercive conduct, described herein were volitional acts; none was accidental or merely negligent.

135. Further, each Defendant violated Plaintiffs' and Decedent's rights by their reckless disregard and with the specific intent and purpose to deprive them of their enjoyment of those rights and of the interests protected by those rights.

136. Defendants COUNTY and WELLPATH are vicariously liable for the violation of rights by their employees and agents.

137. As a direct and proximate result of Defendants' violation of California Civil Code § 52.1 and of Decedent's rights under the United States and California Constitutions, Plaintiffs (as successors in interest for Decedent) sustained injuries and damages, and against each and every

Defendant is entitled to relief as set forth above at ¶¶ 119-121, including punitive damages against all individual Defendants and WELLPATH, and all damages allowed by California Civil Code §§ 52 and 52.1 and California law, not limited to costs attorneys' fees, and civil penalties.

**FOURTH CAUSE OF ACTION**
**(Violation of California Government Code § 845.6)**
**AGAINST DEFENDANTS CORTEZ, GRADY, NEVES, AND REMAINING DOES**

138.   Plaintiffs reallege each and every paragraph in this complaint as if fully set forth here.

139.   Defendants CORTEZ, GRADY, NEVES, and REMAINING DOES knew or had reason to know that JOHN ADENA was in need of immediate medical care and treatment, including being transferred for emergency medical care, and each failed to take reasonable action to summon immediate medical care and treatment.  Each such individual defendant, employed by and acting within the course and scope of his/her employment with Defendant COUNTY, knowing and/or having reason to know of JOHN ADENA's need for immediate medical care and treatment, failed to take reasonable action to summon such care and treatment in violation of California Government Code § 845.6.

140.   Defendant COUNTY is vicariously liable for the violations of state law and conduct of their officers, deputies, employees, and agents, including individual named defendants, under California Government Code sections 815.2 and 845.6.

141.   As a direct and proximate result of the aforementioned acts of these Defendants, Plaintiffs and Decedent were injured as set forth above, and their losses entitle Plaintiffs to all damages allowable under California law.  Plaintiffs (individually and as Successors in Interest for Decedent) sustained serious and permanent injuries and is entitled to damages, penalties, costs, and attorney fees under California law as set forth in ¶¶ 119-121, above, including punitive damages against these individual Defendants.

**RELIEF REQUESTED**

1

2          WHEREFORE, Plaintiffs respectfully request the following relief against each and every

3   Defendant herein, jointly and severally:

4          d.    Compensatory and exemplary damages in an amount according to proof and
                 which is fair, just, and reasonable;
5

6          e.    Punitive damages under 42 U.S.C. § 1983 and California law in an amount
                 according to proof and which is fair, just, and reasonable (Plaintiffs do not
7                seek punitive damages against the COUNTY);

8          f.    All other damages, penalties, costs, interest, and attorneys' fees as allowed by
                 42 U.S.C. §§ 1983 and 1988; California Code of Civil Procedure §§ 377.20 et
9                seq., 377.60 et seq., and 1021.5; California Civil Code §§ 52 et seq., 52.1;
                 and as otherwise may be allowed by California and/or federal law;
10

11         g.    Declaratory relief to judicially declare Defendants' violations of Plaintiffs'
                 and Decedent's fundamental rights, and to explicate the law as applied to
12               these facts for purposes of precedent and deterrence.

13         h.    Injunctive relief – including but not limited to reforms of Defendants'
                 policies, practices, training and supervision – according to proof and which is
14               fair, just, and reasonable;
15

16         i.    Such further relief, according to proof, that this Court deems appropriate and
                 lawful.
17

18
                              **JURY DEMAND**
19

20          Plaintiffs hereby demand a jury trial in this action.

21

22   Dated:  August 8, 2024                 HADDAD & SHERWIN LLP

23

24                                          /s/ Michael J. Haddad
                                            _____
25                                          MICHAEL J. HADDAD
                                            Attorneys for Plaintiffs
26

27

28

# EXHIBIT 1

**BEFORE THE**
**BOARD OF REGISTERED NURSING**
**DEPARTMENT OF CONSUMER AFFAIRS**
**STATE OF CALIFORNIA**

In the Matter of the Accusation Against: | Case No. 4002022002298

**AMANDA SUSANNE REAM**
**AKA AMANDA SUSANNE SANDERS**
**AKA AMANDA SUSANNE ANDERSON**

**Registered Nurse License No. 95063717**

Respondent.

## DECISION AND ORDER

The attached Stipulated Settlement and Disciplinary Order is hereby adopted by the Board of Registered Nursing, Department of Consumer Affairs, as its Decision in this matter.

This Decision shall become effective on **July 14, 2023.**

IT IS SO ORDERED **June 14, 2023.**

Dolores Trujillo, RN
Board President
Board of Registered Nursing
Department of Consumer Affairs
State of California

1  ROB BONTA
   Attorney General of California
2  ANDREW M. STEINHEIMER
   Supervising Deputy Attorney General
3  KEVIN W. BELL
   Deputy Attorney General
4  State Bar No. 192063
   1300 I Street, Suite 125
5  P.O. Box 944255
   Sacramento, CA 94244-2550
6   Telephone: (916) 210-7511
    Facsimile: (916) 327-8643
7   E-mail: Kevin.Bell@doj.ca.gov
   *Attorneys for Complainant*

8                         **BEFORE THE**
                **BOARD OF REGISTERED NURSING**
9             **DEPARTMENT OF CONSUMER AFFAIRS**
                    **STATE OF CALIFORNIA**
10

11 | In the Matter of the Accusation Against: | Case No. 4002022002298 |
12 |                                          |                        |
   | **AMANDA SUSANNE REAM**                  | **STIPULATED SETTLEMENT AND** |
13 | **6910 Sacramento Dr.**                  | **DISCIPLINARY ORDER**        |
   | **Redding, CA 96001**                    |                        |
14 |                                          |                        |
   | **Registered Nurse License No. 95063717** |                       |
15 |                                          |                        |
   |                          Respondents.    |                        |
16

17     IT IS HEREBY STIPULATED AND AGREED by and between the parties to the above-

18 entitled proceedings that the following matters are true:

19                              **PARTIES**

20     1.    Loretta Melby, R.N., M.S.N. (Complainant) is the Executive Officer of the Board of

21 Registered Nursing (Board). She brought this action solely in her official capacity and is

22 represented in this matter by Rob Bonta, Attorney General of the State of California, by Kevin W.

23 Bell, Deputy Attorney General.

24     2.    Respondent Amanda Susanne Ream (Respondent) is represented in this proceeding

25 by attorney Paul Cardinale, at 3800 Watt Avenue, Suite 245, Sacramento, CA 95821.

26     3.    On or about June 17, 2015, the Board issued Registered Nurse License No. 95063717

27 to Respondent. The license was in full force and effect at all times relevant to the charges

28 brought in Accusation No. 4002022002298, and will expire on June 30, 2023, unless renewed.

1

## JURISDICTION

4.    Accusation No. 4002022002298 was filed before the Board, and is currently pending against Respondent. The Accusation and all other statutorily required documents were properly served on Respondent on January 30, 2023. Respondent timely filed her Notice of Defense contesting the Accusation.

5.    A copy of Accusation No. 4002022002298 is attached as exhibit A and incorporated herein by reference.

## ADVISEMENT AND WAIVERS

6.    Respondent has carefully read, fully discussed with counsel, and understands the charges and allegations in Accusation No. 4002022002298. Respondent has also carefully read, fully discussed with counsel, and understands the effects of this Stipulated Settlement and Disciplinary Order.

7.    Respondent is fully aware of her legal rights in this matter, including the right to a hearing on the charges and allegations in the Accusation; the right to confront and cross-examine the witnesses against her; the right to present evidence and to testify on her own behalf; the right to the issuance of subpoenas to compel the attendance of witnesses and the production of documents; the right to reconsideration and court review of an adverse decision; and all other rights accorded by the California Administrative Procedure Act and other applicable laws.

8.    Respondent voluntarily, knowingly, and intelligently waives and gives up each and every right set forth above.

## CULPABILITY

9.    Respondent admits the truth of each and every charge and allegation in Accusation No. 4002022002298.

10.    Respondent agrees that her Registered Nurse License is subject to discipline and she agrees to be bound by the Board's probationary terms as set forth in the Disciplinary Order below.

## CONTINGENCY

11.    This stipulation shall be subject to approval by the Board of Registered Nursing. Respondent understands and agrees that counsel for Complainant and the staff of the Board may

2

1  communicate directly with the Board regarding this stipulation and settlement. without notice to
2  or participation by Respondent or her counsel.  By signing the stipulation, Respondent
3  understands and agrees that she may not withdraw her agreement or seek to rescind the stipulation
4  prior to the time the Board considers and acts upon it.  If the Board fails to adopt this stipulation
5  as its Decision and Order, the Stipulated Settlement and Disciplinary Order shall be of no force or
6  effect, except for this paragraph, it shall be inadmissible in any legal action between the parties,
7  and the Board shall not be disqualified from further action by having considered this matter.

8       12.    The parties understand and agree that Portable Document Format (PDF) and facsimile
9  copies of this Stipulated Settlement and Disciplinary Order, including PDF and facsimile
10 signatures thereto, shall have the same force and effect as the originals.

11      13.    This Stipulated Settlement and Disciplinary Order is intended by the parties to be an
12 integrated writing representing the complete, final, and exclusive embodiment of their agreement.
13 It supersedes any and all prior or contemporaneous agreements, understandings, discussions.
14 negotiations, and commitments (written or oral).  This Stipulated Settlement and Disciplinary
15 Order may not be altered, amended, modified, supplemented, or otherwise changed except by a
16 writing executed by an authorized representative of each of the parties.

17      14.    In consideration of the foregoing admissions and stipulations, the parties agree that
18 the Board may, without further notice or formal proceeding, issue and enter the following
19 Disciplinary Order:

20                          **DISCIPLINARY ORDER**

21      IT IS HEREBY ORDERED that Registered Nurse License No. 95063717 issued to
22 Respondent Amanda Susanne Ream is revoked.  However, the revocation is stayed and
23 Respondent is placed on probation for three (3) years on the following conditions.

24      IT IS FURTHER ORDERED that,any new certification(s) issued while Respondent
25 remains on probation shall also be placed on probation subject to the same terms and conditions
26 applicable to Respondent's registered nurse license.

27      **Severability Clause.**  Each condition of probation contained herein is a separate and
28 distinct condition.  If any condition of this Order, or any application thereof, is declared

3

1  unenforceable in whole, in part, or to any extent, the remainder of this Order, and all other

2  applications thereof, shall not be affected. Each condition of this Order shall separately be valid

3  and enforceable to the fullest extent permitted by law.

4      1.   **Obey All Laws.** Respondent shall obey all federal, state and local laws. A full and

5  detailed account of any and all violations of law shall be reported by Respondent to the Board in

6  writing within seventy-two (72) hours of occurrence. To permit monitoring of compliance with

7  this condition, Respondent shall submit completed fingerprint forms and fingerprint fees within

8  45 days of the effective date of the decision, unless previously submitted as part of the licensure

9  application process.

10      **Criminal Court Orders:** If Respondent is under criminal court orders, including

11  probation or parole, and the order is violated, this shall be deemed a violation of these probation

12  conditions, and may result in the filing of an accusation and/or petition to revoke probation.

13      2.   **Comply with the Board's Probation Program.** Respondent shall fully comply with

14  the conditions of the Probation Program established by the Board, and, cooperate with

15  representatives of the Board in its monitoring and investigation of the Respondent's compliance

16  with the Board's Probation Program. Respondent shall inform the Board in writing within no

17  more than 15 days of any address change and shall at all times maintain an active, current license

18  status with the Board, including during any period of suspension. Upon successful completion of

19  probation, Respondent's license shall be fully restored.

20      3.   **Report in Person.** Respondent, during the period of probation, shall appear in

21  person at interviews/meetings as directed by the Board or its designated representatives.

22      4.   **Residency, Practice, or Licensure Outside of State.** Periods of residency or

23  practice as a registered nurse outside of California shall not apply toward a reduction of this

24  probation time period. Respondent's probation is tolled, if and when she resides outside of

25  California. Respondent must provide written notice to the Board within 15 days of any change of

26  residency or practice outside the state, and within 30 days prior to re-establishing residency or

27  returning to practice in this state.

28      Respondent shall provide a list of all states and territories where she has ever been licensed

4

as a registered nurse, vocational nurse, or practical nurse.  Respondent shall further provide information regarding the status of each license and any changes in such license status during the term of probation.  Respondent shall inform the Board if she applies for or obtains a new nursing license during the term of probation.

5.  **Submit Written Reports.** Respondent, during the period of probation, shall submit or cause to be submitted such written reports/declarations and verification of actions under penalty of perjury, as required by the Board.  These reports/declarations shall contain statements relative to Respondent's compliance with all the conditions of the Board's Probation Program.  Respondent shall immediately execute all release of information forms as may be required by the Board or its representatives.

Respondent shall provide a copy of this Decision to the nursing regulatory agency in every state and territory in which she has a registered nurse license.

6.  **Function as a Registered Nurse.** Respondent, during the period of probation, shall engage in the practice of registered nursing in California for a minimum of 24 hours per week for 6 consecutive months or as determined by the Board.

For purposes of compliance with the section, "engage in the practice of registered nursing" may include, when approved by the Board, volunteer work as a registered nurse, or work in any non-direct patient care position that requires licensure as a registered nurse.

The Board may require that advanced practice nurses engage in advanced practice nursing for a minimum of 24 hours per week for 6 consecutive months or as determined by the Board.

If Respondent has not complied with this condition during the probationary term, and Respondent has presented sufficient documentation of her good faith efforts to comply with this condition, and if no other conditions have been violated, the Board, in its discretion, may grant an extension of Respondent's probation period up to one year without further hearing in order to comply with this condition.  During the one year extension, all original conditions of probation shall apply.

7.  **Employment Approval and Reporting Requirements.** Respondent shall obtain prior approval from the Board before commencing or continuing any employment, paid or

5

1    voluntary, as a registered nurse. Respondent shall cause to be submitted to the Board all

2    performance evaluations and other employment related reports as a registered nurse upon request

3    of the Board.

4        Respondent shall provide a copy of this Decision to her employer and immediate

5    supervisors prior to commencement of any nursing or other health care related employment.

6        In addition to the above, Respondent shall notify the Board in writing within seventy-two

7    (72) hours after she obtains any nursing or other health care related employment. Respondent

8    shall notify the Board in writing within seventy-two (72) hours after she is terminated or

9    separated, regardless of cause, from any nursing, or other health care related employment with a

10    full explanation of the circumstances surrounding the termination or separation.

11        8.    **Supervision.** Respondent shall obtain prior approval from the Board regarding

12    Respondent's level of supervision and/or collaboration before commencing or continuing any

13    employment as a registered nurse, or education and training that includes patient care.

14        Respondent shall practice only under the direct supervision of a registered nurse in good

15    standing (no current discipline) with the Board, unless alternative methods of supervision and/or

16    collaboration (e.g., with an advanced practice nurse or physician) are approved.

17        Respondent's level of supervision and/or collaboration may include, but is not limited to the

18    following:

19        (a)    Maximum - The individual providing supervision and/or collaboration is present in

20    the patient care area or in any other work setting at all times.

21        (b)    Moderate - The individual providing supervision and/or collaboration is in the patient

22    care unit or in any other work setting at least half the hours Respondent works.

23        (c)    Minimum - The individual providing supervision and/or collaboration has person-to-

24    person communication with Respondent at least twice during each shift worked.

25        (d)    Home Health Care - If Respondent is approved to work in the home health care

26    setting, the individual providing supervision and/or collaboration shall have person-to-person

27    communication with Respondent as required by the Board each work day. Respondent shall

28    maintain telephone or other telecommunication contact with the individual providing supervision

and/or collaboration as required by the Board during each work day. The individual providing supervision and/or collaboration shall conduct, as required by the Board, periodic, on-site visits to patients' homes visited by Respondent with or without Respondent present.

9.  **Employment Limitations.** Respondent shall not work for a nurse's registry, in any private duty position as a registered nurse, a temporary nurse placement agency, a traveling nurse, or for an in-house nursing pool.

Respondent shall not work for a licensed home health agency as a visiting nurse unless the registered nursing supervision and other protections for home visits have been approved by the Board. Respondent shall not work in any other registered nursing occupation where home visits are required.

Respondent shall not work in any health care setting as a supervisor of registered nurses. The Board may additionally restrict Respondent from supervising licensed vocational nurses and/or unlicensed assistive personnel on a case-by-case basis.

Respondent shall not work as a faculty member in an approved school of nursing or as an instructor in a Board approved continuing education program.

Respondent shall work only on a regularly assigned, identified and predetermined worksite(s) and shall not work in a float capacity.

If Respondent is working or intends to work in excess of 40 hours per week, the Board may request documentation to determine whether there should be restrictions on the hours of work.

10.  **Complete a Nursing Course(s).** Respondent, at her own expense, shall enroll in and successfully complete a course(s) relevant to the practice of registered nursing no later than six months prior to the end of her probationary term.

Respondent shall obtain prior approval from the Board before enrolling in the course(s). Respondent shall submit to the Board the original transcripts or certificates of completion for the above required course(s). The Board shall return the original documents to Respondent after photocopying them for its records.

11.  **Cost Recovery.** Respondent shall pay to the Board costs associated with its investigation and enforcement pursuant to Business and Professions Code section 125 3 in the

7.

1  amount of **$7,957.64.** Respondent shall be permitted to pay these costs in a payment plan

2  approved by the Board, with payments to be completed no later than three months prior to the end

3  of the probation term.

4       If Respondent has not complied with this condition during the probationary term, and

5  Respondent has presented sufficient documentation of her good faith efforts to comply with this

6  condition, and if no other conditions have been violated, the Board, in its discretion, may grant an

7  extension of Respondent's probation period up to one year without further hearing in order to

8  comply with this condition. During the one year extension, all original conditions of probation

9  will apply.

10       12.    **Violation of Probation.**  If Respondent violates the conditions of her probation, the

11  Board after giving Respondent notice and an opportunity to be heard, may set aside the stay order

12  and impose the stayed discipline (revocation/suspension) of Respondent's license.

13       If during the period of probation, an accusation or petition to revoke probation has been

14  filed against Respondent's license or the Attorney General's Office has been requested to prepare

15  an accusation or petition to revoke probation against Respondent's license, the probationary

16  period shall automatically be extended and shall not expire until the accusation or petition has

17  been acted upon by the Board.

18       13.    **License Surrender.**  During Respondent's term of probation, if she ceases practicing

19  due to retirement, health reasons or is otherwise unable to satisfy the conditions of probation,

20  Respondent may surrender her license to the Board. The Board reserves the right to evaluate

21  Respondent's request and to exercise its discretion whether to grant the request, or to take any

22  other action deemed appropriate and reasonable under the circumstances, without further hearing.

23  Upon formal acceptance of the surrendered license, Respondent will no longer be subject to the

24  conditions of probation.

25       Surrender of Respondent's license shall be considered a disciplinary action and shall

26  become a part of Respondent's license history with the Board. A registered nurse whose license

27  has been surrendered may petition the Board for reinstatement no sooner than the following

28  minimum periods from the effective date of the disciplinary decision:

8

1      (1)     Two years for reinstatement of a license that was surrendered for any reason other

2    than a mental or physical illness; or

3      (2)     One year for a license surrendered for a mental or physical illness.

4      14.    **Therapy or Counseling Program.**  Respondent, at her expense, shall participate in

5    an on-going counseling program until such time as the Board releases her from this requirement

6    and only upon the recommendation of the counselor.  Written progress reports from the counselor

7    will be required at various intervals.

8    <u>**ACCEPTANCE**</u>

9    I have carefully read the above Stipulated Settlement and Disciplinary Order and have fully

10   discussed it with my attorney, Paul Cardinale.  I understand the stipulation and the effect it will

11   have on my Registered Nurse License.  I enter into this Stipulated Settlement and Disciplinary

12   Order voluntarily, knowingly, and intelligently, and agree to be bound by the Decision and Order

13   of the Board of Registered Nursing.

14

15   DATED:  3\10\23 _____

16                    AMANDA SUSANNE REAM
                      *Respondent*

17   I have read and fully discussed with Respondent Amanda Susanne Ream the terms and

18   conditions and other matters contained in the above Stipulated Settlement and Disciplinary Order.

19   I approve its form and content.

20

21   DATED:  . March 13, 2023 _____

22                    PAUL CARDINALE
                    *Attorney for Respondent*

23

24   *III*

25   *III*

26   *III*

27   */ / /*

28   */ / /*

9

1  **ENDORSEMENT**

2      The foregoing Stipulated Settlement and Disciplinary Order is hereby respectfully

3  submitted for consideration by the Board of Registered Nursing.

4      DATED:   __4/13/2023__                Respectfully submitted,

5

6                                                 ROB BONTA
                                               Attorney General of California
                                               ANDREW M. STEINHEIMER
                                               Supervising Deputy Attorney General

7

8                                                 *Kevin W. Bell*

9                                                 KEVIN W. BELL
                                             Deputy Attorney General

10                                                 *Attorneys for Complainant*

11

12

13

14  SA2022304471
   Ream Settlement II.docx

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STIPULATED SETTLEMENT (4002022002298)

**Exhibit A**

Accusation No. 4002022002298

1  ROB BONTA
   Attorney General of California
2  ANDREW M. STEINHEIMER
   Supervising Deputy Attorney General
3  KEVIN W. BELL
   Deputy Attorney General
4  State Bar No. 192063
   1300 I Street, Suite 125
5  P.O. Box 944255
   Sacramento, CA 94244-2550
6   Telephone: (916) 210-7511
    Facsimile: (916) 327-8643
7  *Attorneys for Complainant*

8                       BEFORE THE
               **BOARD OF REGISTERED NURSING**
9              **DEPARTMENT OF CONSUMER AFFAIRS**
                    **STATE OF CALIFORNIA**
10

11  In the Matter of the Accusation Against:        Case No. 4002022002298

12  **AMANDA SUSANNE REAM**
    6910 Sacramento Dr.
13  Redding, CA 96001                              **ACCUSATION**

14  **Registered Nurse License No. 95063717**

15                                  Respondents.

16

17                              **PARTIES**

18      1.    Loretta Melby, R.N., M.S.N. (Complainant) brings this Accusation solely in her

19  official capacity as the Executive Officer of the Board of Registered Nursing (Board),

20  Department of Consumer Affairs.

21      2.    On or about June 17, 2015, the Board issued Registered Nurse License

22  Number 95063717 to Amanda Susanne Ream (Respondents). The Registered Nurse License was

23  in full force and effect at all times relevant to the charges brought herein and will expire on

24  June 30, 2023, unless renewed.

25                             **JURISDICTION**

26      3.    This Accusation is brought before the Board of Registered Nursing (Board), under the

27  authority of the following laws. All section references are to the Business and Professions Code

28  (Code) unless otherwise indicated.

                                    1

1    4.    Code section 2750 provides, in pertinent part, that the Board may discipline any

2    licensee, including a licensee holding a temporary or an inactive license, for any reason provided

3    in Article 3 (commencing with section 2750) of the Nursing Practice Act.

4    5.    Code section 2764 provides, in pertinent part, that the expiration of a license shall not

5    deprive the Board of jurisdiction to proceed with a disciplinary proceeding against the licensee or

6    to render a decision imposing discipline on the license.

7                              **STATUTORY PROVISIONS**

8    6.    Code section 2761 states, in pertinent part:

9          The board may take disciplinary action against a certified or licensed nurse or
      deny an application for a certificate or license for any of the following:
10

11         (a) Unprofessional conduct, which includes, but is not limited to, the
      following:

12         (1) Incompetence, or gross negligence in carrying out usual certified or
      licensed nursing functions.
13

14         . . .

15                              **REGULATORY PROVISIONS**

16    7.    California Code of Regulations, title 16, section 1442, states:

17         As used in Section 2761 of the code, "gross negligence" includes an extreme
      departure from the standard of care which, under similar circumstances, would have
18    ordinarily been exercised by a competent registered nurse. Such an extreme departure
      means the repeated failure to provide nursing care as required or failure to provide
19    care or to exercise ordinary precaution in a single situation which the nurse knew, or
      should have known, could have jeopardized the client's health or life.
20

21    8.    California Code of Regulations, title 16, section 1443, states:

22         As used in Section 2761 of the code, "incompetence" means the lack of
      possession of or the failure to exercise that degree of learning, skill, care and
23    experience ordinarily possessed and exercised by a competent registered nurse as
      described in Section 1443.5.

24    9.    California Code of Regulations, title 16, section 1443.5 states:

25         A registered nurse shall be considered to be competent when he/she
      consistently demonstrates the ability to transfer scientific knowledge from social,
26    biological and physical sciences in applying the nursing process, as follows:

27         (1) Formulates a nursing diagnosis through observation of the client's physical
      condition and behavior, and through interpretation of information obtained from the
28    client and others, including the health team.

                                      2

1        (2) Formulates a care plan, in collaboration with the client, which ensures that direct and indirect nursing care services provide for the client's safety, comfort,

2  hygiene, and protection, and for disease prevention and restorative measures.

3        (3) Performs skills essential to the kind of nursing action to be taken, explains the health treatment to the client and family and teaches the client and family how to

4  care for the client's health needs.

5        (4) Delegates tasks to subordinates based on the legal scopes of practice of the subordinates and on the preparation and capability needed in the tasks to be

6  delegated, and effectively supervises nursing care being given by subordinates.

7        (5) Evaluates the effectiveness of the care plan through observation of the client's physical condition and behavior, signs and symptoms of illness, and reactions

8  to treatment and through communication with the client and health team members, and modifies the plan as needed.

9

10        (6) Acts as the client's advocate, as circumstances require, by initiating action to improve health care or to change decisions or activities which are against the interests or wishes of the client, and by giving the client the opportunity to make

11  informed decisions about health care before it is provided.

12                 **COST RECOVERY**

13     10.  Code section 125.3 provides, in pertinent part, that the Board may request the

14  administrative law judge to direct a licentiate found to have committed a violation or violations of

15  the licensing act to pay a sum not to exceed the reasonable costs of the investigation and

16  enforcement of the case, with failure of the licentiate to comply subjecting the license to not being

17  renewed or reinstated. If a case settles, recovery of investigation and enforcement costs may be

18  included in a stipulated settlement.

19               **FACTUAL ALLEGATIONS**

20     11.  At all times mentioned herein, Respondent was employed by Wellpath[1] located in

21  San Diego, for Shasta County jail ("jail") as a registered nurse. Respondent was the intake nurse

22  at the jail assigned to conduct the receiving medical triage screening for arrestees for initial

23  booking/admission into the jail.

24     12.  Wellpath policy requires the completion of an intake medical screening assessment to

25  document an extensive nursing evaluation that requires all questions to be asked and documented,

26  to include, but is not limited to, the following: the patient's history of drug or alcohol use; type

27  and amount used; frequency of use; most recent use of drugs or alcohol; the patient's history of

28     [1] Medical contractor for Shasta County jail.

(AMANDA SUSANNE REAM) ACCUSATION

1   withdrawal; whether the patient placed any drugs into a body cavity; the patient's mental health

2   and psychiatric hospitalization history; and, the patient's history of suicide attempts.

3       13.   On or about August 14, 2018, M.J., was arrested for being under the influence of

4   methamphetamine in public. When M.J. was transported to the Shasta County jail, he arrived

5   wearing only his underwear, socks and shoes with feces on his underwear, up his back and on his

6   arms. Respondent was informed by the arresting officer that M.J. had attempted to commit

7   suicide by partially injecting methamphetamine into his system as well as ingest

8   methamphetamine anally. Respondent was also informed by the arresting officer that for the past

9   three (3) days M.J. had constantly taken methamphetamine to kill himself.

10      14.   On the digital Medical Intake Triage/Receiving Screening questionnaire for M.J.,

11   Respondent documented the following: his heart rate and blood pressure were elevated, he had a

12   history of high blood pressure and heart disease; he had a history of drug use; he had no history of

13   drug withdrawal; he was dirty, disheveled, and depressed; he had rapid speech, inappropriate

14   activity with outbursts of unusual statements; he was incontinent with stool; and he tried to

15   commit suicide with $100 worth of methamphetamine with a notation that M.J. was clearly under

16   the influence of a substantial amount of methamphetamine. Contradictory to the information

17   Respondent received, Respondent answered "no" to the question of whether M.J. had ingested or

18   placed any drugs into a body cavity.

19      15.   During the intake screening assessment with M.J., Respondent did not thoroughly

20   complete the digital Medical Intake Triage/Receiving Screening questionnaire or ask all the

21   required questions; she inaccurately documented that questions were asked during the intake

22   screening assessment when they were not asked; and she did not contact a physician or midlevel

23   practitioner regarding M.J.'s clinical presentation, as required by Wellpath policy. Specifically,

24   Respondent failed to ask M.J. the type, route, frequency and last use of methamphetamine.

25   Respondent documented "no" to the questions of M.J.'s history of drug or alcohol use or

26   withdrawal or history of suicide attempts, even though she did not ask those specific questions to

27   M.J. Respondent also documented "no" to the question of whether M.J. had any prior driving

28   under the influences.

<center>4</center>

16.   Upon completion of Respondent's assessment with M.J., she did not send him to the hospital for further evaluation. Instead, Respondent medically cleared M.J. to be admitted to the jail. Respondent documented on the digital Medical Intake Triage/Receiving Screening questionnaire for suicide watch and placed M.J. in a sobering and safety cell, but M.J. was not given a suicide level and he was not placed on constant (24/7) observation.

17.   On or about August 16, 2018, M.J. died at Shasta County jail of toxic effects of methamphetamine.

18.   In an interview with a Board investigator, Respondent admitted that some of the information on the digital Medical Intake Triage/Receiving Screening questionnaire was intentionally left blank for questions that had already been asked and documented by the arresting officer. Respondent admitted that she may have incorrectly clicked the incorrect buttons when answering the questions on the digital Medical Intake Triage/Receiving Screening questionnaire; that she forgot to place a referral for a medical provider to see M.J.; and, that she incorrectly entered that M.J. had not had a charge of driving under the influence when, in fact, M.J. admitted that he had a conviction for driving under the influence in the past.

### FIRST CAUSE FOR DISCIPLINE

### (Gross Negligence)

19.   Respondent is subject to disciplinary action under Code section 2761, subdivision (a)(1), on the grounds of unprofessional conduct, in that on or about August 14, 2018, while a registered nurse at Shasta County jail, she was grossly negligence within the meaning of California Code of Regulations, title 16, section 1442, when she engaged in activities that constitute an extreme departure from the standard of care for a registered nurse, as follows:

a.   Respondent failed to follow Wellpath's policy regarding receiving screening in the assessment of M.J. upon arrival at the jail when she failed to refer M.J. to the emergency room for evaluation and clearance for displaying signs of acute drug withdrawal.

b.   Respondent failed to follow Wellpath's suicide prevention program policy in that M.J. was acutely suicidal per the policy's definition and he should have been placed on

5

1   24 hours a day, 7 days a week observation at the facility or in the alternative, transferred

2   M.J to the hospital for a higher level of care, if the facility could not provide the proper

3   supervision.; and,

4           c.     Respondent failed to follow Wellpath's policy regarding chronic care, special

5   needs and services for a medical follow up. Respondent failed to place a referral for a

6   medical provider to see M.J. by failing to note "routine chronic care," "next provider sick

7   call," "mental health emergent/crisis," or "next mental health clinic" on the digital Medical

8   Intake Triage/Receiving Screening questionnaire.

9   <center>**SECOND CAUSE FOR DISCIPLINE**</center>

10  <center>**(Incompetence)**</center>

11      20.    Respondent is subject to disciplinary action under Code section 2761,

12  subdivision (a)(1), on the grounds of unprofessional conduct, in that on or about August 14, 2018,

13  while a registered nurse at Shasta County jail, she was incompetent within the meaning of

14  California Code of Regulations, title 16, section 1443, when she failed to exercise the degree of

15  learning, skill, care and experience of a registered nurse, as more particularly set forth above in

16  subparagraphs (a), (b), and (c) of paragraph 19, and incorporated here by reference.

17  <center>**THIRD CAUSE FOR DISCIPLINE**</center>

18  <center>**(Unprofessional Conduct)**</center>

19      21.    Respondent is subject to disciplinary action under Code section 2761, subdivision (a),

20  in that on or about August 14, 2018, while a registered nurse at Shasta County jail, she committed

21  acts that constitute unprofessional conduct, as more particularly set forth above in subparagraphs

22  (a), (b), and (c) of paragraph 19 and paragraph 20, and incorporated here by reference.

23  <center>**PRAYER**</center>

24      **WHEREFORE**, Complainant requests that a hearing be held on the matters herein alleged,

25  and that following the hearing, the Board issue a decision:

26      1.    Revoking or suspending Registered Nurse License Number 95063717, issued to

27  Amanda Susanne Ream;

28  ///

<center>6</center>

1      2.      Ordering Amanda Susanne Ream to pay the Board the reasonable costs of the

2  investigation and enforcement of this case, pursuant to Code section 125.3; and,

3      3.      Taking such other and further action as deemed necessary and proper.

4

5  DATED:  January 24, 2023

6                                              for  LORETTA MELBY, R.N., M.S.N.
                                                    Executive Officer
7                                                   Board of Registered Nursing
                                                    Department of Consumer Affairs
8                                                   State of California
                                                    *Complainant*
9

10  SA2022304471
11  36747159.docx

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                           7

# EXHIBIT 2

## AUTOPSY PHOTOS





**011**



014



**041**



**042**



046



**051**



**052**



**054**



**062**



**063**



**074**



**076**



**089**



090



**091**



**092**



093



097



098



099



**100**



101





103







**113**



**114**



**116**